

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 1 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOEL FLORES, Individually and<br>On Behalf of All Others Similarly Situated | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| VS | : | |
| | : | CIVIL ACTION NO. B-00-053 |
| CERTUS HEALTH CARE, L.L.C.,<br>NOVOPHARM LIMITED,<br>and NOVOPHARM HOLDINGS, INC. | : | |
| | : | |
| **Defendants** | : | |

## CERTUS HEALTHCARE, L.L.C.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW CERTUS HEALTHCARE, L.L.C., a Defendant in the above-styled and numbered cause, and submits this brief in Opposition to Plaintiff's Motion for Class Certification, and would respectfully urge the Court to consider the following matters:

I.

### THE PUTATIVE CLASS

Plaintiff and Intervenor seek an order certifying a class defined as :

> All policyholders, beneficiaries and members of any health insurance plan or HMO from Certus Healthcare, L.L.C. from May 29, 1998 to November 2, 1999.

Plaintiff and Intervenor seek to have this group divided into two smaller subclasses - (1) Erisa plan members and (2) Non-Erisa plan members. Plaintiff and Intervenor identify the measure of damages sought as "the difference in value between the policies that Certus promised and the

policies that it actually delivered." (Plaintiff's First Amended Complaint, § 3.1). Plaintiff argues that this case can be tried on a class wide basis because there is no need of evidence from individual class members regarding reliance or damages. (Plaintiff's Motion for Class Certification, p. 3).

II.

## STATEMENT OF FACTS

Certus Healthcare, L.L.C., was a health maintenance organization that provided health insurance plans to individuals, employers, and governmental entities in South Texas during the pertinent period of the time. During that period, Certus had over 24,000 members covered under various different types of plans. (Deposition of David Rodriguez, pp. 99-102, 133-34). Plaintiff admits there were several different individuals and group plans marketed by Certus. (Plaintiff's Responses to Defendant Novopharm Holding's Requests for Admission, Nos. 29-31). Plaintiff alleges that due to financial problems, Certus was unable to timely pay medical claims submitted by or on behalf of plan members, resulting in the refusal of many health care providers to accept Certus insurance. (Plaintiff's First Amended Complaint, § 4.1).

Plaintiff alleges that during this time frame, Certus used marketing materials that falsely represented its financial condition. (Plaintiff's First Amended Complaint §§ 4.74-4.80). Plaintiff also alleges that Certus intentionally understated its losses to the Texas Department of Insurance, thereby deceiving the agency into allowing Certus to continue operations. (Plaintiff's First Amended Complaint §§ 4.81-4.86).

Plaintiff filed this lawsuit on behalf of himself and the putative class against Certus and other Defendants, asserting the following claim on behalf of all putative class members:

(1)     an action pursuant to the *Racketeer Influenced and Corrupt Organization Act, 18, U.S.C. § 1964*, for Defendant's conduct constituting mail fraud and wire fraud.

Plaintiff also asserts the following claims on behalf of the Non-Erisa subclass only:

(1)     breach of contract;

(2)     violation of the *Texas Deceptive Trade Practices Act, V.T.C.A, Bus & Comm. Code §§ 17.46(a), 17.46(b)(5), 17.46 (b)(7), 17.46(b)(9), and 17.46(b)(23);*

(3)     violation of the *Texas Insurance Code, Article 21.21, Sections 4(1), 4(2), 4(5), and 4(11);*

(4)     common law fraud;

(5)     negligent misrepresentation; and

(6)     breach of contract between the Texas Department of Insurance and Certus.

(Plaintiff's First Amended Complaint, pp. 17-23).   For the reasons set forth below, Defendant maintains that certification of the putative class would be improper.

III.

## STANDARDS FOR CERTIFICATION

Rule 23 of the Federal Rules of Civil Procedure establishes the procedural framework for determining the propriety of conducting any litigation as a class action.   "A class action is not maintainable as a class by virtue of its designation as such in the pleadings."   *In re American Med. Sys., Inc. 75 F.3d 1069, 1079 (6th Cir. 1996).*   A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class.   *General Tel. Co. v. Falcon, 457 U.S. 147, 161, 102 S.Ct 2364, 2372, 72 L.Ed.2d 740 (1982); Applewhite v. Reichhold Chems., 67 F.3d 571, 573 (5th Cir. 1995).*   The decision to certify is within the broad discretion of the Court, but that discretion must be exercised within the framework of rule 23.   *Gulf Oil v. Bernard, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981).*   The party seeking certification bears the burden of proof.   *Horton v. Goose Creek Ind. Sch. Dist., 690 F.2d 470, 486 (5th Cir, 1982), cert. denied, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).*

A district court certainly may look past the pleadings to determine whether the requirements of Rule 23 have been met. *Castano v. American Tobacco Co., 84 F.3rd 734, 744 (5th Cir. 1996)*. *See also Falcon, 457 U.S. at 160, 102 S.Ct. At 2372* ("sometimes the issues are plain enough from the pleadings ... and sometimes it may be necessary for the Court to probe behind the pleadings before coming to rest on the certification question."); *Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)* (reasoning that "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."). Going beyond the pleadings is necessary, as a Court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Castano, 84 F.3d at 744, citing MANUAL FOR COMPLEX LITIGATION § 30.11 (3d ed. 1995)*.

Rule 23(a) sets forth the threshold criteria for class certification, stating:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representatives are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to the four criteria of Rule 23(a), the proponent of class certification must satisfy the requirements of at least one section of Rule 23(b). In this case, Plaintiff seeks certification of a class pursuant to Rule 23(b)(3), which permits the class certification when, in addition to meeting the requirements of Rule 23(a):

> the Court finds that the questions of law common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Defendant maintains that Plaintiff and Intervenor fail to meet the requirements of typicality and fair representation of Rule 23(a) and the predominance and superiority criteria of Rule 23(b).

## IV.

## TYPICALITY

To determine typicality, the trial court is required to make a comparison of the claims and defenses of the named plaintiff with the claims and defenses of the members of the putative class. *Pistoll v Lynch, 96 F.R.D. 22, 26 (D. Haw. 1982).* To be typical, the named Plaintiff's claims must arise from the same event or course of conduct giving rise to the claims of the other class members, and must be based on the same legal theory. *In Re United Energy Corp., Etc. Securities, Lit., 122 F.R.D. 251, 256 (C.D. Cal. 1988).* As the Supreme Court stated, "we have repeatedly held that a class representative must be part of the class and possess the same interests and suffer the same injury as the class member." *Falcon, 457 U.S. at 156, 102 S. Ct. at 2370, citing East Texas Motor Freight Sys. v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896.* The presence of even an arguable defense peculiar to a named plaintiff or a small subset of the plaintiff class destroys the typicality of the class. *J. H. Cohn & Co. v. American Appraisal Assoc., Inc., 628 F. 2d 994, 999 (7th Cir. 1980).*

As Plaintiffs have defined their putative class, it is easy to identify groups within the class that would likely have divergent interests.   Within the of group persons and entities who obtained health insurance plans from Certus, one can find:

- private individuals;
- employers, on behalf of employees;
- governmental employers, on behalf of employees.

In turn, each of the individuals in these groups would necessarily fall into one of the following categories:

- plan members who never sought medical services during the coverage period;

- plan members who were never denied any medical service during the coverage period, saw their provider of choice on every medical service visit, and had all claims promptly paid;

- plan members who were seen by a medical provider other than one of their choice because of the provider not honoring its contract with Certus because of Certus' failure to timely pay claims, but who incurred no out-of-pocket losses;

- plan members who incurred direct out-of-pocket losses as a result of a medical provider's refusal to accept Certus insurance because of its failure to timely pay claims;

- plan members who were unable to secure necessary medical services as a direct result of the non-acceptance of their Certus insurance by medical providers due to Certus' failure to timely pay claims.

Plaintiff and Intervenor, Mr. Joel Flores and Ms. Monica Blount, are attempting to represent all of the groups described above, yet they belong only to one. Mr. Flores' son was covered by Certus plan for about two weeks. (Deposition of Joel Flores, p. 114). Mr. Flores heard about Certus insurance from the intervenor, Ms. Monica Blount. (Deposition of Joel Flores, p. 7) Although he saw a couple of Certus brochures, he recalls nothing about their content. (Deposition of Joel Flores, p. 16). He spoke with an agent named David Pena prior to purchasing coverage for his son. (Deposition of Joel Flores, p. 15, 17, 19-20, Ex. 1, 5). The policy became effective on February 15, 1999 and on February 22, Plaintiff took his son to Dr. Montalvo. (Deposition of Joel Flores, p. 52). Dr. Montalvo gave him a prescription for two drugs and a delivery device called nebulizer which is available without a prescription from a doctor. Flores attempted to fill the prescription at Autrey's Pharmacy, but they would not accept Certus Insurance. (Deposition of Joel Flores, p. 58). From there, Plaintiff went to an H. E. B. pharmacy, where the prescription was filled except for the nebulizer, Pulmo-Aide. (Deposition of Joel Flores, p. 58-60). Certus insurance was accepted at H.E.B. According to Plaintiff, Mr. Pena had specifically told him that Plaintiff's

plan covered this type of equipment. (Deposition of Joel Flores, p. 60-61). Despite the exclusion of durable medical equipment from the coverage plan, Plaintiff claims that he relied upon Mr. Pena's representations to the contrary. (Deposition of Joel Flores, p. 62-63). That is the basis of this Plaintiff's claim. (Deposition of Joel Flores, p. 65). The only disputed benefit that Plaintiff did not get before he cancelled his son's policy of two weeks was the durable medical device known as a nebulizer. (Deposition of Joel Flores, p. 147-150). The policy clearly excludes things that do not require a prescription. (Deposition of Joel Flores, Ex 17. ).

Ms. Blount learned of Certus insurance through a radio advertisement. (Deposition of Monica Blount, p. 9). After speaking with a sales representative, she purchased coverage for her two daughters. (Deposition of Monica Blount, p 12). She purchased Certus insurance because it was cheaper than her apparent options. (Deposition of Monica Blount, p. 14). Ms. Blount was satisfied enough with Certus that Ms. Blount renewed the coverage after the first year and even recommended it to Plaintiff, Joel Flores. (Deposition of Monica Blount, pp. 17-19). During the year and a half of coverage, her children were seen and treated by the physicians of her choice, with the charges paid by Certus. (Deposition of Monica Blount, p. 55). Her children were never denied any services. (Deposition of Monica Blount, p. 55). Although Plaintiff was once turned away from a Walgreens pharmacy and had to go to H. E. B, she has come to learn that Walgreens was not on Certus' list of providers. (Deposition of Monica Blount, p. 55, 78-79). After cancelling her Certus policy, Plaintiff brought even cheaper coverage for about two years. (Deposition of Monica Blount, p. 82-83).

Already key differences in the claims of the two proposed class representatives themselves are apparent. Ms. Blount, relying upon little more that a radio advertisement and her own cost analysis, purchased coverage for a year, was satisfied enough to renew it and recommend it to

others, and voluntarily cancelled her policy after being denied no benefits whatsoever.  Mr. Flores, who had coverage for about two weeks only, received one and a half times his $60.00 premium in paid benefits, (i.e., Dr. Montalvo's fee and the purchase price of the prescribed drugs).  His dispute centers primarily around the verbal representations made by the sales representatives regarding coverage for medical equipment such as nebulizers.  That particular claim is absolutely individual, bearing no common relationship to the putative class.  Neither of these Plaintiffs have any demonstrable actual damages which one would expect to find among plan members who were denied necessary medical services as a result of the alleged non-payment of claims by Certus.  This fact alone violates the "same injury" requirement quoted by the Supreme Court in *Falcon, 457 U.S. at 156, 102 S. Ct. at 2370*.  Additionally, Ms. Blount was perfectly satisfied with the Certus coverage until the time when Dr. Thelma Gonzalez allegedly called her and told her that Certus was not paying.  (Deposition of Monica Blount, pp. 54-56) Ms. Blount cancelled the policy without determining whether Dr. Gonzalez had not been paid.  (Deposition of Monica Blount, p. 56) The documentary evidence establishes that Dr. Gonzalez was full and timely paid. (Deposition of Monica Blount, p. 55) These circumstances present potential defenses that are peculiar or specific to Ms. Blount's claim.  The potential defenses to Mr. Flores' misrepresentation claim are also specific to his claim.  Under these circumstances, the requisite typicality cannot be established.

V.

## ADEQUACY OF REPRESENTATION

Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class."  To meet this requirement, two elements must be satisfied: (1) concerns regarding the qualifications of counsel and (2) concerns regarding "the relationship

between the interests of the class representatives and the interests of other class members."

*Jenkins v. Raymark Indus., Inc., 109 F.R.D. 269, 273 (E.D. Tex. 1985), aff'd, 782 F.2d 468 (5th Cir. 1986).* The Court must be sure there is an absence of conflict and be assured vigorous prosecution. 1 NEWBERG ON CLASS ACTIONS § 3.22 AT 3-126. Certus does not challenge the qualifications of counsel; however, it questions the relationship between the interest of the class representatives and the putative class members.

Plaintiff had coverage for about two weeks. He paid $60.01 in premiums, and he received over $94.00 in benefits. He claims that the sales representative made a specific representation to him regarding coverage for medical equipment that was actually excluded by the contract language. In this action, Plaintiff is willing to limit his recovery of damages to the difference in value between the policy as represented and as received. If Flores' view of the facts was accepted, the cost of the nebulizer would seem to be a clear item of damages.

Intervenor had Certus coverage for about a year and a half for her two daughters. During that time which they were never denied a benefit provided by the contract, nor were they ever denied any desired medical attention by a doctor of their choice. Since Intervenor sustained no out-of-pocket losses, no mental anguish damages, and no consequential damages, Intervenor limits her damages in this action to the difference in the value of the policy as represented compared to as actually received. In Intervenor's case, that particular measure of damages, if appropriate, requires a determination of when the damages are to be measured since the coverage existed for one full year before she voluntarily renewed it and then existed for another six months without any denial of benefits before she voluntarily cancelled it.

Plaintiff and Intervenor, in their efforts to convince the Court to certify the putative class, voluntarily limit the measure of damages to one basis or format to create the illusion of a

seamless, united class, while in fact the opposite is true. Plaintiff and Intervenor seek to maximize

their own recovery by adopting this singular measure of damages because they, as individuals,

have no other potentially viable measure of damages. In doing so, they have ignored the interests

of all of those putative class members who may have incurred direct and substantial out-of-pocket

losses, who may have been denied necessary medical attention, who may have suffered

compensable mental anguish, or who may have incurred other related economic losses as a

result of the alleged wrongful conduct of Certus. As set forth by the Fifth Circuit in *Mullen v.*

*Treasure Chest Casino, L.L.C., 186 F.3d 620, 625-26 (5th Cir. 1999)* "differences between named

plaintiffs and class members render the named plaintiffs inadequate representatives only if those

differences create conflicts between the named plaintiffs' interests and the class members'

interests." Given their enormous conflict of interest with potential class members, Plaintiff and

Intervenor fail to meet the adequacy of representation standard for class certification. *See*

*Johnson v. United States of America, 2001 U.S. Dist. LEXIS 1100 (W.D. Tex. 2001)*(holding the

adequacy of representation requirement was not fulfilled because the interest of the Plaintiffs in

limiting damages to stay within the jurisdiction of the district court did not achieve the maximum

possible recovery for each class member). In the present case, Plaintiff and Intervenor have

punctured their damage theory to the detriment of any class members who actually lost any money

or service choices.

## VI.

## PREDOMINANCE AND SUPERIORITY

As noted earlier, Plaintiff and Intervenor bear the burden of establishing the elements of

Rule 23(b)(3), which is the provision pursuant to which they move for class certification. The two

requirements of Rule 23(b)(3) are "predominance" and "superiority". The United States Supreme

Court recognized that, "common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615, 117 S.Ct. 2231, 2246, 138, L.Ed.2d 689 (1997).*

Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues "predominate" over individual issues. *Neely v. Ethicon, Inc., 2001 U.S. Dist. LEXIS 15599, 17 (E.D. Tex. 2001), citing 1 HEBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3.10, AT 3-56 (3d. ed. 1992).* In order for common issues to predominate they must constitute a significant part of the individual class. *Mullen v. Treasure Chest Casino, 186 F.3d 620, 626 (5th Cir. 1999).* "The predominance requirement serves two functions. It assures a Court that adjudicating related claims in a single proceeding will conserve resources and yield economies of scale. It also protects absent plaintiffs' rights to due process by showing that a class is cohesive." *Neely, 2001 U.S. Dist. LEXIS 15599 at 31, citing Shaw v. Tonsiba Am Info. Sys., Inc., 91 F. Supp. 2d 942, 955 (E.D. Tex. 2000).* As the Supreme Court noted in Amchem, rule 23 (b)(3) "includes a non-exhaustive list of factors pertinent to a Court's 'close look' at the predominance and superiority criteria: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Amchem, 521 U.S. at 615-16, 117 S.Ct. At 2246, 138 L.Ed 689 (1997).*

Plaintiff has pled seven separate causes of action in this lawsuit, four of which require

individual proof of certain elements in order to establish liability and thus are inappropriate for class litigation. Those four claims are: (1) violation of the RICO statute, (2) violation of the Deceptive Trade Practices Act, (3) common law fraud, and (4) negligent misrepresentations. Plaintiff's claims for violation of the RICO statute are base on alleged conduct constituting mail fraud and wire fraud. The Fifth Circuit has stated quite clearly that "the individual findings of reliance necessary to establish RICO liability and damages preclude not only (b)(2) certification ... but (b)(3) certification as well." *Bolin v. Sears, Roebuck & Co., 231 F.3rd. 970, 978 (5th Cir. 2000)* (vacating district court's order certifying a class in a civil RICO action seeking monetary damages). *See also Patterson v. Mobil Oil Corp., 241 F.3d 417, 419 (5th Cir. 2001)* (holding that the district court erred in certifying a class asserting RICO claims because the predominance requirement could not be met given that individual reliance was at issue); *Summit Properties, Inc. v. Hoechst Celanese Corp., 214 F.3d 556 (5th Cir. 2000)* (holding that a Plaintiff's reliance on the predicate mail or wire fraud is necessary in order to establish proximate causation in a civil RICO action).

Plaintiff asserts claims for violation of the Texas Deceptive Trade Practices-Consumer Protection Act, *V.T.C.A. Bus. & Comm. Code §§ 17.46(a), 17.46(b)(5), 17.46(b)(7), 17.46(b)(9), and 17.46(b)(23),* by Defendant through its allegedly unfair and deceptive insurance practices. Article 21.21 of the Insurance Code, which specifically prohibits unfair and deceptive insurance practices and pursuant to which Plaintiff pleads a separate cause, provides the following in Section 16(a):

> Any person who has sustained actual damages caused by another's engaging in an act or practice declared in Section 4 of this Article to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in any practice specifically enumerated in a subdivision of Section 17.46 (b), Business & Commerce Code, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices. To

> maintain an action for a deceptive act or practice enumerated in Section 17.46 (b), Business & Commerce Code, a person must show that the person has relied on the act or practice to the person's detriment.

Insurance Code, Act 21.21 § 16(a), (emphasis added). In addition to this specific statutory provision requiring proof of reliance in DTPA claim based on insurance practices, Texas courts have recognized that reliance is an essential element of a § 17.46 (23) DTPA claim for failure to disclose facts known at the time of the transaction with the intent to induce the Plaintiff into a transaction he would not have entered had the information been disclosed. *See Peltier Enterprises, Inc. v. Hilton, 51 S.W. 3d 616, 624 (Tex. App.-Tyler 2000, writ denied)* (reversing trial court's order certifying class where Plaintiffs asserted claims for fraud, DTPA violations, and tortious interference with potential contract). Given the individual issues of reliance essential to Plaintiff's DTPA claims, Plaintiff fails to meet the predominance requirement for class certification.

Fraud and negligent misrepresentation are similar causes of action which, under Texas common law, require proof of reliance and materiality of the misrepresentation. The elements of fraud are (1) that a material misrepresentation was made, (2) the representation was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the speaker made the representation with the intent that the other party should act upon it, (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury. *Formosa Plastics Corp., v. Presidio Engineers & Contractors, Inc., 960 S.W. 2d 41, 47 (Tex. 1998).* The elements of a cause of action for negligent misrepresentation are: (1) the representation is made by the Defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the Defendant supplies false information for the guidance of others in their business; (3) the Defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the Plaintiff

suffers pecuniary loss by justifiably relying on the misrepresentation. *First Interstate Bank v. S.B.F.I., Inc., 830 S.W. 2d 239, 245 (Tex. App.-Dallas 1992, no writ)*. Texas courts have held "that at least tow of the above elements require individualized proof: (1) the materiality of the misrepresentation or concealment to the Plaintiff; and (2) each individual plaintiff's reliance on that misrepresentation or concealment tho his or her detriment." *Peltier, 51 S.W. 3d at 623* (reversing trial court's order granting class certification). As the Firth Circuit unequivocally stated, "According to both the advisory committee's notes to Rule 23 (b)(3) and this Court's decision in *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc. 482 F.2d 880 (5th Cir. 1973)*, a fraud class action cannot be certified when individual reliance will be an issue. *Castano, 84 F.3d at 745*. Defendant submits that the reasoning of the Fifth Circuit is just as compelling for Plaintiff's claims for negligent and grossly negligent misrepresentation. These individual reliance issues again defeat Plaintiff's efforts to meet the predominance agreement.

Focusing now on the three remaining causes of action: breach of contract, Art. 21.21 of the Insurance Code, and third party beneficiary/breach of contract, Plaintiff fails to meet the predominance standard. There were several variations of the written contract of insurance between Certus and its plan members. (Plaintiff's Responses to Defendant Novopharm Holdings's Requests for Admission, Nos. Plan 29-31). Plaintiff Flores' claim regarding the nebulizer relates to one specific exclusion in his son's plan. (Deposition of Joel Flores, Ex 17). Until the day that she cancelled the contract, Intervenor Blount received every contractual benefit to which she was entitled without exception. According to these Plaintiffs, some of the putative class members were not so fortunate. Earlier in this brief, this Defendant identified at least five distinct categories of plan members that must exist if Plaintiff's allegations are true. The distinctions between those categories create enormous differences in the damages potentially recoverable by their respective

members.  Such differences can only be determined on a case-by-case basis.  Given that the

Texas Rule 42 is based extensively on Federal Rule 23, the following quote from the Texarkana

Court of Appeals is worthy of consideration:

> The test for evaluating predominance is "not whether the common issues
> outnumber the individual issues, but instead whether common or individual issues
> will be the object of most of the efforts of the litigants and the Court."

*Entergy Gulf States, Inc. v. Butler, 25 S.W.3d. 359, 361 (Tex. App.-Texarkana 2000, no writ).*

Defendant would further ask this Court to consider the Supreme Court's analysis in

*Amchem*, a mass tort case, where the Court noted the Third Circuit's description of disparate

questions undermining class cohesion in that case:

> Class members were exposed to different asbestos-containing products for
> different amounts of time, in different ways, and over different periods.  Some class
> members suffered no physical injury or have only asymptomatic pleural changes,
> while others suffer from lung cancer, disabling absestosis, or from mesotheliama
> .... Each has a different history of cigarette smoking, a factor that complicates the
> causation inquiry.

*Amchem, 521 U.S. at 624, 117 S. Ct at 2250.*  In the case before this court, the putative class

members obtained different insurance plans for different periods of time, in different ways, from

different Certus sources, and over different periods.  Some class members sustained no injury or

damages whatsoever, while others may have actually paid money to be treated by a provider of

choice rather than a provider actively engaged with Certus.  Each class member has a different

history with this Defendant, a factor that complicates the liability and damage determination.  This

Defendant submits to the Court that Plaintiff and Intervenor fail to meet the predominance and

superiority standards of Rule 23(b).

<u>PRAYER</u>

Defendant respectfully requests that this Court enter an order denying Plaintiff's and

Intervenor's Motions for Class Certification.  Defendant further prays for general relief.

Respectfully submitted,

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 26
Brownsville, Texas 78520
(956) 542-5666
(956) 542-0016 (FAX)


By _____
Jeffrey D. Roerig
Texas State Bar #17161700
Federal Bar #1503

Ricardo Morado
Texas State Bar #14417250
Federal Bar #1213

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the above and foregoing Certus Healthcare, L.L.C.'s Opposition to Plaintiff's Motion for Class Certification has been mailed to:

Michael Cowen                                          *CMRRR*
ZAVALETTA & COWEN
603 E. St. Charles Street
Brownsville, Texas 78520

Conrad Bodden                                          *CMRRR*
LAW OFFICE OF JOHN VENTURA, P.C.
62 E. Price Rd.
Brownsville, Texas 78521

Norton A. Colvin, Jr.                                  *CMRRR*
RODRIGUEZ, COLVIN & CHANEY, L.L.P.
1201 E. Van Buren Street
Brownsville, Texas 78520

on this _18th_ day of January, 2002.

_____
Jeffrey D. Roerig

# Exhibit No. 17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and<br>On Behalf of All Others Similarly Situated | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| VS | : | |
| | : | CIVIL ACTION NO. B-00-053 |
| CERTUS HEALTH CARE, L.L.C., | : | |
| NOVOPHARM LIMITED, | : | |
| and NOVOPHARM HOLDINGS, INC. | : | |
| | : | |
| **Defendants** | : | |

## AFFIDAVIT

BEFORE ME the undersigned authority on this day personally appeared Ricardo Morado, and after being duly sworn, deposes and says,

1.  My names is Ricardo Morado and I am over the age of eighteen (18) years and I am fully competent to make this affidavit.

2.  I am counsel for Certus Healthcare, L.L.C., a Defendant in the above-styled and numbered cause.

3.  The attached is a true and correct copy of the Exhibit 17 to the Deposition of Joel Flores on November 14, 2001 in this cause.

4.  I have personal knowledge of all matters stated in this affidavit. All statements are true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Ricardo Morado

Page 1

SUBSCRIBED AND SWORN TO BEFORE ME by the said Ricardo Morado, affiant, to which witness my hand and seal of office on this the  sworn to before me on this the 18th  day of January, 2002.



DELIA G. VASQUEZ
Notary Public, State of Texas
My Commission Expires 2-10-05

_____
Notary Public for the State of Texas

**Page 2**

# ATTACHMENT A
# SCHEDULE OF BENEFITS
# LIMITATIONS AND EXCLUSIONS

## PLAN 10-I 8

Flores

EXHIBIT NO. 17

Bryant & Stingley, Inc.

**I.**   **BENEFITS WHILE HOSPITALIZED AS AN INPATIENT.**

When admitted by or with the approval of Member's Participating Primary Care Physician, and provided by a Participating Provider, the following benefits are covered:

1.  **Inpatient Hospital Benefits** - Services ordered or authorized by Member's Participating Primary Care Physician or authorized referral Physician and rendered by a Participating Hospital, including: semiprivate room and board, care in an intensive care unit when Medically Necessary, definitive observation, isolation charges (when prescribed), operating room recovery room, laboratory, diagnostic and therapeutic radiology; nuclear medicine, pharmacy, inhalation therapy, dialysis, EKG, EEG, EMG and interpretation of the aforementioned services, blood and blood plasma after the first three pints, anesthesia supplies, surgically implanted devices, private nursing, and professional charges by the hospital pathologist or radiologist, coordinated discharge planning and other miscellaneous hospital charges for Medically Necessary care and treatment. Private room and special duty nursing care are included only when Medically Necessary and preauthorized by Health Plan.

    $300 copayment per day for first five days of hospitalization.

    A minimum inpatient hospital stay of 48 hours following a mastectomy and a minimum inpatient hospital stay of 24 hours following a lymph node dissection for the treatment of breast cancer will be covered, unless the Member's Participating Physician determines that a shorter inpatient stay is appropriate.

2.  **Inpatient Physician Care** - The services of Participating Physicians while hospitalized: Member's Participating Primary Care Physician, surgeon, assistant surgeon, anesthesiologist, any other specialty Physicians referred by or with the approval of Member's Participating Primary Care Physician.

    Covered 100%.

3.  **Newborn Care** - Complete post-natal Hospital

    Covered 100%.

3

INDSCHBEN I 10 3/98
Revised 2/99

to, diagnosis and Medically Necessary treatment of the temporomandibular joint, treatment for fractures and excision of tumors and cysts. All other procedures involving the teeth or areas surrounding the teeth are not covered, including shortening or lengthening of the mandible or maxillae for cosmetic purposes, or correction of malocclusion.

7.  **Organ Transplants** - Medical and Hospital Services for the following Medically Necessary organ transplants when preauthorized by Health Plan: (1) kidney transplants; (2) cornea transplants; (3) liver transplants only in minors (under age 18) with biliary atresia, or minors with congenital abnormalities of the liver, or minors with any other form of end-stage liver disease.

    $300 copayment per day for first five days

## II. BENEFITS AVAILABLE ON AN OUTPATIENT BASIS.

(When ordered or approved by Member's Participating Primary Care Physician)

1.  **Allergy Testing** - Service and supplies for the determination of proper allergy treatment.

    Covered 100% subject to office visit copayment

2.  **Allergy Treatment** - Services for administration of an established treatment plan. Serum is not covered.

    Covered 100% subject to office visit copayment

3.  **Ambulance** - A Member is entitled to Medically Necessary ambulance service within the service Area, provided such ambulance service is preauthorized by Health Plan or the use of such ambulance service is deemed necessary for Emergency Services. A Member is entitled to ambulance service while outside the Service Area to transport the Member to the nearest Medical Facility when authorized by Health Plan or the use of ambulance service is determined by the Health Plan to have been necessary for Emergency Services.

    $35 per trip.

4.  **Eligible Materials and Supplies** - The initial purchase of the following items of medical supplies is covered when prescribed by

    Covered 100%.

5

7.  **Hearing and / or Speech Screening** -
    Services performed by Member's Participating
    Primary Care Physician to determine the need
    for hearing and / or speech correction and
    therapy.

    Covered 100% subject to office visit copayment.

8.  **Home Health Care** - Services provided by a
    participating home health agency when
    deemed Medically Necessary by the
    Participating Physician and authorized in
    advance by Health Plan.

    $25 copayment per visit. 25 visits maximum.

9.  **Immunizations** - Services and supplies for
    immunizations as recommended by the U.S.
    Public Health Service and American Academy
    of Pediatrics including, but not limited to, DPT,
    DT, Tetanus Toxoid, Oral Polio, Measles,
    Mumps, Rubella, Smallpox and Hepatitis B,
    Haemophilus Influenzae Type B, Pertussis,
    and Varicella

    Covered 100% for Members age 0-6 years.

    $10 copayment per immunization for Members age 7 years or older.

10. **Laboratory and Radiology** - All diagnostic
    and therapeutic services when preauthorized
    by Health Plan and provided at a Participating
    Provider.

    Covered 100% subject to office visit copayment

11. **Mental Health Services** -  Outpatient care
    for up to 20 sessions during each Contract
    Year with a Participating psychiatrist,
    psychologist, or other duly licensed counselor
    when prescribed by Member's Participating
    Primary Care Physician or a Participating
    Psychiatrist. Group therapy may be used as
    judged appropriate when prescribed by a
    Participating Behavioral Health Provider.

    $10 copayment per visit. Twenty (20) combined visit maximum per Contract Year.

12. **Office Visits** - Visits to the Member's
    Participating Primary Care Physician,
    consultations with or referrals to other
    Participating Physicians as needed for
    preventive medical care, voluntary family
    planning, periodic gynecological exam, well
    child care from birth, vision screening, speech
    screening, immunizations, and ear
    examinations to determine the need for
    hearing correction.

    $10 copayment

7

INDSCHBEN I 10 3/98
Revised 2/99

means of telemedicine, including interactive audio, video, or other electronic media, when ordered by the Member's Participating Primary Care Physician and approved by Health Plan. Services provided through telephone or facsimile communications are not covered.

18. **Diabetic Services and Supplies** - Diabetes equipment, diabetes supplies, and diabetes self-management training programs are covered for Members who have been diagnosed with insulin dependent or noninsulin dependent diabetes, elevated blood glucose levels induced by pregnancy, or another medical condition associated with elevated blood glucose levels. Self-management training programs must be provided by a Participating Provider who is appropriately licensed, registered, or certified in Texas.

Diabetes Services / Self Management Training Programs are covered 100%.

$10 copayment per 30-day supply of a diabetic supply or diabetic equipment.

19. **Infertility Services** - Procedures consistent with established medical practices in the treatment of infertility by Participating Physicians including, but not limited to, diagnosis tests, medication (not including outpatient drugs unless covered by rider) and surgery. In vitro fertilization is not covered unless covered by supplemental rider. For purposes of this Agreement, infertility means either (1) the presence of a demonstrated condition recognized by a Physician as a cause of infertility, or (2) the inability to conceive a pregnancy or to carry a pregnancy to a live birth after a year or more of regular sexual relations without conception.

50% of cost

## III. USE OF EMERGENCY SERVICES

1. Any medical screening examination provided in a hospital emergency room or other facility providing Medical or Hospital Services deemed necessary in determining whether an emergency medical condition exists. A term delivery, whether vaginal or by Cesarean section, is not considered an emergency medical condition.

$75 copayment per visit (waived if admitted as an inpatient for the same condition within 24 hours).

9



INDSCHBEN I 10 3/98
Revised 2/99

subsequent to the time coverage ends.

2. Services and supplies to eliminate or reduce a dependency on or addiction to tobacco or foods, including all surgical or invasive procedures intended for the treatment of obesity and the reversal of such procedures unless such reversal is deemed in advance by Health Plan as Medically Necessary.

3. Ambulance Service. Ambulance services, unless Medically Necessary and authorized by Member's Participating Primary Care Physician or necessitated by the need for Emergency Services.

4. Certain infertility services, including gamete intrafallopian transfer (GIFT) and zygote intrafallopian transfer (ZIFT), except as described in Section II, #18 or as covered by rider.

5. Care of the teeth, appliances for the teeth or for abnormalities of the teeth or jaw, except for oral surgery as described in Section I, 7 of this Schedule of Benefits.

6. Chiropractic Care and treatment unless covered by rider.

7. Cosmetic Surgery, undertaken primarily to improve or otherwise modify the Member's external appearance, except when Medically Necessary and preauthorized by Health Plan. Reconstructive surgery incident to a mastectomy is not subject to this exclusion.

8. Custodial or domiciliary care.

9. Dental Care, Dental Appliances. General dental services including, without limitation, items or services in connection with care, treatment, filling, removal, replacement, or artificial restoration of the teeth or structures directly supporting the teeth, treatment of dental abscess, or other oral conditions.

    General dental services are defined as those services required to diagnose or treat, by surgery or other method, diseases and lesions and the correction of malpositions of the human teeth, alveolar process, gums, jaws, or associated structures, includes all necessary related procedures as well as the use of drugs, anesthetic agents, prosthetic appliances, and physical evaluation.

    Treatment of TMJ (temporomandibular joint), dysfunction abnormalities caused by malocclusion, structural jaw abnormalities resulting in malocclusion and abnormalities unrelated to an external traumatic episode. TMJ is defined as an abnormal condition characterized by facial pain and by mandibular dysfunction, apparently caused by a defective or damaged temporomandibular joint. Limited TMJ is covered as provided in Section I, 6.

10. Disabilities connected to Military Services. Treatment for disabilities connected to

11



INDSCHBEN I 10 3/98
Revised 2/99

23.  Organ Transplants.  Transplants other than those covered under Section I, 7 of this Schedule of Benefits or as covered by a separate rider.  Also excluded from coverage are animal to human transplants, transplants considered experimental, investigational or unproven, transplant services rendered at a non-designated transplant facility, and artificial or mechanical devices designated to replace human organs.  Also excluded are services required to meet patient selection criteria for approved transplant procedure, such as: rehabilitation services, treatment of nicotine or caffeine addiction, services and related expenses for weight loss programs, nutritional supplements, appetite suppressants and supplies of a similar nature otherwise not covered under a supplemental rider or basic health benefit plan.

24.  Physical Examinations.   Physical examinations for insurance, licensing, employment, school, camp, or their non-preventive purposes or for pre-marital and pre-adoption purposes.  Routine Health Evaluations in excess of one (1) per twelve (12) month period as described in Section II, 12, unless ordered by Member's Primary Care Physician.

25.  Private Rooms and Comfort Items.  Personal or comfort items and private rooms unless Medically Necessary during inpatient hospitalization.

26.  Public Facility Care.  Care of illness or conditions for which state or local law requires treatment in a public facility; however, Certus will reimburse Member for out-of-pocket expenses incurred by the Member for any covered benefits delivered at such public facility.

27.  Rehabilitation - Rehabilitation services including physical, occupational, speech, and hearing therapy in excess of those services deemed Medically Necessary by the Member's Participating Primary Care Physician for conditions subject to improvement through such services and preapproved by Health Plan.

28.  Sex Transformations.  Transsexual surgery.

29.  Skilled Nursing care.  Long term services over thirty (30) consecutive calendar days per Contract Year from the first date of treatment per condition.

30.  Treatment Refusal by Member.  Charges for services related to treatment for a specific condition when a Member has refused recommended treatment for such condition, and when Member's Participating Primary Care Physician believes no professionally acceptable alternative treatment exists.

31.  Vision Care.  Refractions, corrective lenses and frames, contact lenses, (except post-cataract extraction), except as covered by a separate rider.

13

INDSCHBEN I 10 3/98
Revised 2/99

## Attachment B

### Geographical Service Area

The following counties are considered to be the initial Geographical Service Area:

1.   HIDALGO

2.   CAMERON

3.   NUECES

4.   ARANSAS

5.   BEE

6.   JIM WELLS

7.   KLEBERG

8.   SAN PATRICIO

9.   STARR

10.  WILLACY

A complete listing of Participating Primary Care Physicians and Participating Providers is found in the Provider Directory.

1

INDSCHBEN I 10 3/98
Revised 2/99

**CERTUS HEALTHCARE, LLC**
**1300 N. 10th Ave. Suite 450**
**McAllen, TX. 78501**

**PRESCRIPTION DRUG RIDER TO THE EVIDENCE OF COVERAGE**

**$10 Generic Drug / $20 Brand Name Drug**
**Copayment For Formulary Drugs**

**$1000 Maximum Benefits Per Contract Year**

The Evidence of Coverage to which this Rider is attached does not include coverage for prescription drugs to Subscribers and their eligible Family Members who are enrolled in Certus Healthcare, LLC. ("Health Plan"). Certain covered drugs requiring Prior Authorization through the Health Plan are listed on "Attachment A" to this Prescription Drug Rider. Please contact the Customer Services Department if you have any questions.

A.   **Definitions**

1.   **"Brand Name Drug"** means a single source, Food and Drug Administration ("FDA") approved drug manufactured by one company for which no FDA approved substitute is available.

2.   **"Copayment"** means the predetermined amount to be paid by the Member each time a covered drug is received. Copayments are to be paid by the Member directly to the Participating Pharmacy at the time service is provided.

3.   **"Formulary"** is the list of covered drug products developed, maintained and authorized by the Pharmacy and Therapeutics Committee of Health Plan from which a Participating Provider must prescribe in order for the Member to receive benefits under this Prescription Drug Rider.

4.   **"Formulary Drug"** means a drug which appears in the Formulary approved by Health Plan; can only be obtained by prescription (except insulin, dietary formulas for treatment of PKU or other heritable diseases); has been approved by the Food and Drug Administration ("FDA") for general marketing; and is dispensed by a Participating Pharmacist and prescribed for the Member's use by a Participating Provider. For purposes of this Rider, Formulary Drug also includes dietary formulas for treatment of phenylketonuria (PKU) or other heritable diseases.

5.   **"Generic Drug"** means pharmacological agents approved by the FDA as an equivalent substitute for a Brand Name Drug and manufactured by a number of different companies.

6.   **"Non-Formulary Drug"** means a drug which does not appear in the Formulary approved by Health Plan; can only be obtained by prescription (except insulin, dietary formulas for treatment of PKU or other inheritable diseases); has been approved by the Food and Drug Administration for general marketing; and, is dispensed by a Participating Pharmacist and prescribed for the Member's use by a Participating Provider.

7.   **"Participating Pharmacy"** means a licensed pharmacy which has an independent contractor agreement with Health Plan to provide covered prescription drugs to Members.

8.   **"Therapeutic Supply"** means the maximum quantity of medication not to exceed a thirty (30) day supply that may be dispensed to the Member at any one time for a single Generic Drug or Brand Name Drug Copayment or Non-Formulary Drug Copayment.

ind.rdr.3/98
Revised 12/98                                                          1

**B.**     **Generic Drug and Brand Name Drug Copayments.** When your Participating Provider prescribes a drug that is on the Formulary, you pay the Generic Drug and Brand Name Drug Copayment, as applicable, per Therapeutic Supply.

**C.**     **Dispensing Limitations**

   1.     Covered drugs must be prescribed by a Participating Provider and received from a Participating Pharmacy.

   2.     Quantities are limited to:

      (a)     An amount of medication generally recognized as a Therapeutic Supply, as may be set forth in the Formulary, but not to exceed a thirty (30) day supply. Members must pay the applicable Copayment for each Therapeutic Supply; and

      (b)     A Member receiving a maintenance medication may obtain up to a ninety (90) day supply if authorized by the Member's Participating Physician; however, the Member must pay three applicable Copayment(s) for each ninety (90) day supply or fraction thereof.

   3.     If a Member has Prescription Drug benefits through any government program, the Member must utilize those benefits prior to receiving benefits under this Rider.

**D.**     **Exclusions**

   1.     Any drug, supply or device which can be purchased without a prescription, unless specifically included herein, even though the Participating Provider has written a prescription;

   2.     Prescription drugs which may be properly received without charge under local, state, or federal programs;

   3.     Devices of any type, except as stated in the Schedule of Benefits;

   4.     Anorexic agents (weight reducing), infertility drugs including Viagra, drugs for smoking cessation or addiction control or drugs intended for cosmetic use;

   5.     Injectable drugs, other than insulin and glucagon;

   6.     Hypodermic needles, syringes, or similar devices used for any purpose other than the administration of insulin;

   7.     Prescriptions related to any non-covered services;

   8.     Prescriptions written by a Physician for use by the Physician or by his immediate family members, unless the Physician and/or family members are covered under the Health plan;

   9.     Any prescription drugs which are for the treatment of a work related injury or illness;

   10.     Prescriptions dispensed by a Non-Participating Pharmacist except in the case of Emergency Services;

ind.rdr.3/98
Revised 12/98                                    2

11.    Prescriptions prescribed by Non-Participating Physician, except in the case of Emergency Services; and

12.    Any drug, supply or device in excess of what is allowed in the Schedule of Benefits.

All other terms, conditions, exclusions and limitations of the Agreement to which this Rider is attached remain in full force and effect except as specifically modified by this Rider.

# ATTACHMENT - A

The following is a list of the drugs that require Prior Authorization by Health Plan:

Accutane
Clomid
Crixivan
Diflucan
Epivir
Hivid
Imitrex Tablets and Nasal Spray
Invirase
Lamisil
Norvir
Retin-A
Retrovir
Serophene
Sporanox
Videx
Viracept
Viramune

ind.rdr.3/98
Revised 12/98                4

# Deposition of David Rodriguez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and<br>On Behalf of All Others Similarly Situated | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| VS | : | |
| | : | CIVIL ACTION NO. B-00-053 |
| CERTUS HEALTH CARE, L.L.C.,<br>NOVOPHARM LIMITED,<br>and NOVOPHARM HOLDINGS, INC. | : | |
| | : | |
| **Defendants** | : | |

## AFFIDAVIT

BEFORE ME the undersigned authority on this day personally appeared Ricardo Morado,

and after being duly sworn, deposes and says,

1.      My names is Ricardo Morado and I am over the age of eighteen (18) years and I am fully competent to make this affidavit.

2.      I am counsel for Certus Healthcare, L.L.C., a Defendant in the above-styled and numbered cause.

3.      The attached excerpts are true and correct copies of portions of the transcript of the deposition of David Rodriguez taken on October 19, 2000 in this cause.

4.      I have personal knowledge of all matters stated in this affidavit. All statements are true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Ricardo Morado

**Page 1**

SUBSCRIBED AND SWORN TO BEFORE ME by the said Ricardo Morado, affiant, to which witness my hand and seal of office on this the  sworn to before me on this the 18th  day of January, 2002.



Notary Public for the State of Texas

**Page 2**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    BROWNSVILLE DIVISION

4    CIVIL ACTION NO.: B-00-53

5    CLASS ACTION

6

7    JOEL FLORES, individually and on:
     Behalf of all Others Similarly  :
8    Situated,                       :
                                     :
9    vs.                             :
                                     :
10   CERTUS HEALTHCARE, L.L.C.,      :
     NOVOPHARM LIMITED, DAVID        :
11   RODRIGUEZ, DR. ASHOK K. GUMBHIR,:
     and NOVOPHARM HOLDINGS, INC.    :
12   _____:

13

     DEPOSITION OF DAVID RODRIGUEZ
14

15

16        Taken before Joan Comparato, Shorthand

17   Reporter and Notary Public in and for the State

18   of Florida at Large, pursuant to Plaintiffs'

19   Notice of Intention to Take The Oral/Videotaped

20   Deposition of David Rodriguez.

21            - - - - -

22   Suite 1250
     1 S. E. 3rd Avenue
23   Miami, Florida
     October 19, 2000
24   9:00 a.m.

25

KLEIN, BURY & ASSOCIATES, INC.

BY MR. COWEN:

Q.   Did anyone at Novopharm ever tell you not to use their name saying that -- to attract customers by you saying they were your financial partner?

A.   No.

Q.   Did anyone at Novopharm ever tell you not to use their name for any -- any purpose?

A.   I can't recall.

Q.   Paradigm Marketing was the company that Certus used initially at least?

A.   Yes.

Q.   Did you ever use any other marketing companies?

A.   No.

Q.   What types -- my understanding is that Certus had both a group product and an individual product?

A.   That's correct.

Q.   Okay.

And a group product would be you're selling to -- usually to an employer --

A.   Yes.

Q.   -- and that would provide coverage for all its employees?

1          A.    Those that opted to join us.

2          Q.    And then individual products would

3     be something that an individual person would buy?

4          A.    That's correct.

5          Q.    And there were basically only a few

6     basic, I mean, there's an actual policy document

7     for each type of policy, is that correct, that

8     tells what, you know, what -- basically a policy?

9          A.    Evidence of coverage.

10         Q.    Well, there's also like a plan, like

11    a plan document, this is what's going to be

12    covered.  This is what's not covered.

13         A.    It's called the evidence of

14    coverage.

15         Q.    It's called the evidence of

16    coverage?

17         A.    Uh-huh.

18         Q.    There was not a unique evidence of

19    coverage for each policyholder, was there?  I

20    mean, you didn't just go make up and write a

21    whole new one for each one.  You used standard

22    forms.

23         A.    You -- you couldn't do that.  The --

24    any -- any evidence of coverage had to be

25    submitted to the Department of Insurance.  They

1    would approve it --

2         Q.   Right.

3         Q.   -- and they would be marked and

4    those would be the ones we would be selling at

5    the time.

6         Q.   How many different products did you

7    have -- how many different evidence of coverage

8    documents did Certus have?

9         A.   At what point?

10        Q.   During its existence.

11        A.   As the regulations changed you had

12   to update them.

13        Q.   Okay.

14        A.   So, you had to refile them and

15   during this period regulations changed quite

16   frequently.  So, I wouldn't be able to tell you

17   how many we had.

18        Q.   Okay.

19             But, at any one given time how many

20   products did you sell?

21        A.   You -- you would sell one evidence

22   of coverage --

23        Q.   Okay.

24        A.   -- for individuals or for

25   commercial, and within those, you would have

1    different benefit plans associated with an

2    individual plan or a commercial plan.

3              Q.   Okay.

4                   How many different benefit plans

5    were there?

6              A.   You have a five dollar plan, a $10

7    dollar plan, a $15 dollar plan, a $20 plan --

8              Q.   Right.

9              A.   -- a five dollar plan with a $500

10   copay for hospital.  A five dollar plan with a

11   $100 copay for hospital.  An RX rider of five,

12   seven, ten or five/twenty.  So, I couldn't tell

13   you.

14             Q.   So, they're all based on the same

15   evidence of coverage?

16             A.   They're all based on the evidence of

17   coverage that is filed at the time.

18             Q.   And would there be one or two filed?

19   One for group and one for individual or just one?

20             A.   No, there would be one for

21   individual and one for group.

22             Q.   So, basically, at any given time

23   you'd have two evidence of coverages filed with

24   the state and that would be the basis that all

25   the other plans were sold under?

1          Q.   Doesn't it also say that even though

2     Certus goes broke we're not supposed to bill the

3     members individually?

4          A.   That is correct.

5          Q.   Okay.

6               In fact, if you look at the last ---

7               Do you mind if I turn the page?

8          A.   Sure.

9          Q.   It even tells people that balance

10    billing is not allowed on this newsletter?

11         A.   That's right.

12         Q.   Okay.

13              Then it also has an article about

14    Certus' record growth, is that correct?

15         A.   Yes.

16         Q.   Okay.

17              Why would it have that in there?

18    Why would you want to tell people about that?

19         A.   Positive news.

20         Q.   Okay.

21              And at the time Certus had 24,000

22    members, correct?

23         A.   Yes.

24         Q.   Okay.

25              And if the class in this case is

1    defined as everyone that was a member of Certus

2    at that time, the class would have at least

3    24,000 people, isn't that true?

4            A.    We had 24,000 members at that time.

5    I don't know what the legalities are in the class

6    or no class.

7            Q.    You'll let the judge take -- take

8    care of that --

9            A.    Okay.

10           Q.    -- is that right?

11           A.    I believe so, yes.

12           Q.    Okay.

13                 But -- but you will agree that at

14    least -- this is a true statement, at the time

15    this newsletter was put out, Certus had

16    approximately 24,000 members?

17           A.    Yes.

18           Q.    Okay.

19                 It also mentions -- I'd like you to

20    look at the second paragraph and the third

21    paragraph.  It also mentions Novopharm, Limited,

22    in this document, correct?

23           A.    Yes.

24           Q.    How come it mentions Novopharm,

25    Limited, rather than Novopharm Holdings Company,

KLEIN, BURY & ASSOCIATES, INC.

# Deposition of Joel Flores

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FLORES, Individually and   :
On Behalf of All Others Similarly Situated :
              :
    Plaintiffs      :
              :
VS            :
              :  CIVIL ACTION NO. B-00-053
CERTUS HEALTH CARE, L.L.C.,   :
NOVOPHARM LIMITED,     :
and NOVOPHARM HOLDINGS, INC.  :
              :
    Defendants     :

## AFFIDAVIT

BEFORE ME the undersigned authority on this day personally appeared Ricardo Morado,

and after being duly sworn, deposes and says,

1. My names is Ricardo Morado and I am over the age of eighteen (18) years and I am fully competent to make this affidavit.

2. I am counsel for Certus Healthcare, L.L.C., a Defendant in the above-styled and numbered cause.

3. The attached excerpts are true and correct copies of portions of the transcript of the deposition of Joel Flores taken on November 14, 2001 in this cause.

4. I have personal knowledge of all matters stated in this affidavit. All statements are true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Ricardo Morado

Page 1

SUBSCRIBED AND SWORN TO BEFORE ME by the said Ricardo Morado, affiant, to which witness my hand and seal of office on this the  sworn to before me on this the 18th  day of January, 2002.



Notary Public for the State of Texas

**Page 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FLORES, INDIVIDUALLY )(
AND ON BEHALF OF ALL )(
OTHERS SIMILARLY SITUATED, )(
      Plaintiffs )(
       )(
VS. )(   CIVIL ACTION NO. B-00-53
       )(
CERTUS HEALTHCARE, L.L.C., )(
NOVOPHARM LIMITED AND )(
NOVOPHARM HOLDINGS, INC., )(
      Defendants )(

ORAL AND VIDEOTAPED DEPOSITION OF
JOEL FLORES
NOVEMBER 14, 2001

# ORIGINAL

      ORAL AND VIDEOTAPED DEPOSITION OF JOEL FLORES,

produced as a witness at the instance of the DEFENDANT

CERTUS HEALTHCARE, L.L.C, taken in the above styled and

numbered cause on NOVEMBER 14, 2001, reported by RHONDA

A. MARTIN, Certified Court Reporter No. 4297, in and

for the State of Texas, at the Law Offices of John

Ventura, P.C., 62 East Price Road, Brownsville, Texas,

pursuant to the Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

| | | |
|---|---|---|
| 10:33:10 | 1 | Q.  When do you take them? |
| 10:33:11 | 2 | A.  I take them at night.  It's Monday, Tuesday, |
| 10:33:16 | 3 | and Wednesdays. |
| 10:33:24 | 4 | Q.  So you've had semesters where you have taken |
| 10:33:30 | 5 | 12 -- between now and '92, you must have had a lot of |
| 10:33:34 | 6 | semesters where you weren't going to school then. |
| 10:33:38 | 7 | A.  Correct.  Either that or I was taking like |
| 10:33:38 | 8 | one -- one course. |
| 10:33:43 | 9 | Q.  Okay.  Okay.  Let me ask you this.  When -- |
| 10:33:45 | 10 | when and how did you first hear of my client, Certus |
| 10:33:53 | 11 | HealthCare? |
| 10:33:53 | 12 | A.  It was from an ex-employee of ours. |
| 10:33:56 | 13 | Q.  Who is that? |
| 10:33:56 | 14 | A.  Monica Blunt. |
| 10:34:03 | 15 | Q.  Was she an agent for Certus, or who is she? |
| 10:34:09 | 16 | A.  No, sir.  She used to work here with us in |
| 10:34:10 | 17 | accounting and she mentioned something about health |
| 10:34:12 | 18 | insurance for her kids and I got involved in a |
| 10:34:16 | 19 | conversation, and that's how it led to Certus. |
| 10:34:19 | 20 | Q.  And what did she have to say about Certus? |
| 10:34:30 | 21 | A.  Basically that she had her kids covered under |
| 10:34:30 | 22 | Certus. |
| 10:34:30 | 23 | Q.  Was she in one of the special programs, the |
| 10:34:30 | 24 | Texas Healthy Kids Program, for instance? |
| 10:34:32 | 25 | A.  I would not know, sir. |

10:43:47  1   conversation with Ms. Blunt and the time of your

10:43:49  2   conversation with David Pena?

10:43:52  3       A.  A couple of brochures, not -- not much, really.

10:43:54  4       Q.  Do you have them?

10:43:55  5       A.  No, sir.

10:43:56  6       Q.  Can you tell me the -- the names or describe

10:44:00  7   them so they can be identified and I can get them out

10:44:02  8   of our records?

10:44:06  9       A.  I wouldn't remember the description exactly.  I

10:44:13  10  do remember that it had the Certus name in there.

10:44:13  11      Q.  What else do you remember from those brochures

10:44:15  12  that you saw?

10:44:25  13      A.  I don't remember.

10:44:28  14      Q.  Where did you get them?

10:44:31  15      A.  A friend of mine does have Certus -- had Certus

10:44:34  16  too.

10:44:34  17      Q.  Who is that?

10:44:36  18      A.  Sergio Cavazos.

10:44:38  19      Q.  Where does Sergio live?

10:44:40  20      A.  He lives in Los Fresnos.

10:44:44  21      Q.  Have you ever lived in Los Fresnos besides now?

10:44:48  22  Did you have any history there?

10:44:49  23      A.  No, sir.

10:44:49  24      Q.  Did your wife?

10:44:51  25      A.  No, sir.

11:38:43  1    that correct?

11:38:44  2        A.  Correct.

11:38:49  3        Q.  All right.  So on February 15th, the policy was

11:38:53  4    effective, and you went to see Dr. Montalvo on February

11:39:03  5    the 22nd.  What were the symptoms that Joel had when

11:39:13  6    you took him in to see Dr. Montalvo?

11:39:18  7        A.  Based on what I saw, it was -- and heard, it

11:39:21  8    was wheezing.  He was having problems breathing.

11:39:27  9        Q.  Was that any different than the symptoms that

11:39:29 10    he had expressed for a long time?

11:39:36 11        A.  They were basically the same, but to a higher

11:39:40 12    degree.

11:39:48 13        Q.  Okay.  Do you know how Dr. Montalvo got your

11:39:51 14    Certus I.D. card number?

11:39:56 15        A.  Well, my wife did give all the information.

11:40:01 16        Q.  Oh, did she go to the doctor with you?  All

11:40:03 17    three of you went?

11:40:04 18        A.  Yes, sir.

11:40:05 19        Q.  Okay.  Was she a witness to the conversation

11:40:06 20    between you and the person in the front office when

11:40:08 21    they said they wouldn't take your Certus card?

11:40:11 22        A.  Yes, sir.

11:40:12 23        Q.  Was she a witness to the conversation between

11:40:13 24    you and Dr. Montalvo when he told you, "Yeah, we had

11:40:18 25    some trouble, and the hospital I'm associated with,

11:58:27  1      A.   No. 13.

11:58:28  2      Q.   Yeah.   That has three items on it, isn't that

11:58:31  3   right, the Prednisolone, the Albuterol, and the

11:58:38  4   nebulizer?

11:58:42  5      A.   I don't know how to read this handwriting.

11:58:49  6      Q.   Okay.   When you gave it to the -- to the

11:58:51  7   pharmacist at H.E.B., did they ask you something or say

11:58:54  8   something to you?

11:58:56  9      A.   No.   Basically we went ahead and just followed

11:58:59  10  the instructions from Dr. Montalvo, went to -- to

11:59:07  11  Autrey's.   It's right there on Central.

11:59:07  12     Q.   Okay.

11:59:10  13     A.   Autrey's.   We handed over this and -- you know,

11:59:12  14  just the regular type of process, and once we mentioned

11:59:17  15  Certus, that's when they would back out.

11:59:21  16     Q.   Okay.   Let me see the H.E.B.'s there.

11:59:40  17          Okay.   So the H.E.B. on Boca Chica, when

11:59:44  18  you went there, you presented your prescription, which

11:59:47  19  is Exhibit No. 13, and they filled the prescription for

11:59:52  20  Albuterol and for Prednisolone, correct?

11:59:59  21     A.   Correct.

11:59:59  22     Q.   And charged you a $10 co-pay with regard to

12:00:05  23  each of them?

12:00:05  24     A.   Correct.

12:00:05  25     Q.   What did they -- did they tell you there was

12:00:06  1    anything else written down on the prescription that

12:00:08  2    they weren't going to do?

12:00:09  3        A.  They would not consider the Pulmo-Aide --

12:00:09  4    Pulmo-Aide.

12:00:14  5        Q.  And did they tell you why?

12:00:19  6        A.  Their main concern was that Certus did not pay

12:00:22  7    them and --

12:00:23  8        Q.  Why were they giving you the drugs?

12:00:26  9        A.  No.  I'm not talking about H.E.B.  I'm talking

12:00:29 10    about the previous --

12:00:30 11        Q.  No, I'm talking about H.E.B.  The question is

12:00:32 12    H.E.B.

12:00:35 13        A.  Why they wouldn't give me the Pulmo-Aide?

12:00:38 14        Q.  Well, they gave you -- they gave you the

12:00:40 15    Albuterol, right?

12:00:42 16        A.  Uh-huh.

12:00:42 17        Q.  Do you know how much that cost --

12:00:44 18        A.  No, sir.

12:00:44 19        Q.  -- the full cost?  It only cost you $10, right?

12:00:46 20        A.  As far as the co-pay, yes.

12:00:48 21        Q.  Okay.  And the Prednisolone, do you know how

12:00:56 22    much that cost?

12:00:56 23        A.  $10 co-pay.

12:00:56 24        Q.  Okay.  But you don't know what it cost Certus?

12:00:59 25        A.  Oh, no.

12:00:59  1      Q.  Okay.  And then the H.E.B. pharmacist said,

12:01:02  2  "Okay.  We'll fill this.  We'll fill this."  And -- and

12:01:07  3  what did he say about the nebulizer or the Pulmo-Aide?

12:01:11  4      A.  They didn't consider it.

12:01:14  5      Q.  Okay.  Did he tell you it wasn't covered under

12:01:16  6  your policy?

12:01:17  7      A.  According to the representative, it did -- it

12:01:18  8  was.

12:01:20  9      Q.  According to what representative?

12:01:22 10      A.  David Lee Pena.

12:01:24 11      Q.  Okay.  What did Mr. David Lee Pena tell you

12:01:27 12  about medical device coverage?

12:01:32 13      A.  Well, it was very unique about it because he

12:01:34 14  mentioned a personal story of his.  He actually told me

12:01:41 15  that he was going exactly through what I was going.

12:01:47 16  His daughter had the conditions that my son had and

12:01:53 17  that he had to get all this medication, all the

12:01:56 18  machinery, all -- everything that is needed and that

12:01:58 19  Certus would -- would provide it for him.

12:02:02 20      Q.  Do you know if he was on a group plan or an

12:02:05 21  individual plan?

12:02:06 22      A.  No, sir.

12:02:06 23      Q.  Did you ask him if you were buying the same

12:02:07 24  plan that he had?

12:02:09 25      A.  I asked him, "Is this what you have?"  And he

12:02:12  1   said, "Yes."

12:02:13  2       Q.  Okay.  Well, in fact, he was on a group plan

12:02:15  3   through Certus, wasn't he?

12:02:16  4               MR. COWEN:  Objection, calls for

12:02:17  5   speculation.

12:02:19  6               MR. ROERIG:  Not much.

12:02:21  7       A.  I don't know.

12:02:22  8       Q.  Do you figure that maybe Certus had a group

12:02:24  9   plan for their employees and it was purchased through

12:02:26  10  Certus?

12:02:29  11              MR. COWEN:  Objection, calls for

12:02:30  12  speculation.

12:02:31  13      A.  I don't know.

12:02:32  14      Q.  Okay.  But your testimony is that Mr. Pena said

12:02:36  15  to you, "You will get the same coverage with your

12:02:41  16  individual plan that I get through my Certus group

12:02:45  17  plan"?

12:02:47  18      A.  No, sir.  That's not what he said.  He said,

12:02:48  19  "This" -- "What you're buying has this because" --

12:02:52  20      Q.  Has what?

12:02:52  21      A.  Has all those coverages.

12:02:56  22      Q.  Okay.

12:02:57  23      A.  You know, it involves machinery, you know, all

12:03:01  24  that service.

12:03:04  25      Q.  Okay.  When did you -- have you ever seen --

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

12:03:05 1          MR. ROERIG:  Let's get this marked No. --
12:03:05 2    15?
12:03:17 3          COURT REPORTER:  17.
12:03:17 4          MR. ROERIG:  17?
12:03:17 5          COURT REPORTER:  Uh-huh.
12:03:18 6          MR. ROERIG:  Time flies.
12:03:18 7       Q.  Have you ever seen Plan 10-I -- and I'll
12:03:22 8    represent to you that means "individual" -- 8, which
12:03:24 9    we've had marked Flores Exhibit No. 17?
12:03:38 10      A.  I -- I don't remember.
12:03:41 11      Q.  Okay.  Are you telling me -- you can't say that
12:03:44 12   you've seen it, but you can't say you haven't --
12:03:44 13      A.  Correct.
12:03:52 14      Q.  -- is that correct?  When you talked to Mr.
12:03:53 15   Pena, were you interested in getting a copy of the
12:03:56 16   insurance plan that would cover you?
12:03:58 17      A.  Yes.  That was one of our concerns.
12:04:02 18      Q.  Okay.  But you don't know that you've ever seen
12:04:03 19   this, Exhibit No. 17?
12:04:09 20      A.  Not to be exact.
12:04:35 21      Q.  Okay.  So you've never seen page 14 before,
12:04:40 22   where there is listed as exclusion No. 34 -- excuse
12:04:45 23   me -- 35, "Durable medical equipment, oxygen, and
12:04:49 24   mechanical equipment for respiratory failure, except if
12:04:54 25   covered by a separate rider"?  First, is that what 35

```
12:04:58  1    says, and second, when did you first see that, if you
12:05:03  2    did, before today?
12:05:05  3        A.  I don't remember seeing this, but I relied on
12:05:08  4    the representative's story and the -- his speech.
12:05:18  5        Q.  "The" what?
12:05:20  6             COURT REPORTER:  "And" what?
12:05:21  7        A.  The -- the presentation that he was giving me
12:05:21  8    and the personal touch that he gave to the -- to the
12:05:23  9    story, I guess.
12:05:24 10        Q.  Okay.  So your -- your position is that the
12:05:34 11    sales representative who called upon you represented to
12:05:40 12    you that there was coverage for nebulizers?
12:05:45 13        A.  Correct.
12:05:47 14        Q.  His daughter had asthma?  Did he say asthma?
12:05:55 15        A.  I don't remember if he said asthma, but --
12:05:59 16        Q.  And you're also -- you're also testifying
12:06:01 17    that -- that you told David Pena that your daughter had
12:06:03 18    asthma?
12:06:04 19             MR. COWEN:  Objection, form on lots of
12:06:06 20    grounds.
12:06:07 21        Q.  Excuse me.  That -- that your son had asthma.
12:06:10 22        A.  I'm sorry.  The question was?
12:06:11 23        Q.  You're telling me that -- that in your
12:06:13 24    conversation with David Pena, you revealed to him that
12:06:16 25    your son had asthma?
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

| | |
|---|---|
| 12:07:28 | 1 |

now?

Q.  Well, you -- you're -- you're basing your claim
on the fact that a rep -- here's a policy that says
that durable medical equipment is not covered, but
you're saying that shouldn't apply to you because David
Pena represented something different to you; isn't that
right?

A.  Correct.

Q.  Okay.  Okay.  So at H.E.B., they told you,
"We'll accept Certus for the medicine.  We'll accept
Certus for the other medicine, but we won't accept
Certus for the nebulizer"; is that right?

A.  That's -- that's basically how it went.

Q.  Did they explain why?  Did they tell you it's
because it's a durable medical device and that you
don't have coverage under your policy for that?

A.  No, sir.  They did not explain.

Q.  They have a little computer there, though,
don't they, when you go to H.E.B., and they type in all
your information, and sometimes they get on the phone
and they call your insurance department or your
insurance company, right?

A.  I don't know.

Q.  Okay.  Did -- what did H.E.B. say to you about
why they're giving you the medicine but not giving you

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

14:40:16  1        A.  He was only one year old.

14:40:16  2        Q.  He was born in 1996 and you applied for

14:40:19  3    insurance in 1999.  Is that correct or am I wrong?

14:40:27  4        A.  He was born in '96 and, yeah, the policy was in

14:40:31  5    '99.  Yeah.  He was -- I'm sorry.  I'm sorry.

14:40:38  6        Q.  Did you ever read your policy to see what was

14:40:42  7    covered in the policy?

14:40:43  8        A.  I glanced through it.  I can't say that I

14:40:46  9    really put --

14:40:47 10        Q.  You never read it?

14:40:49 11        A.  Glanced through it.

14:40:56 12        Q.  Did you read the policy to see what was covered

14:40:56 13    under your policy?

14:40:56 14        A.  I really just put my whole trust on that

14:40:59 15    representative.

14:41:01 16                MR. COWEN:  Answer the question, Joel.

14:41:02 17        Q.  My question is, did you read the policy to see

14:41:05 18    what was covered by the policy?

14:41:06 19        A.  No, I didn't.

14:41:08 20        Q.  Are you aware that there are different benefits

14:41:11 21    whether you're under a group plan or whether you're

14:41:13 22    under an individual plan?

14:41:14 23        A.  No, ma'am.

14:41:22 24        Q.  And the total time that you were a member of

14:41:23 25    the Certus insurance program was about two weeks; is

15:21:01  1  this long enough to know if you talk to --

15:21:02  2          MR. ROERIG:  And what it says up on the

15:21:05  3  top is -- is -- or what it says in this section is

15:21:08  4  "asthma," and then it's signed that it -- does not have

15:21:11  5  asthma.

15:21:11  6      Q.  And my question is, isn't --

15:21:14  7          MR. COWEN:  I'm just saying, you and I

15:21:15  8  have both done this long enough to know that if you're

15:21:18  9  in there and you told a rep about the general nature of

15:21:21 10  a health condition that you or your child have, the

15:21:23 11  form is fairly irrelevant as long as you tell them

15:21:26 12  that, and I have won money on that before.

15:21:29 13          MR. ROERIG:  Okay.  Can I get over to the

15:21:29 14  question then?

15:21:31 15          MR. COWEN:  Sure.  Just --

15:21:31 16          MR. ROERIG:  Thanks.

15:21:32 17          MR. COWEN:  -- don't ask it in a

15:21:33 18  misleading way.

15:21:35 19          MR. ROERIG:  Well, we can just read that

15:21:36 20  back because it wasn't misleading at all.  If you

15:21:39 21  misunderstood it, I apologize, but that's really your

15:21:43 22  fault, not mine.

15:21:50 23          MR. COWEN:  Well, I -- I feel it's a

15:21:50 24  misleading and trick question.

15:21:50 25      Q.  On February 15th, 1999, you -- your Certus

15:21:54 1  policy went into effect, correct?

15:21:54 2      A.  February the 15th, 1999, yes, sir.

15:21:55 3      Q.  And you obtained that Certus policy on the

15:21:59 4  basis of Flores Exhibit No. 1, which is the application

15:22:03 5  that your wife initialled in all the spaces where it

15:22:07 6  says "No" and signed that she had read it and

15:22:09 7  understood it, right?

15:22:12 8      A.  Correct.

15:22:12 9      Q.  Okay.  That was the basis for the granting of

15:22:14 10 your application for the Certus policy, correct?

15:22:17 11     A.  I'm sorry.  What was that?

15:22:18 12     Q.  This application was the basis for Certus

15:22:22 13 granting you the policy --

15:22:23 14     A.  Correct.

15:22:25 15     Q.  -- selling you the policy?

15:22:25 16     A.  Correct.

15:22:26 17     Q.  And then one week later, on February 22nd, you

15:22:28 18 went to see Dr. Montalvo and your child was treated and

15:22:30 19 the bill was sent to Certus and paid by Certus,

15:22:30 20 correct?

15:22:35 21     A.  Yes.

15:22:38 22     Q.  And I believe the bill was something like --

15:22:39 23 they paid $90, which -- which already is in excess of

15:22:44 24 the amount you paid for your premium, correct?

15:22:47 25     A.  Correct.

15:22:48  1      Q.  Okay.  Then you went to a pharmacy where they
15:22:49  2   filled the prescription for the medicine that had been
15:22:51  3   prescribed from Montalvo and that was paid by Certus,
15:22:54  4   right, subject to your co-pays, of course?
15:22:58  5      A.  Correct.
15:22:58  6      Q.  And then you wanted a nebulizer, which I think
15:23:01  7   the -- the record is going to show is not a
15:23:03  8   prescription device and is a durable medical device and
15:23:06  9   is not covered under the plain terms of the Certus
15:23:09 10   policy, and that is the only item that your son
15:23:12 11   required that did not get delivered to you on the basis
15:23:15 12   of your Certus policy, correct?
15:23:20 13      A.  Yes.
15:23:22 14      Q.  The only item that you ever sought to procure
15:23:26 15   through your Certus policy that you did not obtain
15:23:28 16   through your Certus policy was the durable medical
15:23:36 17   device, the nebulizer, that can be obtained without a
15:23:37 18   prescription?
15:23:39 19      A.  That is what -- yes.
15:23:40 20      Q.  Okay.  And then you cancelled your policy on --
15:23:44 21   I think it was effective February 28th -- a little bit
15:23:48 22   later on, the next week, correct?
15:23:53 23      A.  Correct.
15:23:53 24      Q.  Thereafter, you didn't ever go to any more
15:23:56 25   doctors, you didn't ever go to any more pharmacies, you

15:23:59  1   didn't try to buy anything else with your Certus card,

15:23:59  2   correct?

15:24:01  3        A.  No, sir.

15:24:02  4        Q.  So the only thing that you ever did not get

15:24:06  5   that you tried to obtain on your Certus card was the

15:24:12  6   nebulizer?

15:24:12  7        A.  Nebulizer, which was promised by the

15:24:15  8   representative of Certus that it would be covered.

15:24:23  9        Q.  All right.  Now, can you pull out from the

15:24:25  10  exhibits -- and I have all of them here -- well, let me

15:24:29  11  ask you this, sir.  Were there some exhibits that --

15:24:36  12              MS. BATSELL:  That's hers.

15:24:37  13              MR. ROERIG:  Okay.

15:24:37  14       Q.  Were there some exhibits that came to you

15:24:39  15  through the U.S. mail?  Some of these exhibits.  Was

15:24:45  16  anything delivered to you through the United States

15:24:47  17  mail?

15:24:48  18       A.  I would not know.

15:24:50  19       Q.  Okay.  Let me get specific then.  I thought

15:24:52  20  earlier you said that Mr. Pena brought to you most of

15:24:57  21  the information that we have marked as exhibits as part

15:25:00  22  of the presentation --

15:25:01  23       A.  Oh, okay.

15:25:02  24       Q.  -- but then later on you got something

15:25:04  25  delivered to you.  So the first question is, when it

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FLORES, INDIVIDUALLY    ) (
AND ON BEHALF OF ALL         ) (
OTHERS SIMILARLY SITUATED,   ) (
         Plaintiffs          ) (
                             ) (
VS.                          ) (    CIVIL ACTION NO. B-00-53
                             ) (
CERTUS HEALTHCARE, L.L.C.,   ) (
NOVOPHARM LIMITED AND        ) (
NOVOPHARM HOLDINGS, INC.,    ) (
         Defendants          ) (

REPORTER'S CERTIFICATION

    I, RHONDA A. MARTIN, Certified Court Reporter,

certify that the witness, JOEL FLORES, was duly sworn

by me, and that the deposition is a true and correct

record of the testimony given by the witness on

NOVEMBER 14, 2001; that the deposition was reported by

me in stenograph and was subsequently transcribed by me

or under my supervision.

    I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor a relative or employee of such attorney or counsel,

nor am I financially interested in the action.

WITNESS MY HAND on this the 19th day of
November _____, 2001.

*Rhonda Martin*

RHONDA A. MARTIN, Texas CSR 4297
Expiration Date:   12-31-01
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956)428-0755

# Deposition of Monica Blount

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

JOEL FLORES, Individually and      :
On Behalf of All Others Similarly Situated  :
                       :
       Plaintiffs        :
                       :
VS                     :
                     :    CIVIL ACTION NO. B-00-053
CERTUS HEALTH CARE, L.L.C.,     :
NOVOPHARM LIMITED,        :
and NOVOPHARM HOLDINGS, INC.   :
                     :
       Defendants     :

## AFFIDAVIT

BEFORE ME the undersigned authority on this day personally appeared Ricardo Morado,

and after being duly sworn, deposes and says,

1.    My names is Ricardo Morado and I am over the age of eighteen (18) years and I am fully competent to make this affidavit.

2.    I am counsel for Certus Healthcare, L.L.C., a Defendant in the above-styled and numbered cause.

3.    The attached excerpts are true and correct copies of portions of the transcript of the deposition of Monica Blount taken on December 14, 2001 in this cause.

4.    I have personal knowledge of all matters stated in this affidavit. All statements are true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Ricardo Morado

Page 1

SUBSCRIBED AND SWORN TO BEFORE ME by the said Ricardo Morado, affiant, to

which witness my hand and seal of office on this the  sworn to before me on this the 18th  day of

January, 2002.



Notary Public for the State of Texas

**Page 2**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FLORES, INDIVIDUALLY     )(
AND ON BEHALF OF ALL OTHERS   )(
SIMILARLY SITUATED            )(
                              )(
VS.                           )( CIVIL ACTION NO. B-00-53
                              )(
CERTUS HEALTHCARE, L.L.C.,    )(
NOVOPHARM, LIMITED AND        )(
NOVOPHARM HOLDINGS, INC.      )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
MONICA BLOUNT
DECEMBER 14, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF MONICA

BLOUNT, produced as a witness at the instance of the

DEFENDANT CERTUS HEALTHCARE, L.L.C., taken in the above

styled and numbered cause on DECEMBER 14, 2001,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the offices

of Michael R. Cowen, P.C., 765 East 7th Street, Suite

A, Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure.



13:50:43 1      A.   Humberto Scott and Lonnie, which is

13:50:49 2   L-O-N-N-I-E, Scott.

13:50:53 3      Q.   Okay.

13:50:54 4      A.   Two brothers.

13:50:55 5      Q.   Okay.  Do you have any sisters?

13:50:57 6      A.   I have a sister, from my father's first

13:51:00 7   marriage, that lives in California.

13:51:01 8      Q.   Okay.  When did you first hear of Certus

13:51:08 9   Healthcare Plans?

13:51:10 10     A.   I heard of Certus Healthcare Plans when my

13:51:14 11  girls were about nine months old through an

13:51:19 12  advertisement on the radio, radio commercial.

13:51:21 13     Q.   Okay.  So if your -- they were born in March of

13:51:26 14  '97?

13:51:29 15     A.   Yes, sir.  It was around Christmas time.

13:51:31 16     Q.   Of '97?

13:51:32 17     A.   Yes, they started their commercials.  That's

13:51:36 18  when I heard it.

13:51:38 19     Q.   Okay.  And did you -- do you remember what you

13:51:43 20  heard on the radio commercial?

13:51:50 21     A.   Just that they were offering great healthcare,

13:51:56 22  private healthcare.  I don't remember the exact

13:51:58 23  commercial.  Just call 1-800 something Certus,

13:52:03 24  something like that.

13:52:04 25     Q.   Did you hear more than one radio commercial?

13:54:36  1      Q.  Okay.  I think that's a fair answer.  How old

13:54:42  2  were your kids when you signed them up?

13:54:44  3      A.  A year and one month.

13:54:45  4      Q.  Okay.  And so you originally purchased the

13:54:51  5  policy on April 1st, 1998?

13:54:53  6      A.  I believe I purchased it in March to be

13:54:56  7  effective for April the 1st.

13:54:59  8      Q.  Who was the salesman that came to your house?

13:55:01  9      A.  I don't remember his name.

13:55:02 10      Q.  It was a him?

13:55:03 11      A.  It was a gentleman of Indian descent, not

13:55:07 12  American Indian but Asian -- not Asian.  The other

13:55:13 13  Indian.

13:55:14 14      Q.  From India.  Okay.  From Asia.  Did he come to

13:55:22 15  your house more than once?

13:55:24 16      A.  No, just once to sign us up.

13:55:26 17      Q.  Okay.  What do you remember about any

13:55:30 18  representations or promises or statements that he made

13:55:37 19  to you?

13:55:37 20      A.  He just gave a presentation of what plans we

13:55:40 21  could choose from and what the coverage was and

13:55:44 22  basically let us choose and signed us up.  It was very

13:55:49 23  basic.  It wasn't in any sort of detail.

13:55:51 24      Q.  Okay.  But you don't remember him saying, "If

13:55:55 25  you buy this plan, you'll be able to go to any doctor

14

13:56:54  1    A.   My children were the only covered people on the

13:56:58  2    policy.

13:56:59  3    Q.   Okay.

13:56:59  4    A.   I called it private insurance since it was not

13:57:02  5    through a company or employee benefit, sort of.

13:57:09  6    Q.   Did you have employee benefit insurance where

13:57:10  7    you worked?

13:57:11  8    A.   At the time I was employed, yes, I did.  And it

13:57:19  9    was more expensive to purchase it through my job than

13:57:20 10    to purchase it privately.

13:57:21 11    Q.   That's when you were employed with Ventura?

13:57:23 12    A.   At the time that I purchased the Certus

13:57:26 13    Healthcare, I was employed with Sea Garden Sales, and

13:57:35 14    my husband was employed with BISD, and both of us could

13:57:39 15    have put our children on, but it was more expensive on

13:57:43 16    both insurance companies, rather than to purchase it

13:57:46 17    privately.  Because we have -- because they're twins,

13:57:48 18    it's two.  When it's one child, it's cheaper.  When --

13:57:52 19    if it's a family, it's more expensive.

13:57:55 20    Q.   Okay.  Where does your husband work now?

13:57:56 21    A.   He's a federal agent for U.S. Customs.

13:58:00 22    Q.   How long did he work -- what did he do at BISD?

13:58:01 23    A.   He was a school teacher at Porter High School.

13:58:05 24    Q.   How long did he teach there?

13:58:07 25    A.   Six years.

14:00:15 1    price insurance, health insurance products?

14:00:18 2        A.   I don't remember.

14:00:21 3        Q.   Okay.  Do you remember the price that you paid

14:00:23 4    each month to insure Kaitlin and Shelby?

14:00:27 5        A.   The first year, I don't remember how much it

14:00:29 6    was the first year.  The second year it was $110 a

14:00:34 7    month for the both of them.  I do know that the premium

14:00:40 8    went up the second year, but I can't remember how much

14:00:43 9    it was the first year.  I don't remember.

14:00:46 10       Q.   Okay.  Did you get a special deal because there

14:00:52 11   were two of them?

14:00:52 12       A.   I wish.  No, I didn't.

14:00:54 13       Q.   Okay.  And your daughters are named Kaitlin and

14:00:57 14   Shelby; is that correct?

14:00:59 15       A.   That's correct, sir.

14:00:59 16       Q.   And am I saying those right?

14:01:02 17       A.   Yes, sir.

14:01:02 18       Q.   All right.  Now, in his deposition, Mr. Flores

14:01:10 19   indicated that you had advised him about Certus and

14:01:19 20   that it was a good deal and you were saving money.

14:01:25 21       A.   That's correct.

14:01:25 22       Q.   Do you remember that conversation?

14:01:25 23       A.   Yes, I do.

14:01:26 24       Q.   Tell me what else do you remember, besides what

14:01:28 25   I've just said, about it?

14:01:29 1    A.   That pretty much sums it up, because I was

14:01:32 2 John's office manager.  I processed all the insurance,

14:01:37 3 paid bills, accounts receivables, accounts payable.  So

14:01:41 4 I know exactly how much employees were paying for

14:01:44 5 employee benefits for their families and so forth.  And

14:01:47 6 I was actually the one who brought it to his attention

14:01:50 7 and said, "Hey, I've got my kids with Certus, and it's,

14:01:55 8 you know, 'X' dollars cheaper.  You ought to look into

14:01:58 9 it."

14:01:58 10    Q.   Do you remember when that was?

14:01:59 11    A.   No, sir, I sure don't.

14:02:01 12    Q.   Okay.  You said that you were with -- let's get

14:02:07 13 all these dates together here.  You were with John

14:02:10 14 Ventura from January of 1998 to March of 1999, and you

14:02:15 15 had Certus insurance from April of '98 -- that's four

14:02:19 16 months after you went there, three months after you

14:02:21 17 went there -- to September of '99.  So it must have

14:02:30 18 been in between -- was it during the time that you had

14:02:35 19 the policy in effect?

14:02:38 20    A.   It had to have been.

14:02:39 21    Q.   When you had the conversation?

14:02:40 22    A.   Yeah.

14:02:40 23    Q.   Okay.  Do you remember, you know, from the time

14:02:45 24 of your employment, which was January of '98 -- I guess

14:02:47 25 we can eliminate January --

14:02:49  1        A.   Through April.

14:02:50  2        Q.   -- through April.  Can you go any further than

14:02:52  3   that?

14:02:53  4        A.   I don't remember when the conversation took

14:02:55  5   place.

14:02:55  6        Q.   Okay.  It had been some time while you were

14:03:00  7   insured with Certus and while you worked for Ventura?

14:03:07  8        A.   That's correct.

14:03:07  9        Q.   So it would have to be between April of '98 and

14:03:12 10   March of '99?

14:03:14 11        A.   That's correct.

14:03:17 12        Q.   When did you renew?

14:03:21 13        A.   You sign up for a year.

14:03:23 14        Q.   Okay.

14:03:23 15        A.   And so I renewed sometime in March, I believe.

14:03:27 16        Q.   Okay.  And did you sign up for a year the

14:03:31 17   second time, or did you just sign up for six months the

14:03:35 18   second time?

14:03:35 19        A.   I don't remember.

14:03:36 20        Q.   Well, it shows -- as I say, that you're insured

14:03:40 21   from 4/01/98 until 9/15/99.  Do you remember why isn't

14:03:48 22   it coming up to the second anniversary?

14:03:50 23        A.   I don't remember.

14:03:52 24        Q.   Okay.

14:03:53 25        A.   I don't remember.

```
14:56:37  1        Q.  With your kids.  I'm not talking about a
14:56:39  2   theoretical child that maybe was real sick.  But with
14:56:41  3   your kids, do you know if it has actually made a
14:56:45  4   difference?
14:56:45  5        A.  No.
14:56:45  6        Q.  I saw that at least one of your kids had been
14:56:47  7   to a hospital since then?
14:56:48  8        A.  Yes, sir.
14:56:48  9        Q.  What was that about?
14:56:50 10        A.  One had -- actually, it was the same child.
14:56:53 11   She was severely dehydrated, and she was hospitalized
14:56:57 12   for 24 hours.
14:56:58 13        Q.  From a fever?
14:56:59 14        A.  Yes, actually, vomiting and diarrhea.
14:57:02 15        Q.  Okay.  Any other hospitalizations that either
14:57:05 16   of them had?
14:57:06 17        A.  Not hospitalizations.  Went in for x-rays.
14:57:09 18        Q.  Okay.  And -- well, let me just recap this
14:57:17 19   thing and see if I understand all the things that
14:57:20 20   you've got to say about the lawsuit.  And then I'll
14:57:23 21   just ask you that -- you know, at the end of this I'm
14:57:26 22   going to say, "What else, if anything, do you have to
14:57:30 23   add that I need to know about?"
14:57:32 24             You got insured by Certus in April 1 of
14:57:36 25   1998?
```

14:57:37 1      A.  Yes, sir.

14:57:37 2      Q.  During the time that you were insured, both

14:57:39 3  your kids saw Thelma regularly like for regular kid

14:57:43 4  stuff and no real different kind of interesting or

14:57:49 5  exciting or tragic illnesses or injuries at all, but

14:57:56 6  just kind of in there for things kids do?

14:57:56 7      A.  Routine checkups.

14:57:57 8      Q.  And, according to the records that I've got,

14:58:00 9  she always got paid and Dr. Laksh got paid for the

14:58:04 10 child of yours that he saw, right?

14:58:06 11     A.  Correct.

14:58:06 12     Q.  You don't have any memory or any records any

14:58:08 13 different than that?

14:58:09 14     A.  I don't have any memory or any records

14:58:11 15 indicating otherwise.

14:58:12 16     Q.  And you never tried to get your child to see

14:58:15 17 any doctor or enter any hospital and were refused

14:58:20 18 anything there?

14:58:21 19     A.  That's correct.

14:58:21 20     Q.  And you say that one time you went to Walgreen

14:58:23 21 and they said, "We don't take Certus."  So you had to

14:58:27 22 drive ten blocks to an H-E-B where your prescription

14:58:31 23 was filled.

14:58:31 24     A.  To the best of my recollection.

14:58:33 25     Q.  And that's the only inconvenience that you ever

14:58:35  1    suffered from having Certus.  And then you had to

14:58:38  2    change because Thelma Gonzalez called you, presumably

14:58:42  3    around September of 1999, at home and told you she

14:58:45  4    was -- you'd better call your insurance carrier and get

14:58:48  5    them to pay or she was going to stop taking it,

14:58:50  6    correct?

14:58:52  7        A.  That's correct.

14:58:52  8        Q.  And instead of calling your insurance carrier

14:58:54  9    and telling them, "You'd better start paying," you just

14:58:56 10    changed companies?

14:58:57 11        A.  Switched.

14:58:58 12        Q.  Okay.  Was there a reason you didn't call

14:59:00 13    Certus and say, "Hey, Thelma wants some money over

14:59:03 14    there"?

14:59:03 15        A.  No, I just didn't feel like messing with it.

14:59:05 16        Q.  Do you know if Thelma ever made a claim against

14:59:09 17    Certus for having late charges or late payments?

14:59:11 18        A.  No, I don't know if she ever did that or not.

14:59:14 19        Q.  And you have no knowledge as to whether or not

14:59:16 20    she ever was getting paid late or not?

14:59:19 21        A.  No, I sure don't.

14:59:19 22        Q.  You just know somebody whose voice sounded like

14:59:24 23    hers called you on the phone and said it's a fact.  You

14:59:27 24    don't know that it's a fact, correct?

14:59:28 25        A.  That I actually spoke to her?

```
15:21:34  1    plans are lists of counties in areas covered by Certus
15:21:44  2    with the doctors that were on their HMO that you can
15:21:49  3    see that they would then pay whatever your benefits
15:21:53  4    called for, right?
15:21:54  5         A.  Uh-huh.
15:21:55  6         Q.  Is that a "yes"?
15:21:56  7         A.  Yes.
15:21:56  8         Q.  And I only say that so we can have it for the
15:21:59  9    court reporter.
15:21:59 10         A.  Right.
15:22:00 11         Q.  Did you know also that in this plan that I saw
15:22:03 12    for the first time today there are a list of ancillary
15:22:08 13    providers?  For example, if you wanted to go -- like
15:22:12 14    Lab Corps that you were talking about with Mr. Roerig,
15:22:16 15    if you wanted to have tissue samples or blood tests
15:22:20 16    run, there are certain labs within the plan that Certus
15:22:24 17    will pay for.  Did you know that?
15:22:26 18         A.  Yes, sir.
15:22:26 19         Q.  Okay.  And -- but the reason that I'm asking is
15:22:28 20    because I'm looking here on page 14 of the list of
15:22:32 21    providers, which is Cameron County.  And starting on
15:22:35 22    page 13 into page 14 of this exhibit is a list of the
15:22:40 23    pharmacies.  Can you see that?
15:22:42 24         A.  Yes, sir.
15:22:44 25         Q.  And I don't see Walgreen anywhere.
```

15:22:47 1     A.   Okay.

15:22:48 2     Q.   Do you?

15:22:48 3     A.   No, sir.

15:22:49 4     Q.   But I do see H-E-B.

15:22:51 5     A.   Uh-huh.

15:22:54 6     Q.   Is that right?

15:22:54 7     A.   That's correct.

15:22:54 8     Q.   Do you think that might explain why when you

15:22:57 9  went to Walgreen they said, "We're not with Certus,"

15:23:01 10 and then when you went to H-E-B, H-E-B apparently

15:23:06 11 filled the prescription, according to your testimony?

15:23:09 12    A.   Probably.

15:23:09 13    Q.   Okay.  If Walgreen was not one of the listed

15:23:13 14 members, then, of course, you wouldn't have expected

15:23:15 15 for Walgreen's to fill a prescription at Certus'

15:23:18 16 expense, would you?

15:23:19 17    A.   No.

15:23:19 18    Q.   Did you ever get any piece of paper, or have

15:23:22 19 you brought one with you today, that -- where Certus

15:23:25 20 said that Walgreen's was an authorized pharmacy --

        21     A.   No.

15:23:29 22    Q.   -- as opposed to H-E-B?

15:23:34 23    A.   No, sir.

15:23:34 24    Q.   You'll live by whatever these contract

15:23:34 25 documents say, right?

```
      1   Roy, he --
15:25:54  2              THE WITNESS:  Oh, okay.
15:25:55  3        Q.  All right.  I'm going to show you what we've
15:25:55  4   marked as Exhibit 5.
15:25:55  5        A.  Okay.
15:25:56  6        Q.  And this says -- this is your note on the front
15:25:56  7   that says, "I found the rest of the invoices for
15:25:59  8   healthcare from Certus," right?
15:26:01  9        A.  Yes, sir.
15:26:01 10        Q.  And then those are different ones than this
15:26:04 11   No. 4?
15:26:04 12        A.  Yes.
15:26:05 13        Q.  Which is some other invoices from Certus?
15:26:07 14        A.  Yes, sir.
15:26:08 15        Q.  It looks to me like the -- and I'm capable of
15:26:10 16   misreading these things at any time.  But it looks to
15:26:13 17   me like the monthly charge was $55-and-some-odd-cents
15:26:18 18   per child in pretty much all those statements, right?
15:26:23 19        A.  (Moving head up and down)
15:26:23 20        Q.  Yes?
15:26:23 21        A.  Yes, sir.
15:26:24 22        Q.  Okay.  Then on Exhibit 6, this says "billing
15:26:28 23   statements after Certus."  And these are Blue
15:26:31 24   Cross/Blue Shield, right?
15:26:32 25        A.  Yes, sir.
```

15:26:33 1       Q.  And it looks to me like the monthly statements

15:26:35 2   there are $34 per child, which is cheaper than what it

15:26:41 3   was with Certus.  Tell me if I'm wrong.

15:26:44 4       A.  No, that's correct.  The coverage was

15:26:47 5   different.

15:26:54 6       Q.  Can you tell me how it was different?  You said

15:27:02 7   you thought it was 85 -- or it wasn't 85/15, or one was

15:27:05 8   90/10 and the other one was 85/15?

15:27:06 9       A.  Best of my recollection.

15:27:08 10      Q.  Okay.  But it actually cost less money out of

15:27:09 11  your pocket to get whatever it is that you got?

15:27:12 12      A.  The -- just looking to see where it went up.

15:27:42 13  In February of this year the premium had gone up.

15:27:45 14      Q.  To what?

15:27:45 15      A.  $46.

15:27:46 16      Q.  So Blue Cross/Blue Shield went up to $46.  So

15:27:50 17  now they're only $9 cheaper than Certus was, correct?

15:27:57 18      A.  Okay.  And then in March they went up to $58.

15:28:03 19      Q.  58?

15:28:04 20      A.  Yes, sir.

15:28:04 21      Q.  Okay.  So two years later they've finally gone

15:28:07 22  up to where Certus was two years earlier?

15:28:11 23      A.  Okay.  Yes, sir.

15:28:13 24          MR. ROERIG:  Okay.  That's all the

15:28:15 25  questions I have.

1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE SOUTHERN DISTRICT OF TEXAS
2                             BROWNSVILLE DIVISION

3     JOEL FLORES, INDIVIDUALLY    )(
      AND ON BEHALF OF ALL OTHERS  )(
4     SIMILARLY SITUATED           )(
                                   )(
5     VS.                          )( CIVIL ACTION NO. B-00-53
                                   )(
6     CERTUS HEALTHCARE, L.L.C.,   )(
      NOVOPHARM, LIMITED AND       )(
7     NOVOPHARM HOLDINGS, INC.     )(

8
                             REPORTER'S CERTIFICATION
9                          DEPOSITION OF MONICA BLOUNT
                              DECEMBER 14, 2001
10
          I, CORINNA N. GARCIA, Certified Court Reporter
11    in and for the State of Texas, hereby certify to the
      following:
12
          That the witness, MONICA BLOUNT, was duly sworn by
13    the officer and that the transcript of the oral
      deposition is a true record of the testimony given by
14    the witness;

15        The original transcript is being delivered on
      _January 3, 2002_ to Jeff Roerig, custodial
16    attorney, for safekeeping and a duplicate transcript
      with the original Errata Sheet/Signature Page is being
17    submitted to Michael R. Cowen for examination,
      signature, and return to Bryant & Stingley, Inc., by
18    _January 23_ , 2002;

19        That the amount of time used by each party at the
      deposition is as follows:
20
          MICHAEL M. CARRE - 00 Hours, 00 Minutes
21        JEFFREY D. ROERIG - 01 Hours, 13 Minutes
          MITCHELL CHANEY - 00 Hours, 19 Minutes
22
          That $ _____ is the deposition officer's charges
23    for preparing the original deposition transcript and
      any copies of exhibits, charged to Defendant Certus
24    Healthcare, L.L.C.

25

1      That a copy of this certificate was provided to the
following parties:

2

3          MICHAEL R. COWEN
           MICHAEL R. COWEN, P.C.
4          765 East 7th Street, Suite A
           Brownsville, Texas  78520

5
           JEFFREY D. ROERIG
6          ROERIG, OLIVEIRA & FISHER, L.L.P.
           855 West Price Road, Suite 9
7          Brownsville, Texas  78520

8          MITCHELL C. CHANEY
           RODRIGUEZ, COLVIN & CHANEY, L.L.P.
9          1201 East Van Buren
           Brownsville, Texas  78520

10
       I further certify that I am neither counsel for,
11   related to, nor employed by any of the parties or
     attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
     otherwise interested in the outcome of the action.

13
       Pursuant to Rule 203 of TRCP, an additional
14   certificate will be issued.

15      Sworn to by me this _3rd_ day of _January_,
     2002.

16

17      _Corinna N. Garcia_
        CORINNA N. GARCIA, Texas CSR 5210
18      Expiration Date: 12-31-01
        Bryant & Stingley, Inc.
19      2010 East Harrison
        Harlingen, Texas  78550
20      (956) 428-0755

21

22

23

24

25

# Plaintiff Joel Responses to Requests for Admission

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and<br>On Behalf of All Others Similarly Situated | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| VS | : | |
| | : | CIVIL ACTION NO. B-00-053 |
| CERTUS HEALTH CARE, L.L.C.,<br>NOVOPHARM LIMITED,<br>and NOVOPHARM HOLDINGS, INC. | : | |
| | : | |
| Defendants | : | |

## AFFIDAVIT

BEFORE ME the undersigned authority on this day personally appeared Ricardo Morado,

and after being duly sworn, deposes and says,

1.    My names is Ricardo Morado and I am over the age of eighteen (18) years and I am fully competent to make this affidavit.

2.    I am counsel for Certus Healthcare, L.L.C., a Defendant in the above-styled and numbered cause.

3.    The attached excerpts are true and correct copies of Plaintiff Joel Flores' Responses to Defendant Novopharm Holdings, Inc.'s First Set of Requests for Admissions in this cause.

4.    I have personal knowledge of all matters stated in this affidavit.  All statements are true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Ricardo Morado

Page 1

SUBSCRIBED AND SWORN TO BEFORE ME by the said Ricardo Morado, affiant, to which witness my hand and seal of office on this the  sworn to before me on this the 18th  day of January, 2002.



Notary Public for the State of Texas

**Page 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and on | § | |
| Behalf of All Others Similarly Situated | § | |
| | § | CIV. ACTION NO. B-00-53 |
| V. | § | |
| | § | |
| CERTUS HEALTHCARE, L.L.C.; | § | |
| NOVOPHARM LIMITED, DAVID | § | CLASS ACTION |
| RODRIGUEZ, DR. ASHOK K. GUMBHIR, | § | |
| and NOVOPHARM HOLDINGS, INC. | § | |

## PLAINTIFF JOEL FLORES' RESPONSES TO DEFENDANT
## NOVOPHARM HOLDINGS, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS

**TO:**   Defendant, **NOVOPHARM HOLDINGS, INC.**, by and through its attorney of record:

>   Mr. Norton A. Colvin, Jr.
>   RODRIGUEZ, COLVIN & CHANEY, L.L.P.
>   1201 E. Van Buren Street
>   Brownsville, Texas 78520

   NOW COMES, **JOEL FLORES**, Plaintiff in the above styled and numbered cause, and

files these his responses to Defendant, **NOVOPHARM HOLDINGS, INC.'S** First Set of

Requesst for Admissions pursuant to the Texas Rules of Civil Procedure.

>   Respectfully submitted,
>
>   MICHAEL R. COWEN, P.C.
>   765 E. 7th Street, Suite A
>   Brownsville, Texas 78520
>   Telephone    (956) 541-4981
>   Facsimile    (956) 504-3674
>
>   _____
>   Michael R. Cowen
>   Fed. ID. No. 19967
>   ATTORNEY FOR PLAINTIFF

RECEIVED
JAN 15 2002

## CERTIFICATE OF SERVICE

On this the 14h day of January, 2002, a true and correct copy of the above and

foregoing document was sent to opposing counsel in the manner indicated below:

Mr. Norton A. Colvin, Jr.               **CMRRR#7000–0600-0025-9262-8689**
Rodriguez, Colvin & Chaney, L.L.P.
1201 E. Van Buren Street
Brownsville, Texas 78520

Mr. Jeffrey D. Roerig                 **Regular U.S. Mail**
Roerig, Oliveira & Fisher, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

Mr. John Wallace                   **Regular U.S. Mail**
Wallace, Creech & Sarda, L.L.P.
3605 Glenwood Avenue, Suite 240
Post Office Box 12065
Raleigh, North Carolina 27605

Michael R. Cowen

1.    Admit that your son Joel had been diagnosed with asthma prior to his enrollment as a Certus subscriber.

**RESPONSE: Unable to admit or deny as Plaintiff is not sure.**

2.    Admit that you failed to disclose asthma as a preexisting condition on Joel's written application for Certus membership.

**RESPONSE: Deny.**

3.    Admit that you did not disclose any type of lung disease or ailment on Joel's written application for Certus membership.

**RESPONSE: Admit.**

4.    Admit that your son Joel had been diagnosed with chronic bronchitis prior to his application for Certus membership.

**RESPONSE: Admit.**

5.    Admit that you failed to disclose chronic bronchitis on your son Joel's written application for Certus membership.

**RESPONSE: Admit.**

6.    Admit that the nebulizer you allegedly sought to obtain, pursuant to your son's Certus enrollment, was not covered by the Certus plan in which your son was enrolled.

**RESPONSE: Deny.**

7.    Admit that the nebulizer you allegedly sought to obtain, pursuant to your son's Certus enrollment, was not covered by the terms of the written contracts of insurance that you purchased.

**RESPONSE: Deny.**

8.    Admit that you do not meet the typicality requirement set out in Federal Rule of Civil Procedure 23(a) (3).

**RESPONSE: Deny.**

9.    Admit that your claims are not typical of the claims of the proposed class.

**RESPONSE: Deny.**

10.    Admit that your son was enrolled as a Certus member for less than one month.

       **RESPONSE: Admit.**

11.    Admit that your son received medical services and benefits having a value in excess of
       the premium paid by you for your son's enrollment in Certus.

       **RESPONSE: Admit.**

12.    Admit that your son's enrollment as a Certus member was not provided for by or related
       to any employment relationship that you or your wife may have had.

       **RESPONSE: Admit.**

13.    Admit that you did not read the "Schedule of Benefits, Limitations, and Exclusions" for
       Plan 10-I 8 prior to enrolling your son as a Certus subscriber in Plan 10-I 8.

       **RESPONSE: Deny.**

14.    Admit that you did not read the "Schedule of Benefits, Limitations, and Exclusions" prior
       to seeking a nebulizer utilizing the Certus membership benefits.

       **RESPONSE: Admit.**

15.    Admit that Drug Emporium was not an enrolled pharmacy in the Certus network at the
       time you sought medical services there.

       **RESPONSE: Admit.**

16.    Admit that Los Ebanos Pharmacy was not an enrolled pharmacy in the Certus network at
       the time you sought medical services there.

       **RESPONSE: Admit.**

17.    Admit that Walgreen's Pharmacy was not enrolled pharmacy in the Certus network at the
       time you sought medical services there.

       **RESPONSE: Admit.**

18.    Admit that the Certus member agreement explicitly provides that the providers identified
       in the Provider Handbook may not necessarily continue to serve as Certus-approved
       providers.

**RESPONSE: Admit.**

19.   Admit that one or more Certus-approved providers may have breached their agreements with Certus by declining to provide service to Certus members.

**RESPONSE: Deny.**

19.   Admit that Certus members, on average, received medical benefits having a value in excess of the premiums paid by such members.

**RESPONSE: Deny.**

20.   Admit that one or more members of the proposed Non-ERISA subclass failed to make one or more premium payments to Certus.

**RESPONSE: Deny.**

21.   Admit that one or more members of the proposed Non-ERIS subclass received medical benefits having a value in excess of their premiums paid.

**RESPONSE: Admit.**

22.   Admit that you relied on representations made orally by David Lee Pena, sales agent for Certus.

**RESPONSE: Admit.**

23.   Admit that Pena's representations to you specifically related to his own daughter and your son.

**RESPONSE: Admit.**

24.   Admit that you relied on the representations of David Lee Pena, and not on the representations contained in any printed material.

**RESPONSE: Deny.**

25.   Admit that you did not rely individually on any representations made by Certus to the Texas Department of Insurance.

**RESPONSE: Admit.**

26.   Admit that you were unaware of any specific representations made by Certus to the Texas Department of Insurance, prior to or during the time your son was enrolled in Certus.

**RESPONSE: Admit.**

27.    Admit that you were unaware of any assurances made by Novopharm Limited or Novopharm Holdings to the Texas Department of Insurance, prior to or during the time your son was enrolled in Certus.

**RESPONSE: Admit.**

28.    Admit that you were unaware of any assurances made by Novopharm Limited or Novopharm Holdings to the Texas Department of Insurance, prior to or during the time your son was enrolled in Certus.

**RESPONSE: Admit.**

29.    Admit that Certus offered several different employer plans.

**RESPONSE: Admit.**

30.    Admit that Certus offered several different individual plans.

**RESPONSE: Admit.**

31.    Admit that each of the foregoing plans contained variations by co-payment based upon co-payment amount.

**RESPONSE: Admit.**

32.    Admit that Certus providers denying Certus benefits to Certus members have done so in violation of their contractual agreement with Certus.

**RESPONSE: Deny.**

33.    Admit that physicians denying member benefits to Certus members may have done so in violation of regulation and/or statutory provisions of the Texas Department of Insurance.

**RESPONSE: Deny.**

34.    Admit that one or more Certus providers submitted "unclean" claims for payment from Certus.

**RESPONSE: Deny.**

35.    Admit that Certus was not obligated to pay "unclean" claims within forty-five days of their receipt from the provider.

**RESPONSE: Deny.**

36.   Admit that the value of any claim by Joel Fores is less than the alleged values of the majority of the putative class members' potential claims.

**RESPONSE: Deny.**

37.   Admit, on behalf of the class, that some healthcare providers within the Certus network provided care to Certus members without interruption.

**RESPONSE: Admit.**

38.   Admit, on behalf of the class, that many providers in the Certus Healthcare network provided care to Certus Healthcare members without interruption.

**RESPONSE: Deny.**

39.   Admit, on behalf of the class, that one or more providers in the Certus Healthcare network provided care to Certus Healthcare members without interruption.

**RESPONSE: Admit.**

40.   Admit, on behalf of the class, that the majority of providers in the Certus Healthcare network provided care to Certus Healthcare members without interruption.

**RESPONSE: Deny.**

41.   Admit, on behalf of the class, that one or more healthcare providers within the Certus network accepted Certus payments and Certus members until the time when Certus Healthcare stopped operating.

**RESPONSE: Admit.**

42.   Admit, on behalf of the class, that some healthcare providers within the Certus network accepted Certus payments and Certus members until the time when Certus Healthcare stopped operating.

**RESPONSE: Admit.**

43.   Admit, on behalf of the class, that may healthcare pproviders within the Certus network accepted Certus payments and certus members until the time when Certus Healthcare stopped operating.

**RESPONSE: Deny.**

44.    Admit, on behalf of the class, that some healthcare providers within the Certus network accepted Certus payments and Certus members until the time when Certus Healthcare stopped operating.

**RESPONSE: Admit.**

45.    Admit, on behalf of the class, that some Certus members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

46.    Admit, on behalf of the class, that one or more Certus members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

47.    Admit, on behalf of the class, that one or more putative class members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

48.    Admit, on behalf of the class, that some putative class members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

49.    Admit, on behalf of the class, that the majority of putative class members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

50.    Admit, on behalf of the class, that many putative class members were delinquent in making premium payments to Certus.

**RESPONSE: Deny.**

51.    Admit, on behalf of the class, that one or more putative class members did not represent their medical histories accurately to Certus on their written application to Certus.

**RESPONSE: Deny.**

52.    Admit, on behalf of the class, that one or more putative class members may have made misrepresentations on their applications to Certus.

**RESPONSE: Deny.**

53.     Admit, on behalf of the class, that some putative class members, in enrolling with Certus, relied on oral representations, but not written representations by Certus.

        **RESPONSE: Deny.**

54.     Admit, on behalf of the class, that some putative class members, in enrolling with Certus, relied on written representations, but not oral representations by Certus.

        **RESPONSE: Deny.**

55.     Admit, on behalf of the class, that some putative class members, in enrolling with Certus, relied on both written and oral representations by Certus.

        **RESPONSE: Admit.**

56.     Admit, on behalf of the class, that some putative class members, in enrolling with Certus, relied on neither written nor oral representations by Certus.

        **RESPONSE: Deny.**

57.     Admit, on behalf of the class, that the Texas Department of Insurance was not a party to the Second Amendment to the Operating Agreement of Certus Healthcare, LLC.

        **RESPONSE: Deny.**

58.     Admit, on behalf of the class, that the Texas Department of Insurance was not a signatory of the Second Amendment to the Operating Agreement of Certus Healthcare, LLC.

        **RESPONSE: Admit.**

59.     Admit, on behalf of the class, that Novopharm Limited was not a party to the Second Amendment to the Operating Agreement of Certus Healthcare, LLC.

        **RESPONSE: Deny.**

60.     Admit, on behalf of the class, that Novopharm Limited was not a signatory of the Second Amendment to the Operating Agreement of Certus Healthcare, LLC.

        **RESPONSE: Admit.**

61.     Admit, on behalf of the class, that putative class members, if they were able to prove the claims as alleged, would be entitled to damages in some instances greater than the difference between the value of the policy promised and the policy received.

difference between the value of the policy promised and the policy received.

**RESPONSE: Deny.**

62.    Admit that neither the Texas Department of Insurance nor any member of the putative class is named in any part of the Second Amendment to the Operating Agreement of Certus Healthcare, LLC as an intended beneficiary of the Agreement.

**RESPONSE: Deny.**

63.    Admit that there exists no written agreement between Novopharm Limited and the Texas Department of Insurance for the provision of funding to Certus Healthcare, LLC.

**RESPONSE: Admit.**

64.    Admit that there exists no written agreement between Novopharm Holdings and the Texas Department of Insurance for the provision of funding to Certus Healthcare, LLC.

**RESPONSE: Admit.**

65.    Admit that there was no single version of any contract between Certus and every member of the putative class.

**RESPONSE: Deny.**

66.    Admit that each agreement between Certus and a putative class member was unique in that the combination of written and/or oral representations made to that putative class member are known only to that class member and any other person present at the time the contract was made.

**RESPONSE: Deny.**

67.    Admit that the representations relied upon by each putative class member are knownonly to that class and any other person present at the time the contract was made.

**RESPONSE: Deny.**

68.    Admit that one or more Certus Healthcare providers were paid in a timely manner for claims by certus.

**RESPONSE: Admit.**

69.    Admit that few Certus Healthcare providers were paid in a timely manner for claims.

**RESPONSE: Cannot admit or deny.**

70.   Admit that some Certus Healthcare providers were paid in a timely manner for claims.

**RESPONSE: Admit.**

71.   Admit that many Certus Healthcare providers were paid in a timely manner for claims.

**RESPONSE: Deny.**

72.   Admit that the majority of Certus Healthcare providers were paid in a timely manner for claims.

**RESPONSE: Deny.**

73.   Admit that almost all Certus Healthcare providers were paid in a timely manner for claims.

**RESPONSE: Deny.**

74.   Admit that some putative class members are not entitled ot damages in the amount of the difference between the value of the policy promised and the policy received becasue they received medical benefits valued at agreater amount than the value of the premiums they paid.

**RESPONSE: Deny.**

75.   Admit that you are not a member of the proposed ERISA subclass.

**RESPONSE: Admit.**

76.   Admit that Monica Blount is not a member of the proposed ERISA subclass.

**RESPONSE: Admit.**