United States District Court
Southern District of Texas
FILED

JAN 1 8 2002

Michael N. Milby
Clerk of Court

63

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. B-00-053 |
| CERTUS HEALTHCARE, L.L.C., NOVOPHARM LIMITED, and NOVOPHARM HOLDINGS, INC. | ) ) ) ) ) | Class Action |
| Defendants. | ) | |

**DEFENDANTS NOVOPHARM LIMITED AND NOVOPHARM HOLDINGS, INC.'S
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Respectfully Submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.
Norton A. Colvin, Jr.
Attorney-in-Charge
State Bar No. 04632100
Federal Admissions No. 1941
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (fax)

Of Counsel:
John R. Wallace
WALLACE, CREECH & SARDA, L.L.P.
Post Office Box 12065
Raleigh, North Carolina 27605
(919) 782-9322
(919) 782-8113 (fax)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    Formation and Operation of Certus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    Joel Flores . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    Monica Blount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

CLASS CERTIFICATION SHOULD BE DENIED BECAUSE
THE PLAINTIFFS HAVE FAILED IN THEIR BURDEN OF
ESTABLISHING THAT THE ACTION BROUGHT BY THE
CLASS REPRESENTATIVES SATISFIES THE CRITERIA OF
FEDERAL RULE 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

The Standard for Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

I.    PLAINTIFFS HAVE FAILED TO PROVE THAT THE
        PREREQUISITES OF RULE 23(a) HAVE BEEN MET.

    A.    Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    B.    Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    C.    Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

II.   PLAINTIFFS HAVE FAILED TO PROVE THAT COMMON
       ISSUES OF FACT OR LAW PREDOMINATE OVER
       INDIVIDUALIZED ISSUES AND THAT A CLASS ACTION
       WOULD BE THE SUPERIOR MEANS TO ADJUDICATE
       THE CONTROVERSY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

    A.    Detrimental Reliance must be determined on a
           case-by-case basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

    1.    Fraud and Negligent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . .   24

    2.    RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

    3.    DTPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

    4.    Insurance Code Article 21.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

         5.    The Fifth Circuit has refused to recognize
              a presumption of reliance outside the context
              of securities law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

    B.    Whether Damages are due each putative class
           member is an inquiry that must be performed
           for each individual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

    C.    Specific Representations made to each putative
           class member must be factored into any adjudication
           of the individual's claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

         1.    Plaintiffs' claim for Breach of Contract. . . . . . . . . . . . . . . . . .   34

    D.    Plaintiffs' Third Party Beneficiary claim contains
           its own issues which require individualized treatment. . . . . . . . . . . . . .   36

    E.    Individual issues of non-payment of premiums
          and proportionate responsibility dictate against
          certification of a class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiffs. | ) ) | |
| v. | ) ) | Civil Action No. B-00-053 |
| CERTUS HEALTHCARE, L.L.C., NOVOPHARM LIMITED, and NOVOPHARM HOLDINGS, INC. | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS NOVOPHARM LIMITED AND NOVOPHARM HOLDINGS, INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

TO THE HONORABLE UNITED STATES MAGISTRATE JUDGE:

NOW COME NOVOPHARM LIMITED and NOVOPHARM HOLDINGS, INC.,

Defendants herein, and file this, their Brief in Opposition to Plaintiffs' Motion for Class

Certification.

## INTRODUCTION

Plaintiffs come before the Court seeking the certification of a class of plaintiffs based on

their First Amended Complaint, which contains seven claims for relief. Plaintiffs' theory in

bringing forth this action is that members of the putative class purchased an HMO membership

through Certus Healthcare, L.L.C. that was worth less than what they paid for it. As stated in

Plaintiffs' Motion, Plaintiffs seek damages that are calculated as "the difference in value between

the policies that Certus promised and the policies it actually delivered." Plaintiffs' Motion for

Class Certification at 3.

This Court should deny class certification as to all of Plaintiffs' claims, as Plaintiffs have failed to meet their burden of proof with respect to each claim and with respect to each of the proposed subclasses. *See* Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996); *see also* Bertulli v. Independent Association of Continental Pilots, 242 F.3d 290, 295 (5th Cir. 2001) (holding that a class is to be certified on a claim by claim basis). In what appears to be an attempt to create a class, a theory, and a damages model that allows for some type of recovery, Plaintiffs have utilized a "shotgun" approach to pleading their claims. In doing so, they have not pled any single claim that is suitable for class treatment, irrespective of the merits of those claims. For each claim for relief made by Plaintiffs, there are individual issues that predominate over any "class" issues raised by Plaintiffs. With respect to their damages model, Plaintiffs have fashioned a measure of damages that ignores any actual injuries suffered by class members. *See* Maio v. Aetna Inc., 221 F.3d 472 (3rd Cir. 2000) (holding that in a class action under RICO where plaintiffs claimed that HMO memberships were worth less than what was paid for them because of misrepresentations to consumers, plaintiff's failure to allege any actual injury resulting from defendant's practices failed to state a claim).

The Plaintiffs' Motion seeks an order certifying that this action shall be maintained as a class action for the benefit of the class consisting of:

**All policy holders, beneficiaries, and members of any health insurance plan or HMO from Certus Healthcare, LLC from May 29, 1998 to November 2, 1999.**

The Novopharm Defendants will show the Court that Plaintiffs do not meet the threshold standards of Rule 23(a), specifically typicality, commonality, and adequacy. Plaintiffs' failure to meet these tests negates their ability to have a class certified. Further, Defendants will show the Court that Plaintiffs and their proposed class, likewise, do not meet the maintenance requirements of Rule 23(b) in that individual issues predominate over class-wide issues.

Plaintiffs' inability to meet these standards requires that the Court deny Plaintiffs' Motion for

Class Certification.

## STATEMENT OF THE CASE

This action was commenced as a putative class action by Plaintiff Joel Flores on March 1,

2000 in the District Court of Cameron County, Texas.  By Notice of Removal, this action was

removed from the United States District Court on April 5, 2000.  Plaintiff filed a Motion for

Remand on May 5, 2000, and the Court subsequently denied it.  Plaintiff thereupon served

discovery requests including interrogatory requests, requests for production of documents, and

requests for admissions upon Defendants and conducted the deposition of an employee of

Defendant Novopharm Limited, Daniel Youtoff.

On September 25, 2001, the Plaintiff filed his First Amended Complaint and on

September 26, 2001, filed the instant Motion for Class Certification.  The Novopharm

Defendants answered on November 28, 2001.  The deposition of the Plaintiff Joel Flores was

conducted on November 14, 2001.  Thereafter, on November 28, 2001, Monica Blount moved to

intervene as a class representative in the instant action and the Court by Order entered November

30 2001 granted such Motion.  The deposition of the Intervenor Monica Blount was conducted

on December 14, 2001.

The hearing on Plaintiff's Motion for Class Certification is set for February 13, 2002.

## STATEMENT OF THE FACTS

### Formation and Operation of Certus

The Defendant Certus Healthcare, LLC ("Certus") was formed by the filing of a

Certificate of Organization with the Texas Secretary of State on December 29, 1995.  The

members of the LLC at the time of its formation were Total Health Care Plans, a Delaware

corporation ("THCP"), and Novopharm Holdings, Inc., a Delaware corporation (and a holding company subsidiary of the Defendant Novopharm Limited, a Canadian Corporation).

Certus was licensed by the Texas Department of Insurance ("TDI") as an HMO on September 12, 1996. Soon thereafter, Certus commenced business and issued its first policies to its own employees. Novopharm Holdings, Inc. funded Certus operations in an amount in excess of $29,000,000.00. Affidavit of Dan Youtoff, June 9, 2000 ("Aff. Youtoff").

Certus' service area, the Rio Grande Valley, had been underserved by HMOs prior to the arrival of Certus, and therefore, both the patient population and provider population were unfamiliar with the HMO model for the delivery of medical services. Transcript of the Deposition of David Rodriguez, October 19, 2000 at 132 ("Tr. Rodriguez"). The patient population in the Rio Grande Valley differed from the national norm in that the average family was larger, the population was not as healthy, and physician utilization rates were higher among Valley residents. Tr. Rodriguez at 176-177. During the approximately three years of Certus operation during Novopharm Holdings' involvement, Certus enrollment grew from zero to in excess of 20,000 members before declining following the cessation of the writing of new business in 1999. Tr. Rodriguez at 134.

During the course of its operation and prior to November 2, 1999, Certus was managed by its executive staff out of offices in McAllen, Texas. At all times, Certus conducted its operations pursuant to Texas law and TDI regulations. Its member agreements (Evidence of Coverage), provider agreements, and member handbooks were provided to, reviewed by, and approved by TDI. Certus offered an array of policies with varying benefits, endorsements, riders, and co-pay amounts, including policies sold on an individual and group basis. Tr. Rodriguez at 99-100. Certus policies were advertised by television, radio, newspaper, and

billboard advertisements. Certus marketing materials were disseminated widely. Certus sales were conducted by both in-house staff and through independent agents. Tr. Rodriguez, Ex. 30.

In order to provide medical benefits, Certus entered into agreements with medical providers throughout the Rio Grande Valley, including general practitioners and specialists practicing in large and small groups, along with various hospital facilities, laboratories, and pharmacies. Certus had contractual relationships with in excess of 1500 entities providing health care. Tr. Rodriguez, Ex.10. Throughout the period addressed by the Plaintiff's Complaint, the network of Certus providers changed continuously. Certus members were never entitled to the services of any particular provider, but were instead entitled to services provided by qualified providers within the geographic area in which the Certus member resided. Evidence of Coverage, ¶ 4.06.

During the period May 29, 1998 to November 2, 1999, the period used by the Plaintiff for defining the class, the policyholders and/or members of Certus were delinquent in paying the premiums due to Certus in a timely manner. Exhibit 12 to Plaintiffs' Summary Judgment evidence, the Annual Statement of Certus Healthcare, LLC, filed with the Texas Department of Insurance for the year ended December 31, 1998, shows premiums receivable in the amount of $1,359,260.00. This year-end receivable constitutes an indebtedness to Certus by members of the very class that Plaintiffs seek to represent. An update to that Annual Statement, the Quarterly Statement of Certus Healthcare for the quarter ended June 30, 1999, shows a continuing and substantial balance of premiums receivable in the amount of $1,186,804.00. *See* Quarterly Statement (copy attached hereto).

On November 2, 1999, in an arm's length transaction approved by TDI, Certus was sold to Certus Health Management, Inc., a subsidiary of WellCare HMO, Inc. ("WellCare"). At the

time of the sale it was estimated that Certus' outstanding liabilities were approximately $5,000,000.00. Pursuant to the Purchase Agreement and with the express approval of TDI, Novopharm Holdings agreed to fund WellCare in the amount of $5,400,000.00 to cover Certus' existing liabilities and potential claims. Thus, contrary to the Plaintiffs' allegations and argument, Novopharm Holdings did, during its tenure as a member, fully fund Certus' liabilities. *See generally* Aff. Youtoff.

## Joel Flores

In or about January, 1998, the Plaintiff Joel Flores was employed by the Law Offices of John Ventura, P.C., Plaintiff's counsel. Transcript of the Deposition of Joel Flores, November 14, 2001 at 5 ("Tr. Flores"). Although he was provided with a health insurance policy for himself through his employer, he was informed that family coverage would cost close to $300.00 a month. Tr. Flores at 11. He learned through a fellow employee, Monica Blount ("Intervenor Plaintiff" or "Plaintiff"), that she had obtained an HMO policy for each of her twin daughters through the Defendant Certus. Tr. Flores at 7. She recommended Certus to Mr. Flores. Tr. Flores at 7-8.

Mr. Flores, at that time, had a three-year-old child who had experienced breathing problems since his birth. Tr. Flores at 23-24. Although he had seen television advertising for Certus and had obtained a Certus brochure from a friend, Sergio Cavasos, he looked up the Certus telephone number in his yellow pages and obtained the Certus telephone number, called, spoke with their receptionist, and made an appointment with a Certus sales representative. Tr. Flores at 8.

The Certus sales representative, David Lee Pena, met with Mr. and Mrs. Flores in their home. Tr. Flores at 15. During the course of this meeting, Mr. and Mrs. Flores completed an

application form in which Mr. and Mrs. Flores failed to disclose any prior diagnosis of asthma or

any other lung disease or ailment. Tr. Flores at 19-22; Plaintiff's Responses to Defendant's

Requests for Admissions, No. 13. This fact notwithstanding, Mr. Flores has testified that he

discussed with Mr. Pena the need for a nebulizer for his child and was assured by Mr. Pena that

the Certus policy that Mr. Flores was seeking to purchase would provide for a nebulizer and that,

in fact, Mr. Pena's policy provided a similar benefit for Mr. Pena's daughter who also

experienced some form of respiratory ailment. Tr. Flores at 63-65, 117.

Mr. Flores testified that he did not rely on the express language of the Certus policy or

anything obtained from Certus advertising to which he was exposed, but instead relied on

information conveyed to him personally by Mr. Pena. Tr. Flores at 60-63. Mr. Flores, in his

deposition testimony, acknowledged that his child had had asthma since he was less than one

year old. After he was examined with respect to the application for Certus benefits, he denied

ever having received a diagnosis of asthma with respect to his infant child prior to his enrollment

in the Certus program. Tr. Flores at 19-23, 42, 44, 115. Mr. Flores met with Mr. Pena and,

through the application executed by his wife in his presence, submitted his application, including

a check for the first month's premium on January 27, 1999. Tr. Flores at 50-51. His coverage

became effective on February 15, 1999. Tr. Flores at 51-52. On February 22, 1999, Mr. Flores'

child was examined by Dr. Romeo Montalvo. Tr. Flores at 52. Mr. Flores testified early in his

deposition that he had been advised by Dr. Montalvo's office that Dr. Montalvo would not

accept Certus benefits. Mr. Flores also testified that he had paid for the treatment for the child

himself, although he later acknowledged that, in fact, he had not paid for Dr. Montalvo's

services. Tr. Flores at 44-46, 145-146.

Dr. Montalvo provided Mr. Flores with a prescription for Albuterol and Prednisolone during the course of the February 22nd office visit. Tr. Flores at 54, 57. Mr. Flores testified that he left Dr. Montalvo's office and went to several pharmacies in a sequence that he doesn't recall and was told in each instance that they would not accept his Certus benefits. Tr. Flores at 119. He testified further that he went from store to store until visiting the HEB on Central, across the street from Autry's, where HEB honored the Certus membership for the prescription medications. Tr. Flores at 119. Mr. Flores borrowed $100.00 from his uncle to enable him to pay for a nebulizer to use to administer the medications. Tr. Flores at 121-122. Mr. Flores said that he went to Autry's Pharmacy on Central, Los Ebanos, Hector's (no longer in business), Medico, Walgreen, and a Drug Emporium. Tr. Flores at 58, 68-69, 119. He does not recall the names of any persons with whom he spoke at any of the pharmacies. Tr. Flores at 70. Mr. Flores purchased the Pulmo-Aide nebulizer at the Drug Emporium. Mr. Flores was unaware at the time that the nebulizer was not a covered item pursuant to the individual coverage that he purchased, and he did not know whether the pharmacies that he claims to have visited were, in fact, Certus providers at the time of his visits. Tr. Flores at 73, 114. On February 26th, four days after seeing Dr. Montalvo, Mr. Flores corresponded with Certus and cancelled his coverage. Tr. Flores at 79-80, 149. Mr. Flores paid Certus $60.01 for the one month enrollment of his son. Certus paid Dr. Montalvo the sum of $94.00, $6.93 for the Albuterol, and $26.37 for the Prednisolone. Tr. Flores at 38, 57 (Ex. 14, 15), 82.

Mr. Flores testified that he relied only on conversations with Mrs. Blount, his acquaintance Mr. Cavasos, his conversation with Mr. Pena, and the brochures provided by Mr. Cavasos and Mr. Pena, in obtaining the insurance. Tr. Flores at 106. At no time did he rely on any information from any other source. Tr. Flores at 106.

Flores' Evidence of Coverage does not allow the provision of durable medical equipment such as a nebulizer. It states in pertinent part:

V.    Exclusions and Limitations of Benefits

All services and benefits for care and conditions within each of the following classifications shall be excluded from coverage under the Health Plan.

* * *

35.    Durable medical equipment, oxygen, and mechanical equipment for respiratory failure, except if covered by a separate rider.

In addition, the Prescription Drug Rider to the Evidence of Coverage provides:

D.    Exclusions

1.    Any drug, supply or device which can be purchased without a prescription, unless specifically included herein, even though the Participating Provider has written a prescription;

Tr. Flores, Ex. 17.

## Monica Blount

On November 28, 2001, following the deposition of the Plaintiff, Joel Flores, Monica Blount moved the Court for leave to intervene as a Plaintiff and additional class representative. The Court allowed the Motion on November 30, 2001. Transcript of the Deposition of Monica Blount, December 14, 2001 at 4 ("Tr. Blount").

Mrs. Blount, a resident of Brownsville, was employed with the Law Offices of John Ventura, P.C. , Plaintiff's counsel, during the period January 1998 through March 1999. Tr. Blount at 6-7. Mrs. Blount was contacted by Mr. Ventura at or about the time of Mr. Flores' deposition and asked if she would be willing to join the litigation as a Plaintiff. Tr. Blount at 75.

During the course of her employment with Mr. Ventura, Mrs. Blount heard one or more radio commercials sponsored by Certus and called the "1-800" telephone number that she heard during the course of the radio advertisement. Tr. Blount at 9. She did not rely on any television,

newspaper, or other printed media advertisements. Tr. Blount at 10. Mrs. Blount received some written materials from the sales representative that responded to her call. Tr. Blount at 10-11. A year following her enrollment, Mrs. Blount received a renewal packet from Certus and renewed the Certus coverage she obtained for her daughters. Tr. Blount 11.

Mrs. Blount recalls that she was visited by a sales representative of "Indian descent" who provided a presentation of the "plans we could choose from and what the coverage was and basically let us choose and sign us up. It was very basic. It wasn't in any sort of detail." Tr. Blount 12. Mrs. Blount does not recall receiving any representation or promises regarding which hospitals or doctors she would be able to use. Tr. Blount at 13.

Mrs. Blount had twin daughters, born in 1997. Tr. Blount at 6. The primary care physician for the children was Dr. Thelma Gonzalez, who provided care for the children during the term of their Certus enrollment. Tr. Blount at 22. In addition, Mrs. Blount received medical services for her children through LabCorp and through "Dr. Laksh", an orthopedist. Tr. Blount at 29-30. She has no trouble being seen by "Dr. Laksh" and she was never denied services by LabCorp. Tr. Blount at 29, 31. Mrs. Blount testified that she learned of an alternative HMO through her employment with Mr. Ventura, and following a phone call from Dr. Gonzalez, switched to Blue Cross Blue Shield in September of 1999. Tr. Blount at 34-36.

Mrs. Blount testified that she ceased paying for Certus after July 1999, although she understands that she was covered until September 15, 1999. Tr. Blount at 42-43. Thus, Mrs. Blount's daughters received coverage for one and one half months for which she did not pay. She acknowledges that her daughters were never denied covered services during their enrollment. Tr. Blount at 95.

Mrs. Blount acknowledges that she was enrolled with Certus and had been enrolled with Certus, prior to recommending to Mr. Flores, her co-worker, that he consider Certus. Tr. Blount at 60. She further acknowledged that she had not been troubled by anything in connection with her coverage with Certus before she was contacted and invited to join the lawsuit several weeks prior to her testimony. Tr. Blount at 75.

## ARGUMENT

### CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE PLAINTIFFS HAVE FAILED IN THEIR BURDEN OF ESTABLISHING THAT THE ACTION BROUGHT BY THE CLASS REPRESENTATIVES SATISFIES THE CRITERIA OF FEDERAL RULE 23

The instant action, commenced as a putative class action, by the Plaintiff Joel Flores and joined after the filing of the Class Certification Motion by the Plaintiff Intervenor Monica Blount, is inappropriate for class certification. The facts giving rise to the claims of each of the named class representatives are distinctly different from one another and yet neither suffered actual, cognizable injury. Both Mr. Flores and Mrs. Blount ("Plaintiffs") received all the benefits that the Certus policies sold to them actually provided. At the heart of Plaintiffs' claims is the notion that the policies which Certus members purchased were somehow worth less than what they were represented to be worth. Plaintiffs are attempting to recover damages on the basis of that allegation; however, they lack a single cause of action that would afford them any remedy for that notion if it were proven to be true. Plaintiffs have not alleged any quantifiable injury to either the named Plaintiffs or any putative class members. They have only made a bare statement that what they received was worth less than what it was represented to be worth, despite the fact that there are no allegations that the named Plaintiffs or any of the putative class members were denied medical treatment that they were afforded by the policies, or that they suffered any personal or financial injury other than the theoretical difference between the actual

"worth" of their policies and that "worth" which the policies should have had by virtue of sundry alleged representations and promises which the named Plaintiffs themselves did not rely upon.

## The Standard for Class Certification

The party or parties seeking to certify a class have the burden to show that the requirements for a class action have been met. *See* Young v. Nationwide Life Ins. Co., 183 F.R.D. 502, 506 (S.D. Tex. 1998); Applewhite v. Reichhold Chem., Inc., 67 F.3d 571, 573 (5th Cir. 1995). In this instance, Plaintiffs must bear this burden but have failed to do so.

The test to determine whether a class should be certified is set forth in Rule 23 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 23. Rule 23(a) sets out four requirements to sustain a class action, all of which must be met: (1) "the class is so numerous that joinder of all members is impracticable", (2) "there are questions of law or fact common to the class", (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class", and (4) "the representative parties will fairly and adequately protect the interests of the class." Id. Rule 23(b) places an additional hurdle before the Plaintiffs. One of the three subparts of Rule 23(b) must be met in order to maintain a class action. In this instance, Plaintiffs seek to maintain the action solely on the grounds provided in Rule 23(b)(3). In a (b)(3) class action, the court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Id.

District courts have wide discretion in deciding the issue of certification. *See* Applewhite, 67 F.3d at 573. Nevertheless, a District court must conduct a "rigorous analysis" of the Rule 23 prerequisites before a class can be certified. Young, 183 F.R.D. at 506; *see* General Tel. Co. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982); Castano,

84 F.3d at 740. Further, courts <u>must</u> look beyond the mere allegations of a pleading to determine whether the prerequisites of Rule 23 have been met. *See* <u>Castano</u>, 84 F.3d at 744. Therefore, in making its analysis, this Court must look to see whether the unique circumstances of each of the Plaintiff's claims make them suitable representatives of the class in terms of commonality, typicality, and adequacy. The Court must also look closely at whether the Plaintiffs' damages model is unfairly limiting or generous to the putative class members, ignoring actual damages and imposing an "average" on all the class members. Finally, the Court must look to the realities of a trial and whether the numerous issues that will be need to be answered with respect to each individual class member will predominate over any issues which might be answerable for the class in a single proceeding.

## I.   PLAINTIFFS HAVE FAILED TO PROVE THAT THE PREREQUISITES OF RULE 23(a) HAVE BEEN MET.

### A.   Commonality

Rule 23 (a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). A common question has been defined as "one which, when answered as to one class member, is answered as to all." <u>Shaw v. Toshiba America Info. Sys., Inc.</u>, 91 F.Supp. 2d. 942, 954 (E.D. Tex. 2000). "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." <u>Sprague v. General Motors Corp.</u>, 133 F.3d 388, 397 (6th Cir. 1998); *see also* <u>Rockey v. Courtesy Motors, Inc.</u>, 199 F.R.D. 578 (W.D. Mich. 2001).

Plaintiffs have put forward twenty-four "questions" which they claim are common to the class. However, these twenty-four "questions" are nothing more than restatements of the elements of the causes of action which Plaintiffs allege. Thus, they do not constitute common issues of fact or law sufficient to support a class action.

In <u>Kelley v. Galveston Autoplex d/b/a Sand Dollar Autoplex</u>, 196 F.R.D. 471 (S.D. Tex. 2000), the plaintiff brought suit in behalf of a class of persons who bought vehicles from the defendant dealership by way of retail installment contracts.  Plaintiff alleged violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, the Texas DTPA, common law fraud, as well as several federal regulations.  The plaintiff advanced three questions of law which it considered to be the common questions of law or fact for the class.  The plaintiff stated those issues as follows: "A) whether the class members' retail installment contracts contain the TILA disclosure violations, . . . B) whether the disclosure violations alleged herein are false, misleading, and/or deceptive in violation of the DPTA (sic), and C) whether the disclosure violations alleged herein constitute common law fraud."  <u>Id</u>. at 475.

On the basis of those proffered common questions of law, the Court denied class certification, finding that the questions were insufficiently particular.  "Plaintiff has merely restated the three causes of action as the common issues.  If Courts were to address the commonality issue at this level of generality, the requirement would be met every time.  Instead, a Court must look at more particular factual and legal issues."  <u>Id</u>.  The alleged violations did not involve a single type of installment contract, nor did they involve a specific product or singular action.

Similar to the instant case, the defendant in <u>Kelley</u> utilized various contract forms, along with multiple additions to each contract.  The contracts at issue here vary from member to member in that, as alleged by the Plaintiff Flores, oral representations may have been made in addition to the various writings which modified the terms of the contract.

As in <u>Kelley</u>, this Court should deny Plaintiff's Motion for Class Certification on the basis that the proffered common questions of law or fact are insufficiently particular to amount

to any real analysis of the claims brought forward. Plaintiffs here have merely restated their laundry list of causes of action in the hope of finding some common ground in which to base a class and to recover their unique damages model.

### B.    Typicality

The typicality requirement of Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." Griffin v. GK Intelligent Systems, Inc., 196 F.R.D. 298, 301 (S.D. Tex. 2000) (quoting Lightbourn v. County of El Paso, 118 F.3d. 421, 426 (5th Cir. 1997)); *see also* Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620 (5th Cir. 1999). The purpose of the typicality prerequisite is to ensure that the class plaintiff will advance the interest of absent class members. *See* Kelley, 196 F.R.D. 471 (citing Falcon, 457 U.S. 147). There are two primary situations in which class plaintiffs' claims have been found not to be typical of those of the class members: (1) situations where the class representative's claims do not arise from the same event, practice, or course of conduct that give rise to the claims of other class members. *see* Ford v NYLCare Health Plans of the Gulf Coast, Inc., 190 F.R.D. 422 (S.D. Tex. 1999), and (2) situations where a class representative is "preoccupied with a defense which is applicable only to himself." Warren v. Reserve Fund, Inc., 728 F.2d. 741, 747 (5th Cir. 1984). Classes have also not been certified in situations where claims were simply not typical of the other class members. *See* Kelley, 196 F.R.D. at 476 (holding that where the class plaintiff's claim was based on a contract that had terms which varied from those of other class members and that was executed in a different time frame from other class members, the class plaintiff's claims were not typical of the other class members).

In Ford v. NYLCare, the plaintiff filed suit on behalf of a proposed class of board-certified physicians who contracted with various defendant HMO companies, alleging claims of false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff alleged that defendants violated the Act by "misdescribing core features of their HMOs and advertising in promotional materials used to persuade prospective patients and their employees to subscribe to their plans." Ford, 190 F.R.D. at 424. Specifically, the plaintiff alleged that defendant's advertisements regarding the quality of health care provided by doctors participating with the HMOs was misleading because the advertisements failed to inform consumers regarding certain practices of the HMOs including capitation, utilization review, and case management. Id. Plaintiff claimed that these practices lessened the quality of the health care received by patients and subscribers to these HMOs. The defendants argued that the plaintiff could not satisfy the typicality requirement of Rule 23(a)(3). Id.

The Court agreed with the defendants that the plaintiff could not establish the required element of typicality. To sustain a class, the plaintiff would have had to show that the advertisements made by the HMOs were false and that they had a tendency to deceive the intended audience. The inquiry would also focus on whether individual consumers had seen specific advertisements and whether they had relied on those advertisements in deciding to join the defendant HMOs. Id. at 426. The Court ruled that questions of that nature were highly individualized and specific to each consumer and, therefore, that the claim of each doctor affiliated with the defendant HMOs would be unique and depend upon the result of those individualized questions. Id.

Similarly, in the instant case, neither Plaintiff's claims are typical of the claims of the remainder of the putative class. Indeed, the differences between the two named Plaintiffs

illustrate that problem.  Plaintiffs allege that Defendants made representations regarding the

quality of the HMO memberships that Plaintiffs purchased.  Plaintiffs make reference to written

materials distributed by Certus, radio and television advertisements, as well as representations

made by sales agents.  Plaintiff Flores testified in his deposition that he did not hear or see any

radio or television advertisements regarding Certus.  Nor does he remember reading any of the

written materials published by Certus.  He does, however, claim to rely on specific

representations made by David Lee Pena, a Certus sales representative.  Flores claims that the

representations made by Pena led him to the understanding that the HMO membership he was

purchasing for his son Joel would cover any medical devices needed to treat Joel's breathing

problems, including a nebulizer.

The claims that the Plaintiff Flores has made conflict with the claims he has made on

behalf of the class.  Flores claims that he had a written contract with Certus that was modified by

the specific oral representations of the Certus sales representative Pena.  As a result, Flores'

claim cannot be typical of the claims of other class members, as he has made no showing that

similar, specific oral representations were made to other class members.  At the same time, the

other named Plaintiff, Mrs. Blount, testified that she relied on no specific representations from

any sales representative, but did rely on a radio advertisement regarding Certus policies.  Further,

Mrs. Blount testified that she received all of the care that she requested in behalf of her

daughters.  Mrs. Blount has no apparent quarrel with Certus as she received all the care which

she sought.  Thus, Mrs. Blount's claim is very different from Mr. Flores' claim.  These

differences highlight the lack of typicality between the class representatives and the putative

class.

In addition, Mrs. Blount renewed the Certus policies for her daughters during their enrollment. Defendants have alleged waiver as an affirmative defense. Arguably, Mrs. Blount waived her claims by renewing her daughters' membership. Mrs. Blount will be required to devote substantial effort to counter this defense, rendering her claims <u>atypical</u> of those of the remaining putative class members. *See* <u>Warren</u>, 728 F.2d 741.

Plaintiffs attempt to argue, simplistically, that all Certus memberships were worth less (equally less) than what was paid for them; however, in doing so, they ignore the fact that every prospective class member's experience with Certus was different. Not only were the experiences with the receipt of medical care different, but also each contract was potentially different in that oral representations may have been made, as in the case of Flores, that would modify the terms of the specific contracts. This fact was recognized by the Court in <u>Kelley</u>, where it noted that variations in the contracts and the timing of those contracts necessarily created differences between potential class members that would negate the efficiency and the fairness in pursuing a class action. <u>Kelley</u>, 196 F.R.D. at 476.

In <u>Griffin v. GK Intelligent Systems, Inc.</u>, the plaintiff sought certification of a class of investors who purchased shares of the defendant during a specific time period and claimed that the company engaged in securities fraud, causing those investors financial harm. <u>Griffin</u>, 196 F.R.D. at 299. Unlike the remainder of the proposed class, however, the plaintiff Griffin realized a net profit on her trades of GK stock. The second plaintiff, Farrell, purchased his stock while it was traded on the American Stock Exchange, unlike the remainder of the class, which purchased its stock over the counter. <u>Id</u>. at 301. The Court refused to certify the proposed class because of these material variations in the claims of Griffin and Farrell from those of the remaining class members. <u>Id</u>.

As stated above, the claims of the named Plaintiffs in this case are similarly <u>atypical</u>. Flores, whose son's membership lasted all of two weeks, relied on unique representations in choosing to purchase the Certus membership. Blount, who relied on radio advertisement representations, received all of the medical care that she sought in behalf of her daughters.

The differences between the named Plaintiffs' claims alone illustrate just how unique the claims of each proposed class member are. This Court should deny Plaintiffs' Motion as Plaintiffs have failed to meet their burden to show that the named Plaintiffs' claims are typical of those of the class.

## C.    Adequacy

With respect to the Rule 23(a)(4) requirement of representational adequacy, the Fifth Circuit Court of Appeals has stated that "the adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." <u>Horton v. Goose Creek Independent School District</u>, 690 F.2d 470, 484 (5th Cir. 1982); *see also* <u>Berger v. Compaq Computer Corp.</u>, 257 F.3d 475, 479-80 (5th Cir. 2001). A class representative is "inadequate" when the representative has "an insufficient stake in the outcome or interests antagonistic to the unnamed members." <u>Jenkins v. Raymark Industries, Inc.</u>, 782 F.2d 468, 472 (5th Cir. 1986). Further, the Due Process clause of the United States Constitution requires that "the named Plaintiff at all times adequately represent the interests of the absent class members." <u>Phillips Petroleum Company v. Shutts</u>, 472 U.S. 797, 812, 105 S.Ct. 2965, 2974, 86 L. Ed. 2d 628, 642 (1985).

In this case, the named representative Plaintiffs fail to meet this requirement for several reasons. First, with respect to the ERISA subclass, neither named Plaintiff is a member. Both

Mrs. Blount and Mr. Flores have testified that the Certus memberships obtained for their children were not ERISA plans obtained through their employers.

Second, Mr. Flores' stake in the outcome of this case is miniscule. In fact, Mr. Flores may well have the smallest theoretical recovery of any potential class member, pursuant to the damages model put forward by Plaintiffs. Mr. Flores testified that he purchased a Certus HMO membership for his son Joel at a premium of $60.01 per month. Mr. Flores further testified that he cancelled that membership a mere thirteen days after the policy took effect. During that period of time, Mr. Flores' son Joel received care from Dr. Montalvo at one office visit and also obtained prescription medicines for his breathing problems, the cost of all of which exceeded the premium paid by Mr. Flores for the month. According to the Plaintiffs' damage model, Mr. Flores would be entitled to receive a percentage of his purchase price back from Certus because what he received was worth less than what he paid for, even though the medical care he received cost in excess of the premium paid. Assuming *arguendo* that Plaintiffs prevail on one of their claims that provides for such a damages model and that Plaintiffs are able to show that Certus HMO memberships were worth twenty-five percent (25%) of what was paid for them, the most that Mr. Flores would be entitled to receive is $15.00. Considering Plaintiffs seek to represent a class, the members of which may include employers that provided Certus HMO memberships to numerous employees, Mr. Flores' stake is so miniscule that the Court must question whether he is capable of adequately representing the other class members.

Third, the named Plaintiffs have proffered to the Court a damages model that limits their recovery to a percentage of the premiums paid for Certus HMO membership. The Plaintiffs claim that percentage should be applied to all class members, without variation. However, both Mr. Flores and Mrs. Blount have testified that in every instance when they sought care to which

their children were entitled pursuant to the Certus memberships, they received that care.  Neither

putative class representative has testified that they suffered personal injury as a result of a denial

of care.

Theoretically, there are prospective class members that were denied care if all the

allegations made in Plaintiffs' Complaint are proven.  In that instance, it would seem that those

putative class members are entitled to recover for a breach of their contract with regard to the

provision of medical care.  Such claims have not been made by these named Plaintiffs.  These

named Plaintiffs seek nothing more than the theoretical difference between the actual "worth" of

their policies and that "worth" which the policies should have had by virtue of sundry alleged

representations and promises which the named Plaintiffs themselves did not rely upon – a

"difference" which, even if calculable, would be far less than recoveries for any contract

breaches with regard to the provision of medical care.  Therefore, the interests of these Plaintiffs

are <u>antagonistic</u> to those other class members that might be entitled to a greater recovery or

recovery under a more generous damages model.  *See* <u>Horton</u>, 690 F.2d at 485.  By limiting the

amount of damages they seek, Plaintiffs are limiting the other putative class members that will be

bound by this action if a class is certified and resolution is reached.  Defendants vigorously deny

that Plaintiffs or any members of the class are entitled to receive any such damages.

Nevertheless, Defendants assert that the named Plaintiffs cannot adequately represent the class

when such other claims may exist and different damage theories may be allowable to other class

members.

Moreover, there is no presumption of adequacy for class representatives in situations

where Plaintiff's only proof that the representatives are adequate is that there is a lack of conflict

between the class representatives and the absent class members.  *See* <u>Berger</u>, 257 F.3d at 481.

As stated above, Plaintiffs bear an affirmative duty to prove that the named class representatives are adequate. Plaintiffs have put forth no argument or evidence in their Motion for Class Certification that the representatives are adequate, aside from saying "Plaintiff's interests are not antagonistic to or in conflict with the interests of the class members, since his claims are typical of the claims of all members of the proposed class." Plaintiff's Motion for Class Certification at 10. Plaintiffs have proffered no evidence with respect to either Mr. Flores or Mrs. Blount that establishes conclusively for the Court their adequacy as class representatives. The Court should thus deny certification.

## II. PLAINTIFFS HAVE FAILED TO PROVE THAT COMMON ISSUES OF FACT OR LAW PREDOMINATE OVER INDIVIDUALIZED ISSUES AND THAT A CLASS ACTION WOULD BE THE SUPERIOR MEANS TO ADJUDICATE THE CONTROVERSY.

Plaintiffs seek to certify this class under Rule 23(b)(3), which allows for a class action to proceed in situations where issues common to the class predominate over issues common to the individuals and where a class action provides the superior means by which to adjudicate the claims. Fed. R. Civ. P. 23(b)(3). (B)(3) certification provides that members of the class will be afforded notice of the class action along with the opportunity to opt out. Id. Plaintiffs here attempt to establish the applicability of (b)(3) certification by listing the twenty-four "common" questions of law or fact they have put forth in support of the Rule 23(a)(2) prerequisite. Plaintiffs have made no specific showing however, that these questions predominate over the individual issues in this case. Indeed, the questions proffered by Plaintiffs as "common" amount to generalized questions of law that deal with the causes of action in this case. See Kelley, 196 F.R.D. at 476.

Contrary to Plaintiffs' assertions, there are a number of issues present in the claims that make this case wholly unsuited to class treatment. Plaintiffs have glossed over or simply ignored

issues such as reliance, damages, and representations made to individual Certus subscribers and the effects those representations had with respect to each Certus subscriber relationship with the HMO.

As Defendants will show, individual reliance is a specific element of the claims of Civil RICO, fraud, negligent misrepresentation, deceptive trade practices and insurance code violations. The issue of damages, which Plaintiffs attempt to limit despite the fact that they have alleged seven different causes of action, is relevant to all of the causes of actions alleged by Plaintiffs. Theoretically, it is possible that class members may have suffered damages far greater than any percentage of their premiums paid if Plaintiffs' allegations are proven to be true. These class members would be forced to forego any such damages that they may be entitled to, and Plaintiffs are in no position to prove those individualized damages.

With respect to the representations made to various Certus subscribers, the Plaintiff Flores is a keen example of how specific oral representations made by a sales representative have purportedly changed the understanding of what the HMO membership was supposed to do. Any such representations in individual cases may have altered, modified, enhanced, or negated the written contracts. Plaintiffs have made no attempt to account for such representations. Furthermore, Plaintiffs have made no attempt to account for the various relationships between Certus and individual members and Certus and individual health care providers. Mr. Flores' claims are based on his inability to obtain a piece of medical hardware, which was not even available to him pursuant to the terms of his HMO policy. The named Plaintiffs in this instance provide clear examples of the material variations in the relationships between the Certus subscribers and Certus itself.

As Defendants will show, these countless individual issues make the claims in this case completely unsuitable for class treatment. Plaintiffs are attempting to force not one, but several square pegs into a single round hole in this case, and as a result, the Court must deny certification

**A.    Detrimental <u>Reliance</u> must be determined on a case-by-case basis.**

It is well-settled in the Fifth Circuit that cases which are based in some degree on reliance are unsuited for class treatment. *See* <u>Simon v. Merrill Lynch, Pierce, Fenner, and Smith, Inc.</u>, 482 F.2d. 880 (5th Cir. 1973); <u>Castano</u>, 84 F.3d.734; <u>Patterson v. Mobil Oil Corporation</u>, 241 F.3d. 417 (5th Cir. 2001); <u>Summit Properties, Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d. 556 (5th Cir. 2000); <u>Bolin v. Sears, Roebuck & Co.</u>, 231 F.3d. 970 (5th Cir. 2000); <u>Young</u>, 183 F.R.D. 502. Plaintiffs attempt to support their Motion for Class Certification by arguing that few reliance issues are present in the case and that those reliance issues that are involved do not predominate. These arguments ignore long-standing Fifth Circuit case law and are utterly without merit. *See generally* John C. Coffee, Jr., Adolf A. Berle Professor of Law, Columbia University Law School and Joseph Flom Visiting Professor of Law, Harvard University Law School, <u>Class Certification: 2000-2001: A Survey of Major Developments in the Case Law</u> (October 19, 2001) (outline prepared for the American Bar Association's National Institute on Class Actions, held on October 19, 2001 in New Orleans, Louisiana and November 9, 2001 in San Francisco, California) (copy attached hereto).

**1.    Fraud and Negligent Misrepresentation**

Both fraud and negligent misrepresentation require detrimental reliance on the part of an individual in order for that individual to recover as a result of the alleged wrong. *See* <u>Spera v. Fleming, Hovenkamp & Grayson, P.C.</u>, 4 S.W.3d 805 (Tex.App. – Houston 1999); *see also*

Peltier Entrprises, Inc. v. Hilton, 51 S.W.3d 616 (Tex. App. – Tyler 2000, writ den'd). That requirement precludes the claims' suitability for class treatment.

In Castano v. American Tobacco Company, plaintiffs attempted to certify a nationwide class action against the defendant tobacco companies alleging their addiction to nicotine and alleging that tobacco companies failed to inform consumers regarding the addictive nature of nicotine and manufacturers manipulated the level of nicotine in cigarettes to sustain plaintiff's addiction. Castano 84 F.3d. 734, 737. A primary portion of the plaintiff's claims were based in fraud. Id. at 745. The Fifth Circuit, citing the advisory committee's notes to Rule 23(b)(3) and Simon v. Merrill Lynch, held that a fraud class action cannot be certified when individual reliance will be an issue. Id. The Fifth Circuit further held that the District Court, in certifying the nationwide class, ignored the fact that issues of individual reliance would have been required to be proven in individual trials in behalf of each class member after a preliminary trial involving all class members had taken place. The Fifth Circuit held that the countless individual trials cause the action to fail the predominance requirement of Rule 23(b)(3). Id. Since Castano, the Fifth Circuit and the District Courts in the Fifth Circuit, have consistently recognized and ruled that claims involving issues of individual reliance are unsuited to class treatment

In Young v. Nationwide Life Insurance Company, 183 F.R.D. 502 (S.D. Tex. 1998), the plaintiff class representatives brought an action against a defendant insurance company seeking recovery under Rule 10(b)(5) of the Securities Exchange Act of 1934 as well as common law claims of breach of contract, fraud, and civil conspiracy. The plaintiff claimed that defendant misrepresented certain mutual funds. Id. The Court denied class certification on the ground that individual issues of reliance predominated over class wide issues with respect to the claims for

securities fraud and common law fraud.  Citing <u>Castano</u>, the Court held that reliance issues clearly predominated over the class wide issues.

As to the Novopharm Defendants, more is required of Plaintiffs.  Plaintiffs must not only show that individuals relied on misrepresentations by Certus which they claim constitute the fraud or negligent misrepresentation, they must also show reliance on misrepresentations made by both Novopharm Holdings, Inc. and Novopharm Limited.  Plaintiffs allege that the corporate veil of Certus Healthcare, LLC should be pierced and that they should be able to recover from Novopharm Holdings, Inc.  In turn, they assert that Novopharm Holdings, Inc.'s veil should be pierced to reach Novopharm Limited.  As was stated in the Novopharm Defendants' Motion for Reconsideration of their earlier Motion for Partial Summary Judgment, Texas law requires that Plaintiffs plead and prove <u>actual fraud</u> on the part of the parties which the Plaintiffs wish to reach by piercing the veil.  *See* Tex. Bus. Corp. Act art. 2.21 (A) and (B); *see also* <u>Menetti v. Chavers,</u> 974 S.W.2d 168 (Tex. App. – San Antonio 1998, no pet.); <u>United States ex rel. CMC Steel</u> <u>Fabricators, Inc. v. Harrop Construction Co., Inc.</u>, 2000 U.S. Dist. LEXIS 20057 (S.D. Tex. December 21, 2000); <u>Harco Energy, Inc. v. Re-Entry People, Inc.</u>, 23 S.W.2d 389, 393, 397 (Tex. App – Amarillo 2000, no writ).  Thus  Plaintiffs must show detrimental reliance by individual putative class members upon representations made by <u>Novopharm Holdings, Inc.</u> in order to pierce the veil of Certus.  Then, they must show detrimental reliance on misrepresentations made by <u>Novopharm Limited</u> to pierce the veil of Novopharm Holdings, Inc. Because Novopharm Limited was not a shareholder or member of Certus, it can only be reached by way of art. 2.21 (A) if Plaintiffs can make the showing of actual fraud by both Novopharm Defendants.

In sum, to prevail on their claims, Plaintiffs must show (1) acts or misrepresentations on the part of <u>each</u> of the three Defendants, (2) knowledge of all three by the individual putative class members, and (3) reliance on all three by the individual putative class members. Plaintiffs have not offered any evidence on these issues. These attempted showings of reliance will necessarily vary from putative class member to putative class member, since such showings will be dependent upon whether individual putative class members knew about and relied upon individual representations by each of these corporate entities. For example, the Plaintiff Flores admits that he was unaware of any representations made by the Novopharm Defendants or Certus to TDI. *See* Plaintiff's Response to Defendant's Requests for Admissions, Nos. 25-28. Thus, those alleged representations cannot form the basis of Plaintiff's claims. Plaintiffs must come forward with such evidence for each putative class member.

Plaintiffs have thus failed to meet their burden to meet the standard for class certification. The necessary showing of reliance in fraud and negligent misrepresentation cases precludes class certification.

## 2.    RICO

RICO claims are similarly unsuited to class treatment in situations where fraud is implicated in the predicate offenses to the RICO claim. Here, Plaintiffs have alleged that the same actions that constitute fraud and negligent misrepresentation also constitute RICO violations.

In <u>Summit Properties, Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d. 556 (5th Cir. 2000), the plaintiff property owners brought civil RICO claims against the defendants who were manufacturers of polybutylene plumbing systems and components, alleging that the manufacturers engaged in a scheme to defraud plaintiffs. Plaintiffs claimed that fraudulent

misrepresentations served as the necessary predicates for the RICO claim. Id. at 558. The Fifth

Circuit affirmed the Southern District of Texas' ruling that dismissed plaintiffs' claims on the

grounds that individual reliance was a necessary component of RICO where fraudulent

misrepresentations formed the predicate for the RICO injury. Id. at 561. Thus, the Court has

held that individual reliance is applicable to RICO in situations where fraud is the predicate to

that claim.

In Patterson v. Mobil Oil Corporation, 241 F.3d. 417 (5th Cir. 2001), the Fifth Circuit

followed the reasoning of Summit Properties in vacating and remanding a class certification of a

class of employees that brought an action pursuant to RICO with respect to their workers'

compensation insurance. The Court held that the Summit Properties holding that individual

reliance was an element of RICO where fraud was the source of the injury precluded class

certification pursuant to the previous holdings in Castano and Bolin. Id. at 418.

In Bolin v. Sears, Roebuck & Co., 231 F.3d. 970 (5th Cir. 2000), plaintiff brought suit on

behalf of approximately one million consumers who purchased merchandise from defendant and

later declared bankruptcy. Plaintiff sought various types of monetary and injunctive relief

against defendant. Id. at 972-73. In vacating the District Court's certification of a class for

RICO violations, the Fifth Circuit, citing Summit Properties, held that "RICO fraud liability

requires a showing of reliance by each Plaintiff." Id. at 978. The foregoing cases illustrate the

consistency with which the Fifth Circuit and its District Courts have applied the standards related

in Castano and Simon before it.

In this case, Plaintiffs' allegations of RICO are based on mail and wire fraud which they

claim included the sending of promotional materials through the mail and the solicitation of new

members over the telephone. For this conduct to be actionable, reliance is required. Plaintiffs

cannot avoid the necessity of showing individual reliance to prevail on this claim. Plaintiffs'

Motion should be denied.

### 3.    DTPA

Plaintiffs have alleged in their Amended Complaint that reliance is not an element of a

DTPA action. However, Plaintiffs' assertion is without merit, as the Texas Supreme Court

precedent which Plaintiffs cite has been superceded by the DTPA statute itself. Texas Business

& Commerce Code § 17.50 (a)(1)(B) specifically states that a consumer may maintain an action

under the subdivisions of subsection (b) of Section 17.46 of the subchapter only when the

consumer shows that the "false, misleading, or deceptive act or practice" was "relied on by a

consumer to the consumer's detriment." This requirement was recognized by the Court of

Appeals of Texas for the Twelfth District in Peltier, 51 S.W.3d. 616, where the Court reversed

certification of a class which had brought a claim under DTPA Section 17.46 (b)(23).

In the instant case, Plaintiffs allege violations of subsections (a), (b)(5), (b)(7), (b)(9), and

(b)(23), of Section 17.46 of the DTPA. Plaintiffs' Amended Complaint at 19. Plaintiffs'

reference to subsection (a) of Section 17.46 is irrelevant to this matter as subsection (a) only

applies to actions brought by the consumer protection division. See Tex. Bus. & Com. Code §

17.46(a). Pursuant to Section 17.50(a)(1)(B), all of the remaining claims made by Plaintiff are

subject to a showing of individual reliance. See Tex. Bus. & Com. Code § 17.50(a)(1)(B). As

all of Plaintiffs' DTPA claims are subject to a showing of individual reliance, Castano and its

line of cases, including Peltier, hold that Plaintiffs' claims are not suitable for class treatment.

### 4.    Insurance Code Article 21.21

In Plaintiffs' claim for bad faith pursuant to Article 21.21 of the Texas Insurance Code,

Plaintiffs allege that reliance is not an element of the action. Again, Plaintiffs misstate the law.

In making their claim, Plaintiffs point to the same acts that are alleged on the part of the

Defendants in their claim for violations of DTPA. Plaintiff's First Amended Complaint at 20, ¶

8.2. Section 16(a) of article 21.21 states:

> Any person who has sustained actual damages caused by another's engaging in an
> act or practice declared in Section 4 of this Article to be unfair methods of
> competition or unfair or deceptive acts or practices in the business of insurance or
> in any practice specifically enumerated in a subdivision of Section 17.46(b),
> Business & Commerce Code, as an unlawful deceptive trade practice may
> maintain an action against the person or persons engaging in such acts or
> practices. To maintain an action for a deceptive act or practice enumerated in
> Section 17.46(b), Business & Commerce Code, a person must show that the
> person has relied on the act or practice to the person's detriment.

Tex. Ins. Code Art. 21.21 Sec. 16(a) (emphasis added). Contrary to Plaintiffs' assertions, the

very section of the Texas Insurance Code under which Plaintiffs make their claim for relief states

that individual reliance must be shown by the consumer bringing the action. *See* Plaintiffs'

Amended Complaint at 20, ¶ 8.1.

As with Plaintiffs' claim under the DTPA, Plaintiffs' claim under Article 21.21 of the

Insurance Code is not suitable for class treatment as individual reliance on the part of each

putative class member is a necessary showing. By pleading that reliance is not an element,

Plaintiffs cannot bypass the law under which they claim recovery. As was held in Castano, the

Court must look beyond the mere allegations of a pleading to determine whether the

prerequisites of Rule 23 have been met. *See* Castano, 84 F.3d. at 744. Here, Plaintiffs cannot

avoid the fact that individual reliance must be shown.

> **5.      The Fifth Circuit has refused to recognize a
>           presumption of reliance outside the context of securities
>           law.**

Plaintiffs argue that they are entitled to some sort of presumption of reliance and cite

several cases to that effect. However, those contentions are incorrect as a matter of law.

Plaintiffs have cited cases that have applied two presumptions: (1) the presumption recognized in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L. Ed. 2d. 741 (1972) with respect to securities fraud and (2) reliance pursuant to the "fraud on the market" theory, which holds that it is assumed that when misrepresentations are made to the market, the market price reflects those misrepresentations, and actual reliance by an injured Plaintiff is unnecessary. *See* Basic, Inc. v. Levinson, 45 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d. 194 (1988).

The Fifth Circuit has expressly declined to apply these presumptions outside of the context of securities law. In Summit Properties, the Fifth Circuit expressly rejected the "fraud on the market" theory of constructive reliance. *See* Summit Properties, 214 F.3d. at 561. Further, in Perrone v. GMAC, 232 F.3d. 433 (5th Cir. 2000), the Fifth Circuit examined the Affiliated Ute presumption with respect to the Truth in Lending Act and determined that the presumption was not to apply outside the securities context. Id. at 440. As illustrated through these two cases, the Fifth Circuit has refused to lessen the burden on a class plaintiff to prove that class members actually relied on alleged misrepresentations. The Castano holding remains untouched in standing for the proposition that when reliance is an issue applicable to potential class members, the claim on behalf of that class is unsuited for class treatment.

### B. Whether **Damages** are due each putative class member is an inquiry that must be performed for each individual.

Despite Plaintiffs' efforts and arguments to the contrary, the issues of whether each putative class member has suffered actual damages and the calculation of that amount are individualized such that class treatment is precluded. Plaintiffs have constructed a damages model that they claim will compensate the class members while being susceptible to class treatment. Plaintiffs' "diminution in value" theory, according to Plaintiffs, would be easily calculable as a percentage of the premiums each class member has paid to Defendants. In their

attempt to create a common measure of damages applicable to all putative class members,

Plaintiffs ignore the theoretical possibility that some putative class members may be entitled to

greater or lesser measures of damages. "Diminution in value" as a measure of damages is simply

a way to establish commonality or predominance over the naturally individualized issue of

damages.

The named Plaintiffs in this action, Mr. Flores and Mrs. Blount, present situations in

which the Plaintiffs' proposed damages model would very easily be calculated and would, if

Plaintiffs' claims are proven to be true, compensate their alleged damages. However, Plaintiffs

ignore the possibility that, as a result of the alleged conduct on the part of Certus, some putative

class members may have suffered actual damages beyond the "diminution in value" model. For

example, if, as alleged by Plaintiffs, Certus providers refused to provide health care to Certus

members, some Certus members may have incurred out-of-pocket expenses in obtaining the

medical care to which they were entitled, but were refused. Arguably, pursuant to Plaintiffs'

claims, those damages would be recoverable. Plaintiffs choose to ignore those possible damages

in the hope that they can certify a class with a common damages model, easily calculable at a

single trial.

In Maio v. Aetna, Inc., 221 F.3d. 472 (3rd Cir. 2000), the plaintiffs brought a claim

against Aetna Insurance and its numerous health care subsidiaries claiming, pursuant to RICO,

that Aetna failed to disclose policies and practices which rendered its advertising, marketing, and

membership materials false and misleading. Id. at 474. Plaintiffs alleged that as a result of the

misrepresentations on the part of Aetna, the health care that was provided to plaintiffs and their

potential class was of lesser quality than was represented in the marketing materials. Id. at 479.

Plaintiffs claimed that they suffered injury because the "substantial difference in the quality of

health care services marketed by Defendants, and the quality of health care services actually

provided to Plaintiffs and the Class, cause membership in the plan to be worth much less than

that actually charged by Defendants." Id. The District Court dismissed plaintiffs' claims under

RICO, holding that the plaintiffs had failed to sufficiently plead a cognizable injury to business

or property as required by RICO. Id. The Third Circuit Court of Appeals affirmed the District

Court's decision. Id. at 502.

The Maio case is instructive because it illustrates a situation similar to the one in the case

at bar. In Maio, the plaintiffs attempted to create a damages model that afforded them relief. In

this case too, Plaintiffs have attempted to formulate a model that would be applicable to all

members of their proposed class. In Maio, the Court recognized that the plaintiffs had not pled

any actual injury as a result of the alleged misconduct, and that without evidence of personal

injury or a denial of health care benefits, Maio, 221 F.3d. at 493-94, the plaintiff's claims could

not succeed, and the Court dismissed them. Here, the Court should recognize that the artificial

construction of damages that the Plaintiffs have proffered would unfairly limit the recovery of

putative class members. For that reason, the Court should deny Plaintiffs' Motion for Class

Certification

**C.** **Specific <u>Representations</u> made to each putative class member must be factored into any adjudication of the individual's claims.**

Plaintiffs' own allegations raise the issue of whether specific representations were made

to individual Plaintiffs as a result of conversations they may have had with Certus sales

representatives or exposure to various radio and television advertisements. Modifications

alleged to have been made to Mr. Flores' agreement with Certus are relevant to determining the

extent of any breach. Necessarily, an inquiry must be made into whether modifications were made to each putative class member's contract with Certus by individualized representations.

### 1.    Plaintiffs' claim for Breach of Contract

The Plaintiff Flores has claimed that he relied on representations made by sales representative David Lee Pena in making his decision to enroll his son in Certus. The result of his reliance was that he believed he was entitled to receive, under the terms of his policy, a nebulizer for his son, Joel. A reading of the policy sold to Mr. Flores reveals that a nebulizer or other durable medical goods were not available under its terms. Nevertheless, Mr. Flores claims that the representations of Mr. Pena formed a modification to the written contract. In similar instances when representations made to various class members were at issue, courts of the Fifth Circuit have determined that these issues which were specific to various individual plaintiffs predominated over issues common to the class. Specifically in this instance, representations made to individuals would be relevant to a determination of all of the claims that Plaintiffs have proffered in their Complaint.

In Velasquez v. Crown Life Insurance Company, 1999 U.S. Dist. LEXIS 13186 (S.D. Tex. 1999) (copy attached hereto), the plaintiff moved for class certification in behalf of customers of defendant who purchased life insurance policies for which defendant claimed the premiums would "vanish" after a number of years. Plaintiff made claims for violations of defendant's contractual duty of good faith and fair dealing, insurance laws, and tortious misconduct. Id. at *2. The Court declined to grant class certification, holding that individual issues predominated because of the many different representations that were made to various class members by over three hundred sales agents who sold insurance policies. Id. at *19. Similarly, in this case, if, as claimed by Mr. Flores, many class members were confronted with

varying oral representations by sales representatives, then necessarily the basis for the individuals' claims will vary from person to person and from class member to class member.

In a case similar to <u>Velasquez</u>, the United States District Court for the Southern District of Mississippi declined to certify a class of purchasers of "vanishing premium" life insurance policies in <u>Keyes v. The Guardian Life Insurance Company of America</u>, 194 F.R.D. 253 (S.D. Miss. 2000). The plaintiff alleged that the class members were subject to standardized misrepresentations with regard to the policies. However, plaintiffs could not show that the representations made to all class members were similar in that the defendant did not uniformly train sales representatives who sold its policies. Furthermore, plaintiffs put forth no evidence that the sales presentations made to policyholders were uniform. <u>Id.</u> at 257-58.

Likewise in this case, <u>Plaintiffs have proffered no evidence that the sales presentations made by Certus sales representatives were uniform or even similar</u>. Indeed, from Mr. Flores' testimony, it seems that the representations made by Certus representatives varied, depending on the issues raised by individual customers. It is highly unlikely that Mr. Pena, let alone the entire Certus sales force, discussed Mr. Pena's daughter's use of a nebulizer with every customer solicited. It is also instructive to note that independent brokers were used to sell Certus policies. Certus had no control over the representations that were made in the presentations to prospective clients. *See* <u>Keyes</u>, 194 F.R.D. 253.

In sum, both <u>Keyes</u> and <u>Velasquez</u> illustrate that in situations where potential class members are exposed to varying representations on the part of sales representatives, the experience and expectations of each potential class member differs greatly. Plaintiffs cannot substantiate their claims made on behalf of the class in such a case where each potential class member understood and purchased their policy on the basis of representations that were made

solely to them and which are known solely to them. Plaintiffs have made no attempt to account for these individual issues in proposing a trial of these matters. The individual issues and the steps necessary to account for them would so predominate any trial that any efficiency in the mechanism would be lost.

**D.    Plaintiffs' Third Party Beneficiary claim contains its own issues which require individualized treatment.**

In addition to their other claims, Plaintiffs bring forward a claim in their alleged capacity as third-party beneficiaries of the Second Amendment to the Operating Agreement for Certus Healthcare, LLC. The Second Amendment to the Operating Agreement is an internal agreement between Certus Healthcare, LLC members, Novopharm Holdings, Inc. and THCP, which provides for additional funding for Certus.

In Texas, there is a strong presumption against third-party beneficiary agreements. *See* MJR Corp. v. B&B Vending Co., 760 S.W.2d. 4, 12 (Tex. App.-- Dallas 1988, writ den'd). In determining whether parties have third-party beneficiary status, the intent of the contracting parties is controlling. *See* Corpus Christi Bank & Trust v. Smith, 525 S.W.2d. 501, 503 (Tex. 1975). Furthermore, in determining intent, courts presume that parties did not contract for the benefit of third-parties unless the duty to a third-party is clearly and fully spelled out. Id. at 503-04; *see also* MJR Corp., 760 S.W.2d. at 10. The success of a claim for third-party beneficiary status will be determined according to the terms of the contract. *See* Greenville Indep. School Dist. v. B&J Excavating, Inc., 694 S.W.2d. 410, 412 (Tex. App.-- Dallas 1985, writ ref'd. n.r.e.). Furthermore, Texas law requires that a third-party beneficiary "accept" the contract upon which they rely in making their claim. *See* Rau v. Modern Sales & Service, Inc., 414 S.W.2d. 203, 206 (Tex.App -- San Antonio 1967, writ ref'd. n.r.e.); Palmer v. Radio Corp. of America, 453 F.2d 1133 (5th Cir. 1971).

The law of third-party beneficiary contracts thus requires two acts that are individualized in nature: (1) a specific intent, discernible from the contract itself, on the part of the parties to the contract to benefit the individual and (2) acceptance on the part of each individual. With respect to the intent of the parties, the Second Amendment to the Operating Agreement contains no reference to any Certus member, nor does it contain any reference to the benefit of those individuals. Plaintiffs have made no affirmative showing that the individual putative class members were intended beneficiaries of that Agreement, particularly in light of the fact that many Certus members subscribed to the HMO before the Second Amendment to the Operating Agreement was even executed. Thus, those individuals' Certus memberships could not have been entered into in reliance on the Second Amendment to the Operating Agreement.

Plaintiffs have further not shown that individual putative class members have "accepted" the Second Amendment to the Operating Agreement in order to attain their third-party beneficiary status. As was stated before, Certus subscribers that joined Certus before the agreement was entered could not have accepted that contract at the time of their enrollment. Further, it is doubtful that many Certus subscribers even knew of the existence of the Second Amendment to the Operating Agreement. Mr. Flores admits that he was unaware of representations or assurances made by Certus, Novopharm Limited, or Novopharm Holdings to TDI. Plaintiff's Responses to Defendant's Requests for Admissions, Nos. 25-28. A party must have knowledge of a contract before it can "accept" the benefits thereof. Plaintiffs cannot now "accept" the Agreement in behalf of other putative class members without any showing that those members wish to be bound or had knowledge of it. The individual issues of knowledge, acceptance, and intent to be benefited thus preclude the certification of a class on this claim.

**E.**     **Individual issues of non-payment of premiums and proportionate responsibility dictate against certification of a class.**

In addition to the foregoing, several issues related to each individual putative class member's relationship with Certus cannot be determined on a class-wide basis, and their resolution on an individual basis will be necessary to a complete adjudication of Plaintiffs' claims. As a defense to several of Plaintiffs' claims, Defendants will assert any unpaid or delinquent premiums by any individual class members in lieu of or as a setoff against their recovery of any damages. Defendants will assert any such premiums as a material breach of the class member's contract with Certus. Plaintiffs' damages model does not preclude the use of such a setoff. A trial with respect to each individual class member will be necessary to determine whether a breach occurred on the part of the class member and whether Defendants will be entitled to the setoff. For example, Mrs. Blount acknowledged not paying for the last one and one half months of her daughters' coverage by Certus. Whether her failure to pay for those months of coverage constitutes a material breach of her contract with Certus and the amount of any setoff are issues that will necessarily be determined at an individual trial.

Further, Defendants have asserted affirmative defenses such as contributory negligence, waiver and estoppel on the part of the individual class members. Among the putative class members, certain individuals renewed their Certus policies. If those parties were aware that, as stated by Plaintiffs, their policies were not worth as much as they were promised, the individual's choice to renew the policy would arguably constitute negligence or waiver on the part of that person. Defendants would be entitled to a calculation of the comparative fault of each such individual or whether waiver or estoppel had occurred.

In sum, Defendants contend that the named Plaintiffs have failed in their burden of proof to show that a class should be certified in this case.  Plaintiffs fail to meet the prerequisites of commonality, typicality and adequacy as set out in Rule 23(a).  Further, Plaintiffs have failed to show that class wide issues predominate over individual issues.  Having failed to meet the standards of Rule 23, Plaintiffs' Motion for Class Certification should be denied.

## CONCLUSION

For the reasons stated herein, Defendants Novopharm Holdings, Inc. and Novopharm Limited respectfully request that the Court deny Plaintiffs' Motion for Class Certification and dismiss the Plaintiffs' Class Complaint.

Respectfully submitted,

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

By: _____Norton A. Colvin_____

Norton A. Colvin, Jr. w/ permission
Attorney-in-Charge          M Chistell
State Bar No. 04632100
Federal Admissions No. 1941
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441
Fax (956) 541-2170

OF COUNSEL:
John R. Wallace
Paul P. Creech
Wallace, Creech & Sarda, L.L.P.
Post Office Box 12085
Raleigh, North Carolina 27605
(919) 782-9322
(919) 782-8113 - Fax

ATTORNEYS FOR DEFENDANTS,
NOVOPHARM  LIMITED AND
NOVOPHARMHOLDINGS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants Novopharm Limited and Novopharm Holdings, Inc.'s Brief in Opposition to Plaintiff's Motion for Class Certification was served upon all counsel of record, to-wit:

> Michael R. Cowen
> 765 East 7th Street, Suite A
> Brownsville, Texas 78520
> Attorneys for Plaintiff
>
> John Ventura
> Conrad A. Bodden
> Law Offices of John Ventura, P.C
> 62 East Price Road
> Brownsville, Texas 78521
> Attorneys for Plaintiff
>
> Jeffrey D. Roerig
> Roerig, Oliveira & Fisher, L.L.P.
> 855 West Price Road, Suite 9
> Brownsville, Texas 78520
> Attorneys for Defendants Certus Healthcare, L.L.C., David Rodriguez,
> and Dr. Ashok K. Gumbhir

by certified mail, return receipt requested, hand delivery, and/or facsimile transmission pursuant to the Federal Rules of Civil Procedure, on this the 18th day of January, 2002.

_____
Norton A. Colvin, Jr.

# QUARTERLY STATEMENT

### OF THE

## Certus HealthCare, LLC

of **TEXAS**

in the state of **TEXAS**

### TO THE

## Insurance Department

### OF THE

## STATE OF TEXAS

**FOR THE QUARTER ENDED**

June 30. 1999

0000   54199920100102

# QUARTERLY STATEMENT
### FOR THE PERIOD ENDING June 30, 1999
OF THE CONDITION AND AFFAIRS OF THE

## Certus Healthcare, LLC
(Name)

NAIC Group Code _____ 0000 _____ NAIC Company Code _____ 95454 _____ Employer's ID Number ___ 74-2768870 ___

A Health Maintenance Organization organized under the laws of the ___ Texas ___

made to the ___ Department of Insurance ___ pursuant to the laws thereof.
(Appropriate Agency)

Date Incorporated or Organized: _____ December 29, 1995 _____ Date Commenced Business: ___ December 29, 1995 ___

Date Federally Qualified As An HMO: _____ Date Certified As An HMO: ___ September 16, 1996 ___

Statutory Home Office: ___ 1300 North 10th Street, Suite 450 ___        McAllen, TX ·   78501

Address of Main Administrative Office ___ 1300 North 10th Street, Suite 450 ___

_____ McAllen, TX   78501 _____        Telephone Number: _____ 956-630-1956 _____

Name of Administrator ___ David R. Rodriguez ___

Mail Address ___ 1300 North 10th Street, Suite 450 ___        McAllen, TX   78501

Primary Location of Books and Records _____ 1300 North 10th Street, Suite 450 _____
_____ McAllen, TX   78501 _____ · _____ 956-630-1956 _____

Contact Person _____ David R. Rodriguez _____        956-630-1956

Service Areas or Counties: _____

## OFFICERS

David R. Rodriguez        David R. Rodriguez......  .. ....

Edward E. McCormack        . ..  Edward E. McCormack......  .. ....

Treasurer        . . .. ..... ....... ...... .. .

## Other Officers

Ashok K. Gumbhir        Leslie L. Dan

## DIRECTORS

David R. Rodriguez

State of . .  .   . I..  . .
County of .   . I. .  . .

The officers of this company, being duly sworn, each deposes and says that they are the above described officers of the said Health Maintenance Organization, and that on reporting period stated above, all of the herein described assets were the absolute property of the said HMO, free and clear from any liens or claims thereon, except herein stated, and that this Statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to are a full and true state-- -f -ll ------ and liabilities and of the condition and affairs of the said HMO as of the reporting period stated above, and of its income and deductions therefrom for

Statement as of June 30, 1999 of the ⸴rtus Healthcare, LLC

# REPORT #1 — PART A: ASSETS

| | Current Period | | | Prior Calendar Year (a) |
|---|---|---|---|---|
| | 1 Assets | 2 Assets Not Admitted | 3 Net Admitted Assets | 4 Net Admitted Assets |
| **CURRENT ASSETS:** | | | | |
| 1. Cash ($   399,299  ) and Short-term Investments ($   1,309,168  ) | 1,708,467 | | 1,708,467 | 1,625,377 |
| 2. Premiums Receivable | 1,186,804 | | 1,186,804 | 1,359,260 |
| 3. Investment Income Receivables | | | | |
| 4. Health Care Receivables | | | | |
| 5. Amounts Due from Affiliates | | | | |
| 6. Reinsurance Recoverable on Paid Losses | 90,250 | | 90,250 | |
| 7. Aggregate Write-ins for Current Assets | 88,649 | 552 | 88,097 | 10,000 |
| 8. TOTAL CURRENT ASSETS (Lines 1 to 7) | 3,074,170 | 552 | 3,073,618 | 2,994,637 |
| **OTHER ASSETS:** | | | | |
| 9. Bonds | | | | |
| 10. Stocks: | | | | |
| 10.1 Preferred Stocks | | | | |
| 10.2 Common Stocks | | | | |
| 11. Other Long-term Invested Assets | | | | |
| 12. Receivable for Securities | | | | |
| 13. Amounts Due from Affiliates | | | | |
| 14. Aggregate Write-ins for Other Assets | 8,560 | 8,560 | | |
| 15. TOTAL OTHER ASSETS (Lines 9 to 14) | 8,560 | 8,560 | | |
| **PROPERTY AND EQUIPMENT:** | | | | |
| 16. Land, Building and Improvements | | | | |
| 17. Furniture and Equipment (Col. 3 includes $         0 Health Care Delivery and $   19,269 Administration) | 19,269 | 2,920 | 16,349 | 21,007 |
| 18. Leasehold Improvements | | | | 8,446 |
| 19. EDP Equipment (Col. 3 includes $         0 Health Care Delivery and $   177,744 Administration) | 177,744 | 68,816 | 108,928 | 138,915 |
| 20. Other Property and Equipment (Col. 3 includes $         0 Health Care Delivery and $         0 Administration) | | | | |
| 21. TOTAL PROPERTY AND EQUIPMENT (Lines 16 to 20) | 197,013 | 71,736 | 125,277 | 168,368 |
| 22. TOTAL ASSETS (Lines 8, 15 and 21) | 3,279,743 | 80,848 | 3,198,895 | 3,163,005 |

| DETAILS OF WRITE-INS | | | | |
|---|---|---|---|---|
| 0701. Other Assets | 88,649 | 552 | 88,097 | 10,000 |
| 0702. | | | | |
| 0703. | | | | |
| 0798. Summary of remaining write-ins for Line 7 from overflow page | | | | |
| 0799. Totals (Lines 0701 through 0703 plus 0798)   (Line 7 above) | 88,649 | 552 | 88,097 | 10,000 |
| 1401. Deposits | 7,059 | 7,059 | | |
| 1402. Organizational Costs | 1,501 | 1,501 | | |
| 1403. | | | | |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | | | | |
| 1499. Totals (Lines 1401 through 1403 plus 1498)   (Line 14 above) | 8,560 | 8,560 | | |

(a) Or other annual reporting period as permitted by regulatory authority.

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# Report #1 - Part B: LIABILITIES AND NET WORTH

| | Current Period | | | Prior Calendar Year (a) |
|---|---|---|---|---|
| | 1 Covered | 2 Uncovered | 3 Total | 4 Total |
| **CURRENT LIABILITIES:** | | | | |
| 1.  Accounts Payable | | 209,850 | 209,850 | 315,585 |
| 2.  Claims Payable (Reported and Unreported)(Net of $      0 Reinsurance Ceded) | 7,457,411 | 392,495 | 7,849,906 | 8,000,169 |
| 3.  Accrued Medical Incentive Pool | | | | |
| 4.  Unearned Premiums | | 163,860 | 163,860 | 306,384 |
| 5.  Loans and Notes Payable | | | | |
| 6.  Amounts Due to Affiliates | | | | |
| 7.  Unauthorized Reinsurance | | | | |
| 8.  Aggregate Write-ins for Current Liabilities | | 60,302 | 60,302 | 41,058 |
| 9.  TOTAL CURRENT LIABILITIES (Lines 1 to 8) | 7,457,411 | 826,507 | 8,283,918 | 8,663,196 |
| **OTHER LIABILITIES:** | | | | |
| 10. Loans and Notes Payable | | | | |
| 11. Amounts Due to Affiliates | | | | |
| 12. Payable for Securities | | | | |
| 13. Aggregate Write-ins for Other Liabilities | | | | |
| 14. TOTAL OTHER LIABILITIES (Lines 10 to 13) | | | | |
| 15. TOTAL LIABILITIES (Lines 9 and 14) | 7,457,411 | 826,507 | 8,283,918 | 8,663,196 |
| **NET WORTH:** | | | | |
| 16. Common Stock | X X X | X X X | | |
| 17. Preferred Stock | X X X | X X X | | |
| 18. Paid in Surplus | X X X | X X X | | |
| 19. Contributed Capital | X X X | X X X | 20,584,855 | 14,072,812 |
| 20. Surplus Notes | X X X | X X X | | |
| 21. Contingency Reserves | X X X | X X X | | |
| 22. Retained Earnings/Fund Balance | X X X | X X X | (25,669,878) | (19,573,003) |
| 23. Aggregate Write-ins for Other Net Worth Items | X X X | X X X | | |
| 24. TOTAL NET WORTH (Lines 16 to 23) | X X X | X X X | (5,085,023) | (5,500,191) |
| 25. TOTAL LIABILITIES AND NET WORTH (Lines 15 and 24) | 7,457,411 | 826,507 | 3,198,895 | 3,163,005 |

| DETAILS OF WRITE-INS | | | | |
|---|---|---|---|---|
| 0801. Accrued Payroll | | 30,255 | 30,255 | |
| 0802. Accrued Sick Leave | | 30,047 | 30,047 | 41,058 |
| 0803. | | | | |
| 0898. Summary of remaining write-ins for Line 8 from overflow page | | | | |
| 0899. Totals (Lines 0801 thru 0803 plus 0898)  (Line 8 above) | | 60,302 | 60,302 | 41,058 |
| 1301. | | | | |
| 1302. | | | | |
| 1303. | | | | |
| 1398. Summary of remaining write-ins for Line 13 from overflow page | | | | |
| 1399. Totals (Lines 1301 thru 1303 plus 1398)  (Line 13 above) | | | | |
| 2301. | X X X | X X X | | |
| 2302. | X X X | X X X | | |
| 2303. | X X X | X X X | | |
| 2398. Summary of remaining write-ins for Line 23 from overflow page | X X X | X X X | | |
| 2399. Totals (Lines 2301 thru 2303 plus 2398)  (Line 23 above) | X X X | X X X | | |

(a) Or other annual reporting period as permitted by regulatory authority.

Statement as of June 30, 1999 of the  Certus Healthcare, LLC

# Report #2 – STATEMENT OF REVENUE, EXPENSES AND NET WORTH

| | Current Period | Year-To-Date | | Prior Calendar Year (a) |
|---|---|---|---|---|
| | 1 Total | 2 Uncovered | 3 Total | 4 Total |
| MEMBER MONTHS | 64,243 | X X X | 130,884 | 225,847 |
| **REVENUES:** | | | | |
| 1. Premium (Net of $   223,558  Reinsurance Premiums Ceded) | 5,991,452 | X X X | 12,345,878 | 19,300,485 |
| 2. Fee-For-Service (Net of $   0  Medical Expenses) | | X X X | | |
| 3. Risk Revenue | | X X X | | |
| 4. Net Investment Income (Including $   0  Net Realized Capital Gains or (Losses)) | 14,636 | X X X | 23,267 | 33,620 |
| 5. Aggregate Write-ins for Other Health Care Related Revenues | | X X X | | |
| 6. Aggregate Write-ins for Other Revenues | | X X X | 14 | 238 |
| 7. TOTAL REVENUES (Lines 1 to 6) | 6,006,088 | X X X | 12,369,159 | 19,334,343 |
| **EXPENSES:** | | | | |
| **Medical and Hospital:** | | | | |
| 8. Physician Services | 2,571,746 | | 4,255,231 | 6,819,679 |
| 9. Other Professional Services | 1,163,554 | | 1,891,214 | 2,955,194 |
| 10. Outside Referrals | 1,079,952 | 475,266 | 1,733,613 | 2,660,712 |
| 11. Emergency Room and Out-of-Area | 761,315 | 139,302 | 1,260,810 | 2,273,225 |
| 12. Inpatient | 2,884,823 | 204,856 | 4,457,309 | 6,365,035 |
| 13. Incentive Pool and Withhold Adjustments | | | | |
| 14. Occupancy, Depreciation and Amortization | | | | |
| 15. Aggregate Write-ins for Other Medical and Hospital Expenses | 1,132,113 | | 2,161,939 | 3,887,522 |
| 16. Subtotal (Lines 8 to 15) | 9,593,503 | 819,424 | 15,760,116 | 24,961,367 |
| **LESS:** | | | | |
| 17. Net Reinsurance Recoveries Incurred | (60,167) | | 90,250 | 89,950 |
| 18. Copayments | 5,000 | | 5,000 | |
| 19. COB and Subrogation | | | | |
| 20. Subtotal (Lines 17 to 19) | (55,167) | | 95,250 | 89,950 |
| 21. TOTAL MEDICAL AND HOSPITAL (Lines 16 minus 20) | 9,648,670 | 819,424 | 15,664,866 | 24,871,417 |
| **Administration:** | | | | |
| 22. Administration Expenses | 1,277,798 | 2,790,995 | 2,796,323 | 7,305,437 |
| 23. TOTAL EXPENSES (Lines 21 and 22) | 10,926,468 | 3,610,419 | 18,461,189 | 32,176,854 |
| 24. INCOME (LOSS) (Line 7 minus Line 23) | (4,920,380) | X X X | (6,092,030) | (12,842,511) |
| 25. Extraordinary Item | | X X X | | |
| 26. Provision for Federal Income Taxes | | X X X | | |
| 27. NET INCOME (LOSS) (Line 24 minus Lines 25 and 26) | (4,920,380) | X X X | (6,092,030) | (12,842,511) |

| DETAILS OF WRITE-INS | | | | |
|---|---|---|---|---|
| 0501. | | X X X | | |
| 0502. | | X X X | | |
| 0503. | | X X X | | |
| 0598. Summary of remaining write-ins for Line 6 from overflow page | | X X X | | |
| 0599. Totals (Lines 0501 thru 0503 plus 0598)  (Line 5 above) | | X X X | | |
| 0601. Other Income | | X X X | 14 | 238 |
| 0602. | | X X X | | |
| 0603. | | X X X | | |
| 0698. Summary of remaining write-ins for Line 6 from overflow page | | X X X | | |
| 0699. Totals (Lines 0601 thru 0603 plus 0698)  (Line 6 above) | | X X X | 14 | 238 |
| 1501. Prescription Services | 1,030,341 | | 1,975,658 | 2,296,264 |
| 1502. Other Medical Services | 101,772 | | 186,281 | 1,591,258 |
| 1503. | | | | |
| 1598. Summary of remaining write-ins for Line 15 from overflow page | | | | |
| 1599. Totals (Lines 1501 thru 1503 plus 1598)  (Line 15 above) | | | | |

Statement as of June 30, 1999 of the  Certus Healthcare, LLC

# REPORT #2 – STATEMENT OF REVENUE, EXPENSES AND NET WORTH (Continued)

| | 1<br>Current Period | 2<br>Year-To-Date | 3<br>Prior Calendar Year (a) |
|---|---|---|---|
| **NET WORTH:** | | | |
| 28. Net Worth Beginning of Period | (3,175,854) | (5,500,191) | (1,678,432) |
| 29. Increase (Decrease) in Common Stock | | | |
| 30. Increase (Decrease) in Preferred Stock | | | |
| 31. Increase (Decrease) in Paid in Surplus | | | |
| 32. Increase (Decrease) in Contributed Capital | 2,999,985 | 6,512,043 | 8,985,000 |
| 33. Increase (Decrease) in Surplus Notes | | | |
| 34. Increase (Decrease) in Contingency Reserves | | | |
| 35. Increase (Decrease) in Retained Earnings/Fund Balance: | | | |
|    a. Net Income | (4,920,380) | (6,092,030) | (12,842,511) |
|    b. Dividends to Stockholders | | | |
|    c. Interest on Surplus Notes | | | |
|    d. Change in Nonadmitted Assets | 11,226 | (39,266) | 24,289 |
|    e. Change in Unauthorized Reinsurance | | | |
|    f. Unrealized Capital Gains and Losses | | | |
|    g. Aggregate Write-ins for Changes in Retained Earnings | | 34,421 | 11,463 |
| 36. Aggregate Write-ins for Changes in Other Net Worth Items | | | |
| 37. NET WORTH END OF PERIOD (Lines 28 to 36) | (5,085,023) | (5,085,023) | (5,500,191) |

| DETAILS OF WRITE-INS | | | |
|---|---|---|---|
| 35g01. Correction of prior year data | | 34,421 | 11,463 |
| 35g02. | | | |
| 35g03. | | | |
| 35g98. Summary of remaining write-ins for Line 35g from overflow page | | | |
| 35g99. Totals (Lines 3501 thru 35g03 plus 35g98)  (Line 35g above) | | 34,421 | 11,463 |
| 3601. | | | |
| 3602. | | | |
| 3603. | | | |
| 3698. Summary of remaining write-ins for Line 36 from overflow page | | | |
| 3699. Totals (Lines 3601 thru 3603 plus 3698)  (Line 36 above) | | | |

(a) Or other annual reporting period as permitted by regulatory authority.

Statement as of June 30, 1999 of the ᴄertus Healthcare, LLC

# Report #3 - STATEMENT OF CASH FLOWS (Indirect Method)

| | 1<br>Current Period | 2<br>Year-to-Date | 3<br>Prior<br>Calendar Year<br>(a) |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| 1. Net income (loss) | (4,920,380) | (6,092,030) | (12,842,511) |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | |
| 2. Depreciation and amortization | 108,506 | 254,255 | 448,478 |
| Change in Operating Assets and Liabilities: | | | |
| (Increase) Decrease in Operating Assets: | | | |
| 3. Premium receivable | 263,918 | 172,456 | (1,312,786) |
| 4. Due from affiliates | | | |
| 5. Health care receivable | | | |
| 6. Aggregate write-ins for (increase) decrease in operating assets | 64,032 | (168,347) | (1,726) |
| Increase (Decrease) in Operating Liabilities: | | | |
| 7. Medical claims payable | 1,211,475 | (150,263) | 5,340,274 |
| 8. Due to affiliates | | | |
| 9. Unearned premiums | (46,909) | (142,524) | 180,176 |
| 10. Accounts payable | (197,389) | (105,735) | 106,846 |
| 11. Accrued medical incentive pool | | | |
| 12. Aggregate write-ins for increase (decrease) in operating liabilities | (17,706) | 19,244 | (49,309) |
| 13. Net cash provided (used) from operating activities | (3,534,453) | (6,212,944) | (8,130,558) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| 14. Receipts from investments | | | |
| 15. Receipts from sales of property, plant and equipment | | | |
| 16. Payments for investments | (54,635) | (575,320) | (624,872) |
| 17. Payments for property, plant and equipment | (89,235) | (192,360) | (170,935) |
| 18. Aggregate write-ins for investing activities | | (23,649) | |
| 19. Net cash provided by investing activities | (143,870) | (791,329) | (795,807) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| 20. Proceeds from paid in capital or stock issuance | 2,999,985 | 6,512,043 | 8,985,000 |
| 21. Loan proceeds from non-affiliates | | | |
| 22. Loan proceeds from affiliates | | | |
| 23. Principal payments on loans from non-affiliates | | | |
| 24. Principal payments on loans from affiliates | | | |
| 25. Dividends paid | | | |
| 26. Principal payments under lease obligations | | | |
| 27. Aggregate write-ins for cash flow provided by financing activities | | | |
| 28. Net cash provided by financing activities | 2,999,985 | 6,512,043 | 8,985,000 |
| 29. NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (678,338) | (492,230) | 58,635 |
| 30. CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 1,077,637 | 891,529 | 832,894 |
| 31. CASH AND CASH EQUIVALENTS AT END OF PERIOD | 399,299 | 399,299 | 891,529 |

| DETAILS OF WRITE-INS | | | |
|---|---|---|---|
| 0601. Other Assets | 3,865 | (78,097) | (1,726) |
| 0602. Reinsurance Receivables | 60,167 | (90,250) | |
| 0603. | | | |
| 0698. Summary of remaining write-ins for Line 6 from overflow page | | | |
| 0699. Totals (Lines 0601 through 0603 plus 0698) (Line 6 above) | 64,032 | (168,347) | (1,726) |
| 1201. Accrued Payroll | | 30,255 | (49,309) |
| 1202. Accrued Sick Leave | (17,706) | (11,011) | |
| 1203. | | | |
| 1298. Summary of remaining write-ins for Line 12 from overflow page | | | |

Statement as of June 30, 1999 of the   Certus Healthcare, LLC   ...................................................................

# Report #4 - ENROLLMENT AND UTILIZATION TABLE

| | Total Members at End of | | | | | 6 Current Year-To-Date Member Months | Total Member Ambulatory Encounters for Year-To-Date | | | 10 Total Hospital Patient Days Incurred. Year-To-Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Prior Calendar Year (a) | 2 First Quarter | 3 Second Quarter | 4 Third Quarter | 5 Current Year | | | 7 Physician | 8 Non-Physician | 9 Total | |
| 20,205 | 20,133 | 19,296 | | | 119,851 | | 38,578 | 7,565 | 46,143 | 2,770 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 2,154 | 1,944 | 1,625 | | | 11,033 | | 6,239 | 941 | 7,180 | 49 |
| 22,359 | 22,077 | 20,921 | | | 130,884 | | 44,817 | 8,506 | 53,323 | 2,8.. |

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# SCHEDULE A–PART 2

Showing all Real Estate ACQUIRED During the Current Quarter

| | 2 Location | | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| a | b | | Date Acquired | Name of Vendor | Actual Cost | Amount of Encumbrances | Book Value Less Encumbrances | Expended for Additions and Permanent Improvements |
| City | State | | | | | | | |

NONE

Statement as of June 30, 1999 of the Certus Healthcare...LLC

## SCHEDULE B – PART 1
Showing all Mortgage Loans ACQUIRED during the Current Quarter

| b State | 3 Loan Type | 4 Year Acquired | 5 Rate of Interest | 6 Book Value | 7 Increase (Decrease) by Adjustment in Book Value During Year | 8 Value of Land and Buildings | 9 Year of Last Appraisal or Valuation |
|---|---|---|---|---|---|---|---|
| | | | NONE | | | | |

## SCHEDULE B - PART 2

Showing all Mortgage Loans SOLD, transferred or paid in full during the Current Quarter

| b State | 3 Loan Type | 4 Year Acquired | 5 Book Value Prior Year End | 6 Increase (Decrease) by Adjustment in Book Value During Current Quarter | 7 Book Value at Disposition | 8 Consideration Received | 9 Profit (Loss) on Sale |
|---|---|---|---|---|---|---|---|
| | | | | NONE | | | |

## SCHEDULE B - VERIFICATION

| 1 First Quarter Current Year | 2 Second Quarter Current Year | 3 Third Quarter Current Year | 4 Prior Year December 31 |
|---|---|---|---|
| | NONE | | |

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# SCHEDULE BA—PART 1

Showing Other Long-Term Invested Assets ACQUIRED during the Current Quarter

| Location | | Name of Vendor | Year Acquired | Actual Cost | Amount of Encumbrances | Book Value Less Encumbrances | Increase (Decrease) by Adjustment in Book Value During Year |
|---|---|---|---|---|---|---|---|
| a City | b State | 3 | 4 | 5 | 6 | 7 | 8 |
| | | NONE | | | | | |

Statement as of June 30, 1999 of the.... Certus Healthcare, LLC

# SCHEDULE D - PART 1B

Showing the Acquisitions, Dispositions and Non-Trading Activity
During the Current Quarter for all Bonds and Preferred Stock by Rating Class

| 1 Statement Value Beginning of Current Quarter | 2 Acquisitions During Current Quarter | 3 Dispositions During Current Quarter | 4 Non-Trading Activity During Current Quarter | 5 Statement Value End of First Quarter | 6 Statement Value End of Second Quarter | 7 Statement Value End of Third Quarter | 8 Statement Value December 31 Prior Year |
|---|---|---|---|---|---|---|---|
| 23.130 | | NONE | NONE | 23.130 | 23.130 | | 23.130 |
| 23.580 | | | | 23.580 | 23.580 | | 23.580 |
| 24.030 | | | | 24.030 | 24.030 | | 24.030 |
| 24.480 | | | | 24.480 | 24.480 | | 24.480 |
| 24.930 | | | | 24.930 | 24.930 | | 24.930 |
| 25.380 | | | | 25.380 | 25.380 | | 25.380 |
| 145.530 | | | | 145.530 | 145.530 | | 145.530 |
| | | NONE | NONE | | | | |
| 145.530 | | | | 145.530 | 145.530 | | 145.530 |

Statement as of June 30, 1999 of the ... Certus Healthcare, LLC ......

# SCHEDULE D – PART 3
Showing all Long-Term Bonds and Stocks ACQUIRED During Current Year

| Description | 2 Date Acquired | 3 Name of Vendor | 4 Number of Shares of Stock | 5 Actual Cost | 6 Par Value | 7 Paid for Accrued Interest and Dividends | 8 NAIC Designation (a) |
|---|---|---|---|---|---|---|---|
| | | NONE | | | | | |

...vide: the number of such issues .............. 0 ..

Statement as of June 30, 1999 of the. Certus Healthcare, LLC

## SCHEDULE D – PART 4

ng all Long-term Bonds and Stock Sold, Redeemed or Otherwise Disposed of by the Company During the Current Quarter

| 1 | 2 Disposal Date | 3 Name of Purchaser | 4 Number of Shares of Stock | 5 Consideration | 6 Par Value | 7 Actual Cost | 8 Book Value at Date of Disposal | 9 Profit on Disposal | 10 Loss on Disposal | 11 Interest and Dividends Received Current Year to Date | 12 NAIC Designation (a) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | NONE | | | | | | | |

e: the number of such issues .......... 0.

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 59 of 96

Statement as of June 30, 1999 of the ertus Healthcare, LLC

# SCHEDULE DA – PART 1
## Short-Term Investments Owned End of Current Quarter

| | 1<br>Book<br>Value | 2<br>Par<br>Value | 3<br>Statement<br>Value | 4<br>Cost to<br>Company | 5<br>Amount of Interest<br>Received Current<br>Quarter | 6<br>Paid for<br>Accrued Interest |
|---|---|---|---|---|---|---|
| 8299999   Totals | 1,309,168 | X X X | 1,309,168 | | 14,636 | |

# SCHEDULE DA – PART 2 – Verification
## Short-Term Investments Owned

| | 1<br>First Quarter<br>Current Year | 2<br>Second Quarter<br>Current Year | 3<br>Third Quarter<br>Current Year | 4<br>Prior Year Ended<br>December 31 |
|---|---|---|---|---|
| 1. Book value of short-term investments, beginning of period | 733,848 | 1,254,532 | | |
| 2. Cost of short-term investments acquired | 512,054 | 40,000 | | |
| 3. Increase by adjustment in book value | 8,630 | 14,636 | | |
| 4. Profit on disposal of short-term investments | | | | |
| 5. Subtotals (Sum of Lines 2 through 4) | 520,684 | 54,636 | | |
| 6. Consideration received on disposal of short-term investments | | | | |
| 7. Decrease by adjustment in book value | | | | |
| 8. Loss on disposal of short-term investments | | | | |
| 9. Subtotals (Sum of Lines 6 through 8) | | | | |
| 10. Book value of short-term investments, end of period | 1,254,532 | 1,309,168 | | |
| 11. Income collected | | | | |

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# SCHEDULE S — CEDED REINSURANCE
## Showing all new reinsurers - Current Year to Date

| NAIC Company Code | Federal ID Number | Name of Reinsurer | Location | Is Insurer Authorized? (Yes or No) |
|---|---|---|---|---|
| | | Accident and Health - Affiliates | | |
| | | | | |
| | | Accident and Health - Non-Affiliates | | |
| 67016 | 13-1562932 | SwissRe Life & Health America, Inc. | Miami, FL | Yes |

Case 1:00-cv-00053    Document 63    Filed in TXSD on 01/22/2002    Page 61 of 96

Statement as of June 30, 1999 of the Certus Healthcare, LLC

## CHEDULE Y – INFORMATION CONCERNING ACTIVITIES OF INSURER MEMBERS OF A HOLDING COMPANY GROUP

All insurer members of a holding Company Group that has acquired and/or disposed of any domestic insurer(s) since filing the last annual or quarterly statement shall prepare a common schedule for inclusion in each of the individual quarterly statements

### PART 1 – ORGANIZATIONAL CHART

# Ownership Chart

For Informational Purposes Only

OCT 27 1998

Received Financial Monitoring

Novopharm Limited
an Ontario Corporation

100%

Novopharm Holdings, Inc.
a Delaware Corporation

Certus HealthCare, LLC
a Texas
Limited Liability Company

80%

20%

Total Health Care Plans,
Inc.
a Delaware Corporation

Novopharm Limited owns 100% of common stock of Novopharm Holdings, Inc.
Novopharm Holdings, Inc. owns 80% of Certus HealthCare, LLC
Total Health Care Plans, Inc. owns 20% of Certus HealthCare, LLC

**Ownership structure of Total Health Care Plans, Inc:**

| | | | |
|---|---|---|---|
| D. Rodriguez | 17.16 | W. Fuentora | 4.00 |
| O. Jalas | 16.72 | C. Williams | 1.00 |
| F. McGhee | 9.00 | F. Beissner | 17.00 |
| I. Phillips | 16.52 | V. Gambhir | 4.00 |
| G. Sabater | 20.00 | | |

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# SCHEDULE T - PREMIUMS AND OTHER CONSIDERATIONS

## Allocated by States and Territories

| | 1 | | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| | | | | | Direct Business Only Year-to-Date | | | |
| | States, Etc. | | Guaranty Fund (Yes or No) | Is Insurer Licensed (Yes or No) | Premiums | Medicare Title XVIII | Medicaid Title XIX | Federal Employees Health Benefits Program Prem |
| 1. | Alabama | AL | No | No | | | | |
| 2. | Alaska | AK | No | No | | | | |
| 3. | Arizona | AZ | No | No | | | | |
| 4. | Arkansas | AR | No | No | | | | |
| 5. | California | CA | No | No | | | | |
| 6. | Colorado | CO | No | No | | | | |
| 7. | Connecticut | CT | No | No | | | | |
| 8. | Delaware | DE | No | No | | | | |
| 9. | Dist. of Columbia | DC | No | No | | | | |
| 10. | Florida | FL | No | No | | | | |
| 11. | Georgia | GA | No | No | | | | |
| 12. | Hawaii | HI | No | No | | | | |
| 13. | Idaho | ID | No | No | | | | |
| 14. | Illinois | IL | No | No | | | | |
| 15. | Indiana | IN | No | No | | | | |
| 16. | Iowa | IA | No | No | | | | |
| 17. | Kansas | KS | No | No | | | | |
| 18. | Kentucky | KY | No | No | | | | |
| 19. | Louisiana | LA | No | No | | | | |
| 20. | Maine | ME | No | No | | | | |
| 21. | Maryland | MD | No | No | | | | |
| 22. | Massachusetts | MA | No | No | | | | |
| 23. | Michigan | MI | No | No | | | | |
| 24. | Minnesota | MN | No | No | | | | |
| 25. | Mississippi | MS | No | No | | | | |
| 26. | Missouri | MO | No | No | | | | |
| 27. | Montana | MT | No | No | | | | |
| 28. | Nebraska | NE | No | No | | | | |
| 29. | Nevada | NV | No | No | | | | |
| 30. | New Hampshire | NH | No | No | | | | |
| 31. | New Jersey | NJ | No | No | | | | |
| 32. | New Mexico | NM | No | No | | | | |
| 33. | New York | NY | No | No | | | | |
| 34. | North Carolina | NC | No | No | | | | |
| 35. | North Dakota | ND | No | No | | | | |
| 36. | Ohio | OH | No | No | | | | |
| 37. | Oklahoma | OK | No | No | | | | |
| 38. | Oregon | OR | No | No | | | | |
| 39. | Pennsylvania | PA | No | No | | | | |
| 40. | Rhode Island | RI | No | No | | | | |
| 41. | South Carolina | SC | No | No | | | | |
| 42. | South Dakota | SD | No | No | | | | |
| 43. | Tennessee | TN | No | No | | | | |
| 44. | Texas | TX | No | Yes | 11,545,123 | | | 800,755 |
| 45. | Utah | UT | No | No | | | | |
| 46. | Vermont | VT | No | No | | | | |
| 47. | Virginia | VA | No | No | | | | |
| 48. | Washington | WA | No | No | | | | |
| 49. | West Virginia | WV | No | No | | | | |
| 50. | Wisconsin | WI | No | No | | | | |
| 51. | Wyoming | WY | No | No | | | | |
| 52. | American Samoa | AS | No | No | | | | |
| 53. | Guam | GU | No | No | | | | |
| 54. | Puerto Rico | PR | No | No | | | | |
| 55. | U.S. Virgin Islands | VI | No | No | | | | |
| 56. | Canada | CN | No | No | | | | |
| 57. | Aggregate Other Alien | OT | X X X | X X X | | | | |
| 98. | Total (Direct Business) | | X X X | 1 | 11,545,123 | | | 800,755 |

Statement as of June 30, 1999 of the Certus Healthcare, LLC

# GENERAL INTERROGATORIES

**(Responses to these interrogatories should be based on changes that occurred since prior year end)**

1. (a) Has the company been a party to a merger or consolidation during the period covered by this statement?          YES [   ] NO [ X ]

   (b) If yes, provide name of company, NAIC Company Code, and state of domicile (use two letter state abbreviation) for any company that has ceased to exist as a result of the merger or consolidation.

| Name of Company | NAIC Company Code | State of Domicile |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

2. (a) Has this company had any Certificates of Authority, licenses or registrations (including corporate registration, if applicable) suspended or revoked by any governmental entity during the reporting period? (You need not report an action, either formal or informal, if a confidentiality clause is part of the agreement.)          YES [   ] NO [ X ]

   (b) If yes, give full information

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 64 of 96

Statement as of March 31, 1999 of the Certus Healthcare, LLC

# OVERFLOW PAGE FOR WRITE-INS

```
Claims Reported:      2,906,962
Claims UnReported:    4,942,944
Outstanding Claims:   7,849,906
```

Statement for the year 1999 of the Certus Healthcare, LLC

# SCHEDULE E – PART 2 – SPECIAL DEPOSITS

| Description of Deposit | Where Deposited and Purpose of Deposit | 1 Par or Book Value | 2 Statement Value | 3 Market Value |
|---|---|---|---|---|
| | Laredo National Bank | 518,700 | 518,700 | |
| | Nations Bank | 114,822 | 114,822 | |
| | Lone Star National Bank | 567,860 | 567,860 | |
| eposit | Lone Star National Bank | 67,786 | 67,786 | |
| eposit | Lone Star National Bank | 40,000 | 40,000 | |
| ld for the benefit of all Policyholders, Claimants, and Creditors of the Company | | 1,309,170 | 1,309,170 | |

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 66 of 96

HMO SUPPLEMENT - ANNUAL and QUARTERLY
OF THE Certus Healthcare, L.L.C.

(Name of Company)

HR THE PERIOD ENDING   June 30, 1999

RT FOR :1. CORPORATION / 2. DIVISION   CONSOLIDATED

(Location)

EXHIBIT II *(Filed Annually and Quarterly)*

ACTUAL REVENUES AND EXPENSES BY MAJOR SPECIFIED LINES

Indicate Reporting Period:
Current Quarter   X

| | 1. Total | 2. * COMMERCIAL RISK (Omit Provider HMO Business) | 3. MEDICARE (Omit Provider HMO Business) RISK | COST | 4. MEDICAID (Omit Provider HMO Business) RISK | COST | 5. ASSUMED RISK (as Provider HMO) | 6. PUBLICLY SUPPORTED HEALTH CARE | 7. ** NON-RISK |
|---|---|---|---|---|---|---|---|---|---|
| EPORTING PERIOD | 20,921 | 20,921 | 0 | 0 | 0 | | 0 | | 0 |
| | 64,243 | 64,243 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | | | | | | | | | |
| | 5,991,452 | 5,991,452 | 0 | 0 | 0 | | 0 | | 0 |
| nt income) | 0 | 0 | 0 | 0 | 0 | | 0 | | 0 |
| | 14,636 | 14,636 | 0 | 0 | 0 | | 0 | | 0 |
| 3 to 5) | 6,006,088 | 6,006,088 | 0 | 0 | 0 | | 0 | | 0 |
| | | | | | | | | | |
| | 2,571,746 | 2,571,746 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 1,163,554 | 1,163,554 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 1,079,952 | 1,079,952 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 761,315 | 761,315 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 2,884,823 | 2,884,823 | 0 | 0 | 0 | | 0 | 0 | 0 |
| stments | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| rtization | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 1,132,113 | 1,132,113 | 0 | 0 | 0 | | 0 | 0 | 0 |
| TAL (Lines 7 to 14) | 9,593,503 | 9,593,503 | 0 | 0 | 0 | | 0 | 0 | 0 |
| AND HOSPITAL: | | | | | | | | | |
| d | (60,167) | (60,167) | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 5,000 | 5,000 | 0 | 0 | 0 | | 0 | 0 | 0 |
| es 16 to 18) | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | (55,167) | (55,167) | 0 | 0 | 0 | | 0 | 0 | 0 |
| ine 15 minus Line 19) | 9,648,670 | 9,648,670 | 0 | 0 | 0 | | 0 | 0 | 0 |
| | 1,277,798 | 1,277,798 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 0 plus Line 21) | 10,926,468 | 10,926,468 | 0 | 0 | 0 | | 0 | 0 | 0 |
| # 22) | (4,920,380) | (4,920,380) | 0 | 0 | 0 | | 0 | | 0 |
| e Taxes | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| rs Line 24) | (4,920,380) | (4,920,380) | 0 | 0 | 0 | | 0 | 0 | 0 |

*Commercial risk" are (26a)_____(Examples of non-taxable enrollees are State of Texas enrollees and Federal employees).  Commercial member months for Non-taxable Enrollees equal (26b).

onths are required only if a type of business represented lends itself to maintenance of an enrollee count.  Examples of non-risk business are "Administrative Services Only and "Fee for Services."

HS 3

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 67 of 96

HMO SUPPLEMENT - ANNUAL and QUARTERLY
OF THE  Certus Healthcare, L.L.C.

(Name of Company)

THE PERIOD ENDING  June 30, 1999

T FOR :1. CORPORATION / 2. DIVISION  CONSOLIDATED

(Location)

EXHIBIT II (Filed Annually and Quarterly)
ACTUAL REVENUES AND EXPENSES BY MAJOR SPECIFIED LINES

Indicate Reporting Period:
Year-to-Date  X

| | 1. Total | 2. * COMMERCIAL RISK (Omit Provider HMO Business) | 3. MEDICARE (Omit Provider HMO Business) | | 4. MEDICAID (Omit Provider HMO Business) | | 5. ASSUMED RISK (as Provider HMO) | 6. PUBLICLY SUPPORTED HEALTH CARE | 7. NON-RISK |
|---|---|---|---|---|---|---|---|---|---|
| | | | RISK | COST | RISK | COST | | | |
| ORTING PERIOD | 20,921 | 20,921 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 130,884 | 130,884 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 12,345,878 | 12,345,878 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (income) | 23,281 | 23,281 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| to 5) | 12,369,159 | 12,369,159 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | |
| | 4,255,231 | 4,255,231 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 1,891,214 | 1,891,214 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 1,733,613 | 1,733,613 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 1,260,810 | 1,260,810 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 4,457,309 | 4,457,309 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| atments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2,161,939 | 2,161,939 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AL (Lines 7 to 14) | 15,760,116 | 15,760,116 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ND HOSPITAL: | | | | | | | | | |
| | 90,250 | 90,250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 5,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 to 18) | 95,250 | 95,250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| e 15 minus Line 19) | 15,664,866 | 15,664,866 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2,796,323 | 2,796,323 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| lus Line 21) | 18,461,189 | 18,461,189 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22) | (6,092,030) | (6,092,030) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Line 24) | (6,092,030) | (6,092,030) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Commercial risk" are (26a) _____ (Examples of non-taxable enrollees are State of Texas enrollees and Federal employees). Commercial member months for Non-taxable Enrollees equal (26b)_____

ints are required only if a type of business represented lends itself to maintenance of an enrollee count.  Examples of non-risk business are "Administrative Services Only and "Fee for Services."

HS 3

Case 1:00-cv-00053  Document 63  Filed in TXSD on 01/22/2002  Page 68 of 96

HMO SUPPLEMENT - ANNUAL and QUARTER'~

STATEMENT FOR THE YEAR /QUARTER ✓ ENDING <u>June 30, 1999</u> OF THE <u>Certus Health Care, LLC</u>

EXHIBIT VI
Supplemental Interrogatories

1. Are any providers, within the HMO's network, responsible for provision of health care services for which the provider, itself, is not licensed to directly furnish the services? YES / NO

   a. If answer is "yes", are the costs of these services less than 15% of the total costs of services provided by the contracting provider? YES / NO   (Percentage: _____%)

   b. Are the services being directly provided by licensed sub-contracting providers?  YES / NO

2. Is documentation supporting the answers above being maintained at the HMO's home office or other designated administrative office, as approved by the Texas Dept. of Insurance?  YES / NO

3. Are you a Primary HMO contracting with Provider HMO(s) or ANHC(s), as defined in 28 TAC §11.2? YES / NO

4. If the answer to question number 3 is yes;

   a. Are there written agreements evidencing each Primary HMO / Provider HMO and Primary HMO / ANHC relationship? YES / NO

      (If not, please attach a description of any such relationship including the identity of the parties involved.)

   b. Have all written agreements been filed with the Texas Department of Insurance in accordance with 28 TAC §11.1604(2).  YES / NO

      (If not please attach a schedule identifying those agreements that have not been filed.)

   c. Has a monitoring plan been submitted to the Texas Department of Insurance in accordance with 28 TAC §11.1604(1).  YES / NO

      (If not, please attach a schedule listing all relationships of which a monitoring plan has not been submitted to the Texas Department of Insurance.)

   d. If contracting with an ANHC,

      i. Has each ANHC provided a financial statement showing evidence of financial solvency and financial ability to perform under the contract in accordance with 28 TAC § 11.1604(2)(F)?  YES / NO

         (Attach a schedule identifying any ANHCs not providing a financial statement.)

      ii. List the "as of dates" and dates that the financial statements were received from each ANHC.

      _____

   e. Has the data required under 28 TAC §11.1604(2)(G) been received from the Provider HMO or ANHC? YES / NO

   f. If so;

      i. Has utilization data received from Provider HMO or ANHC been included in Report #4?  YES / NO

      ii. Has complaint data received from Provider HMO or ANHC been included in Exhibit VIII?  YES / NO

   g. Has an on-site audit of each ANHC or Provider HMO been conducted in accordance with 28 TAC

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 69 of 96

## EXHIBIT VI - Supplemental Interrogatories
## (continued)

6. If answer to question number 5 is "yes", then;

    a. For services provided under the written agreement required to be filed under 28 TAC §11.1604(2), do all contracts and sub-contracts between the Provider HMO and physicians and providers contain enrollee hold harmless clauses?   YES / NO

    b. Has the information listed under 28 TAC §11.1604(G) been provided to the Primary HMO on a monthly basis?   YES / NO

7. Please list the total amounts paid to physicians, hospitals, and other health care providers under the compensation methods listed:

| COMPENSATION METHOD | CURRENT YEAR-TO-DATE AMOUNT | PERCENT OF TOTAL | PREVIOUS YEAR AMOUNT | PERCENT OF TOTAL |
|---|---|---|---|---|
| Fee for service | $ 2,077,641 | 16 % | $ 978,888 | 5 % |
| Discounted Fee For Service | $ 7,911,919 | 60 % | $ 13,615,942 | 70 % |
| Capitation | $ | % | $ | % |
| Per diem | $ 3,206,057 | 24 % | $ 4,982,934 | 25 % |
| Other | $ | % | $ | % |
| Total Paid | $ 13,195,617 | 100% | $ 19,577,764 | 100% |

8. Within the next 12 months following the reporting date, does the HMO anticipate a change in compensation methods utilized (as reflected above) equal or exceeding 20%? (For example, if 70% of an HMO's medical and hospital expenses were paid on a capitation basis in the previous year and the HMO anticipates that for the next 12 months only 50% of the medical and hospital expenses will be paid on a capitation basis, then there is a change equal to 20%.)   YES / NO

    a. If yes, please reflect the anticipated percentages below.

| COMPENSATION METHODS | PERCENTAGE, CURRENT YEAR-TO-DATE | ANTICIPATED PERCENTAGES |
|---|---|---|
| Fee for service | % | % |
| Discounted Fee For Service | % | % |
| Capitation | % | % |
| Per diem | % | % |
| Other | % | % |
| Total Paid | 100% | 100% |

9. Within the next 12 months, does the HMO anticipate any major changes in the manner by which health care services are provided? (for example, implementing or eliminating a "gatekeeper" system would constitute a major change in the manner by which health care services are provided.)

    YES / NO

10. Has there been any significant change in the manner of delivery of health care services during the current period that was not previously anticipated and disclosed in previous statement filings?

    YES / NO

11. If question 9 and/or 10 are answered "Yes", please describe.

# CLASS CERTIFICATION: 2000-2001:
## A Survey of Major Developments in the Case Law

by      John C. Coffee, Jr.
Adolf A. Berle Professor of Law
Columbia University Law School,
Joseph Flom Visiting Professor of Law,
Harvard University Law School

This outline was prepared for the American Bar Association's National Institute on Class Actions, held on October 19, 2001 in New Orleans, Louisiana and November 9, 2001 in San Francisco, California.

The author wishes to acknowledge the considerable research assistance received from his research assistants: Jonathan Blavin, Harvard Law School, Class of 2003, Kathryn Gainey, Harvard Law School, Class of 2003, and Pankaj Venugopal , Columbia Law School, Class of 2003.

1

## Introduction

As an organizing device, this outline will analyze recent class certification developments by grouping decisions in terms of the subsection of Rule 23(b) under which the action was proposed to be certified. Necessarily, this results in some cases being considered under multiple headings. Across all contexts, however, the dominant finding is of a new conservatism toward class certification, even in contexts where classes were once certified with regularity. This trend appears to be the by-product of the adoption of Rule 23(f), which liberalized interlocutory appellate review of class certification and resulted in a rapidly expanding body of decisions that are curtailing the occasions on which a class can be certified. This pattern is not uniform across all Circuits, and growing inter-Circuit disparity is probably the second clearest impression that emerges from this tour of recent case law. Indeed, an important division has recently arisen between the Second and Fifth Circuits on the scope of Rule 23 (b)(2) which may ultimately require Supreme Court resolution.

### I. Rule 23 (b)(3) and the Traditional Class Action for Money Damages

From a policy perspective, the justification for class certification is strongest in the case of small claimant (or •negative value•) suits in which the transaction costs of litigation would exceed the likely individual recovery if the action were litigated on an individual basis. See Amchem Products Inc. v. Windsor, 521 U.S. 591, 624 (1997) (predominance •test readily met in certain cases alleging consumer or securities fraud...•); Smith v. Texaco, 263 F.3d 394, 416 (5th Cir. 2001) (•most compelling rationale for finding superiority....[is]... the existence of a negative value suit•). Nonetheless, the predominance requirement of Rule 23(b)(3), which requires that

common questions of law or fact •predominate• over individual questions, appears to be
increasingly making certification impractical across a wide range of •garden variety• fraud suits.
Several recurring problems arise in such fraud cases that, at least in some circuits, now generally
preclude a finding of predominance:

> **A. The Need to Prove Detrimental Reliance**  Unless reliance by the investor
can be presumed under some circumstances, the plaintiff will typically be under an obligation to
prove not only the materiality of a misrepresentation or omission, but also that it was in fact
relied upon and amounted to the proximate cause of the investor·s loss.  Over the last two years, a
number of recent decisions have reversed class certifications because proof of individual reliance
was necessary and thus presented an individual issue of fact:

> 1. Bolin v. Sears Roebuck Co., 231 F.3d 970 (5th Cir. 2000).  Here, the class consisted of
bankrupt debtors who alleged illegal post-bankruptcy collection practices by Sears.  Although the
class members had in common purchased merchandise from Sears, then declared bankruptcy, and
later had made payments to Sears in respect of its claimed, but allegedly inflated, security interest
in their property, the Fifth Circuit still found that individual issues predominated because a RICO
action requires a showing of detrimental reliance by each plaintiff.

> 2. Summit Properties Inc. v. Hoechst Celanese Corp., 214 F.3d 556 (5th Cir. 2000)
(similar result in RICO action against manufacturers of plumbing systems and components).

> 3. Perrone v. General Motors Acceptance Corp., 232 F.3d 433 (5th Cir. 2000)
(detrimental reliance on lessor·s disclosure must be proven by individual members of a class of
lessees suing under the Truth in Lending Act (•TILA•) and Consumer Leasing Act);

> 4. Stout v. J.D. Byrider, 228 F.3d 709 (6th Cir. 2000) (affirming denial of certification of

3

proposed class of car buyers who asserted fraud claims under TILA and Ohio consumer statute because of necessity of proving individual reliance);

5. <u>Peters v. Lupient Oldsmobile Co.</u>, 220 F.3d 915 (8th Cir. 2000) (non-class action under TILA dismissed because of failure to prove proximate causation by showing actual detrimental reliance);

6. <u>Turner v. Beneficial Corp.</u>, 242 F.3d 1023 (11th Cir. 2001) (reversing prior law in the Eleventh Circuit and finding that detrimental reliance is an element of a TILA claim for actual damages; reliance could not be found where consumer did not read defendant's improper disclosure statement).

To sum up, in at least a number of Circuits, it appears today unlikely that a fraud claim for actual damages could be certified for class treatment under either RICO or TILA (although a claim for statutory damages under TILA could presumably still be certified).

### B.  Actual Damages As An Individual Fact Issue

1. <u>Bolin v. Sears Roebuck</u>, supra, also drew a sharp distinction between legal theories that lent themselves to the calculation of damages under an objective formula and those that necessarily required individualized calculations of actual damages.  Only the former, it suggested, could qualify for class treatment.  Thus, the Fifth Circuit noted:

> •Unwinding various settlements or refunding overcharges pursuant to a standard formula also may not require calculating the damages of each class member.• <u>Id</u>. at 978.

On this basis, it might be possible to certify a class seeking overcharges (because each class member would be entitled to be reimbursed the amount paid in excess of the maximum permissible rate) or statutory damages, but not •out of pocket• or consequential damages.

4

2. <u>Lienhart v. Dryvit Systems, Inc.</u>, 255 F.3d 138 (4th Cir. 2001), similarly finds it impermissible to determine damages on a class-wide basis where the governing law requires individualized proof of damages. Such individualized proof was also necessary where North Carolina law gave the defendant seller of stucco siding products an absolute defense of contributory negligence if class members failed to follow its express directions for the installation of its product.

3. <u>Miller v. Hygrade Food Prods. Corp.</u>, 198 F.R.D. 638 (E.D. Pa.. 2001) (class certification denied when calculation of compensatory and punitive damages in Title VII case could not be done by applying objective standards and would require individual examination).

### C. <u>Oral and Nonstandardized Misrepresentations</u>

In many allegedly fraudulent marketing programs, the defendant may employ a variety of agents and independent third parties, selling on a commission basis, who make non-uniform misrepresentations, often on an oral basis in face-to-face or telephone encounters with the class members. In <u>In re LifeUSA Holding, Inc.</u>, 242 F.3d 136 (3d Cir. 2001), this was the underlying fact pattern in a case where the defendant had marketed its annuity policies over an eleven year period to more than 280,000 investors through 30,000 independent agents. Although the District Court had certified a class, relying on the Third Circuit's earlier opinion in <u>In re Prudential Life Ins. Co. of America Sales Practices Litigation</u>, 148 F.3d 283 (3d Cir. 1998), which had affirmed the certification of a settlement class of more than eight million plaintiffs who had purchased Prudential Insurance policies based on •uniform, scripted and standardized sales presentations,• the District Court in <u>LifeUSA</u> did not identify any common script or standardized sales practices developed by the issuer to guide or direct its agents. See <u>LifeUSA</u>, 242 F.3d at 146. Also,

5

whereas in <u>Prudential</u>, the agents were career agents, working exclusively for Prudential, the

agents in <u>LifeUSA</u> represented multiple issuers of annuities and diverged widely in their sales

practices (and even in whether they used the defendant's marketing materials).  On this basis, the

Third Circuit panel found that the <u>LifeUSA</u> class could not be certified.  Arguably, the critical

distinction may have been that <u>Prudential</u> was a settlement class being challenged by objectors,

whereas <u>LifeUSA</u> was an adversarial class, that had been certified for litigation purposes, over

the objections of the defendant.  In any event, the bottom line may be that, even if the defendant

has made material misrepresentations or omissions in its sales literature, the defendant may still

be able to evade certification if its agents diverged in how and whether they used that sales

literature, because such differences will give rise to •individual• issues that defeat

•predominance.•

### D.  <u>Choice of Law Variations</u>

Nationwide classes, particularly those alleging fraud or products liability, regularly face

the problem that state laws vary, thus presenting individual questions of law that cannot survive

the predominance standard.  Even if subclasses are used to group states with similar legal rules,

this tactic only solves the predominance issue at the cost of aggravating the manageability issue -

- at least  if the case is to be tried.  Recent cases rejecting nationwide classes because of

variations in state law include:

1.  <u>Spence v. Gluck</u>, 227 F.3d 308, 314 (5th Cir. 2000) (holding that District Court had

incorrectly ruled that one state's law governed product liability claims for defective design and

that nationwide class under the law of fifty states was infeasible);

2.  <u>Szabo v. Bridgport Machs., Inc.</u>, 249 F.3d 672 (7th Cir. 2001) (reversing class

6

certification breach of warranty products liability case involving machine tools);

3. <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180 (9th Cir. 2001) (affirming denial of class certification in mass torts products liability class action against manufacturers of cardiac pacemaker).

One response available to plaintiffs is to argue that, under governing choice of law rules, the law of one state applies to all claims because of that state's more significant relationship to the conduct as the actors. In <u>Simon v. Phillip Morris</u>, 124 F. Supp. 2d 46 (E.D.N.Y. 2000), Judge Jack Weinstein found New York law to govern with respect to tobacco manufacturers domiciled in New York, North Carolina and Kentucky because of New York's more significant interests.

## E. Decisions Affirming Class Certification

Although heightened barriers to certification now exist in cases involving variable damages, non-standardized marketing or, most importantly, a need to prove individualized reliance, not all decisions have rejected certification on these facts, and wide inter-Circuit disparity is evident. Even within •conservative• Circuits (such as the Fifth Circuit), some courts have certified fraud claims on fact patterns in which the reliance of third parties was found to substitute for individual reliance:

1. <u>In re Sumitomo Copper Litig.</u>, 262 F.3d 134 (2d Cir. 2001). This RICO class action asserted that defendants had artificially manipulated the prices of copper futures on public exchanges. The Second Circuit refused to grant interlocutory review under Rule 23(f) of the district court's decision to certify a 20,000 member class, and it announced restrictive criteria that would be applied to future Rule 23(f) appeals. The district court (Judge Milton Pollack) had

7

certified the class, despite defendants• objections that each class member had different actual

damages and its claim that the artificiality of the prices in the public market presented an

individual issue the pattern varied on a day-by-day basis over the alleged life of the 27 month

conspiracy.  See In re Sumitomo Copper, Litig., 194 F.R.D. 480 (S.D.N.Y. 2000).  Judge Pollack

responded to these objections by finding that, if serious issues of manageability or predominance

in fact arose, he would bifurcate the trial into separate liability and damage stages and might

shorten the class period to simplify manageability.  Although the Second Circuit did not disturb

his approach, it seems doubtful that the same decision would have been upheld in the Fifth

Circuit.

2.  Sandwich Chef of Texas v. Reliance National Indemnity Ins. Co., 202 F.R.D. 212;

2001 WL 914850; 2001 U.S. Dist. LEXIS 12484 (S.D. Tex. August 9, 2001). Plaintiffs

alleged that some 150 defendant insurance companies who offered retrospectively rated

workman•s compensation insurance had conspired on a nationwide basis to overcharge

class members by unlawfully inflating a regulated premium factor above their permissible

filed rates and had concealed their overcharges from state regulators in all fifty states.

Although the amount charged for the particular regulated factor appears to have been

above the filed rate in every state, defendants still pointed to the diversity of state laws

and the need to show detrimental reliance in a RICO fraud action as reasons why the

predominance standard could not be satisfied.  In response, plaintiffs advanced an

ingenious theory by which to prove detrimental reliance.  Relying on language from the

Fifth Circuit•s decision in Summit Properties, Inc. v. Hoechst Celanese Corp., 214 F.3d

556 (5th Cir. 2000), they alleged that:

8

(1)  Defendants had made false filings with state regulators that enabled them to charge illegal premiums (the •fraud on the regulator theory•); and

(2)  Defendants had sent invoices to class members billing them for amounts above those permitted by law and that, by paying these invoices, plaintiffs had implicitly relied on defendant•s implicit representation that the amount so charged was lawful (the reliance on invoice theory).

In Summit Properties, the Fifth Circuit had held that, in a fraud case, the plaintiff needed to prove that it had •either been the target of a fraud [the target wing] or has relied upon the fraudulent conduct of the defendants [the reliance wing].• See 214 F.3d at 561. Since Summit Properties, the Fifth Circuit has again upheld the idea that a third party•s reliance on a fraudulent statement can furnish the requisite proximate causation. See Proctor & Gamble v. Amway, 242 F.3d 539, 565 (5th Cir. 2001) (by defrauding P&G•s customers, defendant could indirectly defraud P&G, even though P&G did not itself detrimentally rely on false statements).  Still, the future of the Sandwich Chef exception to the usual rule that each class member must prove detrimental reliance is uncertain, as the Fifth Circuit has recently granted defendants• interlocutory appeal.

3.  In re Visa Check/Mastermoney Antitrust Litigation, 2001 U.S. App. LEXIS 22480 (2d Cir. October 17, 2001) (affirming certification of several million member class in antitrust litigation alleging illegal tying arrangement).  Although it granted defendants• Rule 23(f) interlocutory appeal, the Second Circuit affirmed the District Court•s certification of this class action, both under Rule 23 (b)(3) and also Rule 23(b)(2) - - despite the significant financial damages sought.  Finding both that common issues predominated and that the action would be manageable as a class action, it permitted the issue of the measure of damages to be deferred until after certification (thereby rejecting defendants• objection that damages were highly

9

individualized and speculative).

## F. Securities Fraud Cases

Securities fraud cases have long been among the easiest fraud cases to certify because of special doctrines of presumed reliance, including the •fraud on the market• doctrine accepted by the Supreme Court in Basic, Inc. v. Levinson, 485 U.S. 224 (1988). These doctrines do not, however, apply in all cases, as recent decisions have shown:

1. Newton v. Merrill Lynch, 259 F.3d 154 (3d Cir. 2001). Here, the Third Circuit found that, although reliance could be presumed on defendants• allegedly fraudulent conduct, plaintiffs still remained under an obligation to prove loss causation on an individual basis. This latter obligation precluded any finding of predominance and hence prevented class certification. Plaintiffs alleged that brokers trading NASDAQ securities had breached their duty of best execution by failing to exploit new means (such as ECNs and wholesale services) to obtain prices inside the best bid and asked prices (the •NBBO•) displayed on the NASDAQ screen. An earlier Third Circuit opinion had upheld this legal theory against a motion to dismiss, but remanded on the class certification issue. The district court on remand found that issues of individual reliance and individual damages precluded class certification and that the •fraud on the market• doctrine did not apply because the case did not involve the release of publicly available information about specific securities. The Third Circuit partially agreed with the plaintiffs, finding that a presumption of reliance was appropriate under Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972), because at bottom the case involved an omission (namely, the failure to disclose that their trade execution practices did not comply with the duty of best execution). Although this

10

presumption satisfied plaintiffs' obligation to prove transaction causation, the Third Circuit still found that plaintiffs had failed to show loss causation. Execution at the NBBO price did not necessarily cause a loss; rather, it only did so when superior prices were available inside the NBBO. Absent proof by plaintiffs that superior prices were available in each case (obviously, an individual and fact specific issue), loss causation could not be established. Hence, because no presumption of economic loss was permissible, individual issues predominated over commons ones.

2. <u>Berger v. Compaq Computer Corp.</u>, 257 F.3d 475 (5th Cir. 2001). The Fifth Circuit reversed certification of a securities class action when it found the lead plaintiff was inadequate for purposes of Rule 23(a)(4) and the Private Securities Litigation Reform Act because the lead plaintiff did not sufficiently understand the action's legal and factual basis, took positions at deposition that were inconsistent with the complaint's allegations, and seemed therefore unable to monitor or control his attorneys. <u>Id</u>. at 481 n.10. The actual holding in <u>Compaq</u> may be narrow: namely, that the burden is on the plaintiff to establish adequacy, not on the defendant to rebut it. But, the decision suggests that, at least in PSLRA cases, the plaintiff must be in a position to monitor and control its attorneys by demonstrating its understanding of the case. On this basis, many individual plaintiffs would not qualify, and in all cases class counsel would need to expend considerable time preparing the lead plaintiff for depositions that would predictably become lengthy and difficult.

3. <u>Johnston v. HBO Film Mgmt.</u>, 2001 U.S. App. LEXIS 20425 (3d Cir. September 21, 2001). The Third Circuit affirmed denial of class certification in a RICO action based on a sale of limited partnerships in a case where the evidence showed that oral misrepresentations falsely

11

represented that a famous actor (Michael Douglas) would produce films for the partnership.
Because the presentations made to investors were not uniform and involved material
misrepresentations, rather than simple omissions, the Court found that no presumption of
reliance was justified under either <u>Affiliated Ute</u> or <u>Basic v. Levinson</u>.  Adjudication of the
plaintiffs• claims would, it said, require an individual analysis of each investor's relationship to
the defendants, thereby ensuring that individual issues would predominate over common ones.

   4. <u>Krogman v. Sterritt</u>, 202 F.R.D. 467 (N.D. Tex. 2001).  Purchasers in the over-the-
counter securities market found not entitled to a presumption of reliance under the •fraud on the
market• doctrine where market not shown to be an efficient one.  Evidence showed that there had
been only limited trading and that few market makers and no security analysts followed the
stock; hence, individual detrimental reliance needed to be shown on alleged misrepresentations.

### G. <u>Mass Torts Under Rule 23(b)(3)</u>

   Although it seems highly doubtful that a •litigation• class can be certified in a mass tort
case involving personal injuries, settlement classes appear to remain possible if special
protections and limitations are implemented.  This contrast between a •settlement class• and a
•litigation class• distinguishes two recent cases- - <u>In re Telectronics Pacing Systems, Inc.</u>, 221
F.3d 870 (6th Cir. 2000) <u>Zinser v. Accufix Research Institute, Inc.</u>, 253 F.3d 1180 (9th Cir. 2001) -
- which otherwise involved an identical fact pattern centering on a defective cardiac pacemaker
which tended to fracture after implantation in the heart.  In <u>Telectronics</u>, the District Court
certified a settlement class with ten subclasses and three sub-subclasses in order to accommodate
choice of law differences among the states.  Although the Circuit Court reversed the certification
of the mandatory, non-opt out class, it did not disturb the parallel certification of a Rule 23(b)(3)

class, but remanded to the District Court for further fact finding without commenting on its certification of an elaborate system of subclasses for purposes of the Rule 23(b)(3) damages settlement (which system presumably would not have been •manageable• in a •litigated• class action). In <u>Zinser</u>, however, both the District Court and the Circuit Court refused to certify a litigation class based on the same choice of law grounds, finding that variations in state law resulted in individual questions predominating over common questions. The dissenting judge on the Ninth Circuit panel suggested that these problems could be solved with subclasses, which the District Court could have designed on remand. Still, even if subclasses would solve this problem, it remains uncertain whether such a multi-class structure would have been manageable for trial purposes.

The most optimistic signal for parties seeking to fashion a mass torts settlement is clearly the Third Circuit's approval of the settlement in <u>In re Diet Drugs Prods. Liab. Litig</u>, 263 F.3d 157 (3d Cir. 2001), aff'g 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. April 28, 2000). At least implicitly, this approval strongly suggests that the most practical (and perhaps the only) means to secure certification of a mass torts damages settlement class is to devise a structure of •back end• opt out rights that are triggered as and when the individual class member's condition deteriorates. In <u>Diet Drugs</u>, class members received three additional opt out rights in addition to an initial opt out right at the time of class certification. Although such an open-ended structure does not place an absolute or certain ceiling on the defendant's aggregate liability, the attraction to defendants from such a structure is that those class members who do not opt out initially will waive their claim to punitive damages and will only have claims for compensatory damages if they later opt out.

## II.  Rule 23(b)(2) Classes

13

A. The •Incidental Damages• Standard

Class actions that seek certification under Rule 23(b)(2), which permits certification of an

action seeking injunctive or declaratory relief, are not required to satisfy the predominance and

superiority standards of Rule 23(b)(3).[1]  Obviously, this creates an incentive to seek certification

of an action allegedly for injunctive relief that also (and probably  primarily) seeks monetary

damages.  To guard against such an outflanking of Rule 23(b)(3), some Circuits have held that

only •incidental damages• may be sought under Rule 23(b)(3).  The leading decision so

restricting the scope of Rule 23(b)(2) is Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir.

1998).  Under its •incidental damages• rule, only damages that flow automatically from the fact

of the violation and that were •capable of computation by means of objective standards and not

dependent in any significant way on the intangible, subjective differences of each class member's

circumstances• could be awarded. Id. at 415.  See also Bolin v. Sears Roebuck Co., 231 F.3d 970

(5th Cir 2001).  Thus, in an employment discrimination action, Allison held that class members

could not obtain compensatory damages under Rule 23 (b)(2), but could only seek to certify a

parallel Rule 23(b)(3) action for such damages (if the latter action could satisfy the predominance

and superiority standards).  Some commentators saw the Allison v. Citgo Petroleum rule as the

•death knell• of employment discrimination class actions.  See, e.g., Miller v. Hygrade Food

Prods. Corp., 198 F.R.D. 638 (E.D. Pa. 2001) (de-certifying Title VII class that sought

compensatory damages).

---

[1]Some Circuits do, however require a Rule 23(b)(2) class to meet high standards of •class
cohesion• that may largely overlap with the standards imposed by the predominance test.  See
Barnes v. American Tobacco Company, 161 F.3d 127, 142-43 (3d Cir. 1998) (de-certifying
medical monitoring class because of presence of individual issues that destroyed class cohesion).

In October, 2001, however, the Second Circuit rejected <u>Allison</u>'s •incidental damages•

rule and broadly held that the District Court was required to certify the •pattern-or-practice•

disparate treatment claims in a large employment discrimination case. <u>See</u> <u>Robinson v. Metro-</u>

<u>North Commuter R.R.</u>, 2001 U.S. App. LEXIS 21597 (2d Cir. October 9, 2001). Initially, the

Court distinguished •pattern-or-practice• claims from •disparate impact• claims under Title VII.

Because •pattern-or-practice• cases typically use statistical evidence and focus on class-wide

intentional discrimination, the Court viewed them as more susceptible to class treatment than

cases alleging individual disparate treatment or disparate impact based on facially neutral criteria.

A •presumption of cohesion• arose, it said, when such class-wide intentional discrimination is

alleged. <u>Id</u>. at *36. Although the Court did not order certification of the more individualized

disparate impact claims, it still remanded to the District Court with instructions to certify at least

a partial class action under Rule 23(c)(4)(A) with respect to the liability issues regarding these

claims and to consider in its discretion whether class-wide relief was possible.

Rejecting <u>Allison</u>'s •incidental damages• rule, the Court found that a Rule 23(b)(2) class

seeking non-incidental money damages should be certified if the District Court found that •(1)

the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is

predominant, even though compensatory or punitive damages are also claimed, and (2) class

treatment would be efficient and manageable, thereby achieving an appreciable measure of

judicial economy.• •Insignificant or sham requests for injunctive or declaratory relief• would not

, however, suffice.

The <u>Metro-North</u> decision also significantly revises the structure of the Rule 23(b)(2)

class action because it implies that when non-incidental damages are sought (such as

15

compensatory damages), due process may require the enhanced procedural protections of notice and opt out for absent class members. In effect, Rule 23(b)(3) protections are imported into Rule 23(b)(2). See also Eubanks v. Billington, 110 F.3d 87, 92-94 (D.C. Cir. 1997).

As a result of Metro-North, a substantial split now exists among the Circuits as to the scope of Rule 23(b)(2). In addition to Metro-North's clear impact on employment discrimination litigation, it may arguably invite plaintiffs to plead causes of action that could not today obtain certification (at least in some Circuits) as a Rule 23(b)(2) class for predominantly injunctive relief. Indeed, in the Visa Check/Mastermoney class action, supra, the Second Circuit approved the potential use of a Rule 23(b)(2) class in a high damages antitrust class action. Judicial resistance to attempts to use Rule 23(b)(2) certification in actions seeking non-incidental damages may be stronger outside the context of Title VII litigation, but the likelihood of such attempts still seems predictable.

B. Medical Monitoring Decisions

Certification of medical monitoring classes has frequently been accomplished under Rule 23(b)(2) and sometimes under Rule 23(b)(1)(A). The latest decisions show, however, a developing judicial skepticism when this cause of action is asserted in the absence of adequate epidemiological evidence.

1. In re Marine Asbestos Litig., 2001 U.S. App. LEXIS 20136 (9th Cir. September 10, 2001). The Ninth Circuit here found that plaintiff seamen failed to raise a genuine issue of material fact as to (i) whether an increased risk of disease made medical monitoring necessary, or (ii) whether early detection would provide any medical benefits to the class members. Four elements, it said, needed to be shown before certification was

16

appropriate:

> (1) Were class members significantly exposed to a proven hazardous substance through the negligence of defendant?;
>
> (2) As a proximate result of such exposure, had class members suffered a significantly increased risk of contracting a serious latent disease?;
>
> (3) Did this increased risk make periodic diagnostic medical examination reasonably necessary?; and
>
> (4) Do monitoring and testing programs exist that make early detection and treatment both beneficial and possible?

Unable to find that the seamen's exposure to asbestos necessitated any special diagnostic program or indeed that any such program would be more beneficial than normal periodic medical examinations, the Court denied certification.

2. Zinser v. Accufix Research Institute, Inc., 253 F.3d 180 (9th Cir. 20001). The District Court refused to certify both a money damages class under Rule 23(b)(3) and a medical monitoring class under Rule 23(b)(1)(A). Rule 23(b)1A) authorizes certification where •separate actions create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing certification.• Both the District Court and the Ninth Circuit agreed that the risk that separate adjudications would cause the defendant to pay damages to some and not all plaintiffs was insufficient. In addition, the Ninth Circuit emphasized that the action sought to create a monitoring fund, not a remedial monitoring program, and that the use of such a fund converted the class into an impermissible suit for money damages, which cannot be obtained except under, and in compliance with, Rule 23(b)(3).

Zinser is consistent with several other decisions that have found any attempt to obtain a

17

fund in a medical monitoring case to convert the case into a suit for money damages and hence to make certification inappropriate under either Rule 23(b)(1) or (b)(2).  In Zinser, the fact that a medical monitoring program was already in effect pursuant to the Telectronics litigation made the fund particularly vulnerable to this attack.

Why do plaintiff's attorney seek a fund in medical monitoring cases?  Of course, the future solvency of the defendant may be in doubt (and likely was in Zinser), but another important reason may involve the attorney's own self-interest: a fund can justify an application for attorney's fees under a percentage-of- the recovery fee formula, while injunctive relief, standing alone may necessitate use of the lodestar formula (and probably lesser fees).

3. Rink v. Cheminov, 2001 U.S. Dist. LEXIS 9986 (M.S. Fla. June 6, 2001. This medical monitoring class for persons •exposed• to Malathion insecticide sprayings conducted to eradicate the medfly from eight Florida counties was rejected where the class was inadequately defined in terms of what •exposure• meant.  Plaintiffs failed to show what level of exposure was sufficiently dangerous, what latent diseases were likely to result, and how their proposed program differed from ordinary medical examinations.  The lack of precise definition was especially troubling in a class action that could cover most residents of South Florida.

4. Summary.  At present, the major doctrinal obstacle to medical monitoring lasses involves the claim that the use of a fund converts the action into a suit for money damages.  This argument may, however, be inconsistent with the Second Circuit's view in Metro-North Commuter R. R. Co., supra, that non-incidental damages can be sought in a Rule 23(b)(2) class action so long as they do not •predominate.•  Even if a fund is seen as an impermissible form of money damages, however, there remains the possibility that a medical monitoring class could be

18

certified under Rule 23(b)(3). Here, the obvious claim would be that the •predominating• common issue was the class members• need for monitoring as a result of defendants• alleged negligence. Although defendants would foreseeably respond that the level of each class member•s exposure was an •individual• issue, the class could conceivably be defined in terms of an objective and class-wide benchmark for exposure.

### III.  Rule 23(b)(1) and the Future of the Limited Fund

Both <u>Telectronics</u> and <u>Zinser</u> rejected attempts to certify a Rule 23(b)(1)(B) mandatory, non-opt out class for money damages. Although the facts of the two cases are virtually identical (because both involve the same cardiac pacemaker with the same tragic flaw), the reasoning of the two Courts was considerably different. In <u>Telectronics,</u> the Sixth Circuit reversed the lower court•s certification of a Rule 23(b)(1)(B) class essentially because the settlement reached by the parties had released the defendant•s highly solvent parent from liability. As a result, the Sixth Circuit said that the fund was limited only by the agreement of the parties and thus violated the Supreme Court•s holding in <u>Ortiz v. Fibreboard</u>, 527 U.S. 815 (1999), that a Rule 23(b)(1)(B) fund could not be so limited. In <u>Zinser</u>, there was no settlement agreement, but the attempt to certify a Rule 23(b)(1)(B) class was similarly rejected because there was no limited fund that pre-existed the settlement and because the claims against the defendant had not been sufficiently liquidated, as required by <u>Ortiz.</u>

Yet, if a mandatory, non-opt out class can no longer be certified on the rationale that the corporate defendant•s assets are limited and bankruptcy looms, the parties may still be able to achieve the functional equivalent of a mandatory, non-opt out class through private contracting. Here, a very controversial case now before the federal courts involves the attempt of Sulzer

19

Medica to craft a settlement that as a practical matter precludes opt outs. When in December, 2000 Sulzer recalled some 40,000 hip implants that had been surgically installed in patients (many of them elderly), a wave of individual lawsuits predictably followed that threatened its solvency. But under the novel settlement that Sulzer reached with •friendly• plaintiffs• attorneys, a lien is placed on all of Sulzer•s assets in favor of the settlement class (but not individual tort claimants).. If a class member opts out from the class and brings an individual action, such an individual plaintiff cannot effectively enforce any judgment against Sulzer•s assets prior to 2008 (at the earliest). While much criticized, this settlement has received preliminary approval from U.S. District Judge Cathleen O•Malley in the Northern District of Ohio. If it survives appellate review, it will predictably become the template for future mass torts settlements because the technique can be replicated in virtually any case where corporate insolvency is threatened. Thus, while mandatory, non-opt out settlements had seemed dead, they may have been revived by a case that also raises the same stark ethical and fairness issues that animated the debate over Amchem Products in 1997. Put simply, is it ethical for class counsel to structure a settlement that compels the counsel•s own clients not to exercise their individual due process right to opt out? Stark and indeed emotional issues such as this seem destined to continue to cloud the future of class action practice in the mass torts arena.

20

LEXSEE 1999 U.S. Dist. LEXIS 13186

**DR. ARNULFO MANSUR VELASQUEZ, On Behalf of Himself and the Class of Similarly Situated Customers, Plaintiffs, v. CROWN LIFE INSURANCE COMPANY and BUSINESS MEN'S INSURANCE COMPANY, Defendants.**

**CIVIL ACTION NO. M-97-064 (MDL-1096)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*1999 U.S. Dist. LEXIS 13186*

**August 10, 1999, Decided**

**August 10, 1999, Entered**

**DISPOSITION:**
[*1] Plaintiff's Motion for Class Certification (Docket Entry No. 46) DENIED.

**COUNSEL:**
For ARNULFO MANSUR VELASQUEZ, plaintiff: Michael Stuart Lee, Michael Stuart Lee and Associates, Corpus Christi, TX.

For ARNULFO MANSUR VELASQUEZ, plaintiff: J Mitchell Clark, Attorney at law, Corpus Christi, TX.

For ARNULFO MANSUR VELASQUEZ, plaintiff: Allan Kanner, Conlee Schell Whiteley, Elizabeth B Cowen, Allan Kanner and Associates, New Orleans, LA.

For ARNULFO MANSUR VELASQUEZ, plaintiff: Daniel M Harris, Attorney at Law, Chicago, IL.

For THE CROWN LIFE INSURANCE COMPANY, defendant: Gregory F Burch, Liddell Sapp Zivley Hill & Laboon, Houston, TX.

For THE CROWN LIFE INSURANCE COMPANY, defendant: Edwin R DeYoung, Liddell Sapp Zivley Hill & LaBoon, Dallas, TX.

For THE CROWN LIFE INSURANCE COMPANY, defendant: Roger Brian Cowie, David G Cabrales, Liddell Sapp et al, Dallas, TX.

For THE CROWN LIFE INSURANCE COMPANY, defendant: Adolfo Campero, Jr, Liddell Sapp et al, Houston, TX.

For BUSINESS MEN'S INSURANCE COMPANY, defendant: Brenton N Ver Ploeg, Ver Ploeg & Lumpkin, Miami, FL.

For BUSINESS MEN'S INSURANCE COMPANY, defendant: Ivonne Prieto, Brenton N Ver Ploeg, Miami, FL.

**JUDGES:**
SIM LAKE, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:**
SIM LAKE

**OPINION:**

**ORDER**

Pending before the court is Plaintiff's Motion for Class Certification (Docket Entry No. 46). Plaintiff seeks to certify a class of "all customers who purchased certain life insurance policies from defendant, Crown Life Insurance Company ("Crown Life") and/or defendant Business Men's Insurance Company ("BMI") between, and including the years 1985 to present while living in Central and South America [except for customers living in Mexico]."

In his Original Complaint plaintiff alleges that defendants sold certain "vanishing premium" life

1999 U.S. Dist. LEXIS 13186, *

insurance policies to the members of the proposed class by falsely representing that, under certain projected dividend scenarios, the purchasers of the policies would not have to pay premiums on the policies after a certain number of years. In general, plaintiff alleges that defendants knew that their dividend projections were wrong and could not be realized but failed to disclose this information to their customers. Plaintiff alleges that Crown Life's practices violated its contractual duty of good [*2] faith and fair dealing and Florida insurance laws and that defendants engaged in tortious misconduct. In particular, plaintiff makes the following allegations in his Original Complaint:

13. Life insurance companies should use reasonable assumptions in developing their illustrations. But Crown Life and BMI based its [sic] illustrations on assumptions that had no reasonable basis in reality. Those illustrations (and the sales literature and standardized sales pitches which accompanied them) represented that the Crown Life policies would build up such a substantial cash value and would earn such substantial dividends that, after only five to ten years (depending on the particular policy), the premiums would vanish; and customers would not have to pay any additional monies to maintain their policies. The illustrations showed that the dividends earned on the cash value would be so large that they would be sufficient to pay the premiums on the life insurance policy in the later years while continuing to increase the policy's cash value.

14. In fact, the illustrations given to the Latin American customers were not realized. The cash value of the policies has been much less than Crown [*3] Life projected the dividends have been smaller and customers have been required to pay premiums to keep their policies in force well past the time at which, according to the illustrations, the premiums were to vanish.

15. Crown Life knew that its illustrations were false and misleading at the time the illustrations were given to the customers. The Crown Life "vanishing premium" illustrations were based on assumptions that Crown Life knew, at the time, to be unrealistic and, often, on dividend scales that Crown Life had already reduced or that Crown Life knew that it would be reducing. Also, the illustrations represented that they were based on "current new money interest rates," when in fact, the actual current new money interest rates in effect were different. Moreover, the illustrations did not show that the policies may (indeed, were likely to) collapse in later years and require additional premiums.

...**MANSUR ILLUSTRATION AND POLICY**

18. Dr. Mansur's situation typifies the general problem. Dr. Mansur, then a resident of Colombia,

purchased a Crown Life policy through BMI in Miami in 1986. Dr. Mansur was told, and given an illustration showing, that if he purchased [*4] the Crown Life policy he would receive lifetime life insurance coverage with more than $ 100,000 in death benefits, that by the time he was 65 the total cash value of the policy (available at the end of that year) would be $ 123,816 and that the death benefits at age 65 would be $ 220,252. Dr. Mansur was told, and given an illustration showing, that he would only be required to pay annual premiums of $ 1,120 for nine years and that the policy would sustain itself thereafter.

...20. Crown Life knew at the time of the sale (and BMI should have known) that the illustration given to Dr. Mansur was false and misleading, as it was based on assumptions which Crown Life knew at that time to be inaccurate, unsound and unrealistic. Crown Life and BMI did not disclose this fact to Dr. Mansur. Rather, Crown Life continued to bill and collect premiums from him through its agent BMI in Miami. Dr. Mansur did not realize that he had been deceived until recently, when (contrary to the illustration) he was required to continue making premium payments to keep his policy in force.

**CLASS ACTION ALLEGATIONS**

21. Plaintiff's situation is typical. Acting through its agent BMI in Miami, Crown Life [*5] sold universal life insurance policies to, and collected premiums from, hundreds of Latin American customers using the same (or very similar) fraudulent misrepresentations, inaccurate illustrations and misleading omissions. n1

n1 Plaintiffs' Original Complaint, Docket Entry No. 1, pp. 4-7.

Plaintiff argues that the proposed class is properly certifiable under Fed. R. Civ. P. 23(b)(2) and (3). Defendants contest class certification arguing that a 23(b)(2) class is not certifiable because the principal relief sought by plaintiff is damages and that a Rule 23(b)(3) class is not certifiable because individual issues predominate and because a class action is not the superior method of resolving the individual claims of the proposed class action members.

For purposes of the pending motion the court assumes, and defendants do not seriously contest, that plaintiff has satisfied Rule 23(a)'s threshold requirements of numerosity, commonality, typicality, and adequacy of representation. The court will therefore address [*6] the requirements of Rule 23(b).

Plaintiff argues that class certification is appropriate under Rule 23(b)(2) since plaintiff in his complaint seeks

Case 1:00-cv-00053  Document 63  Filed in TXSD on 01/22/2002  Page 92 of 96

a judgment "declaring defendant Crown Life's practice of selling insurance policies through misleading illustrations to be a breach of contract and deceptive insurance practice" n2 and "requiring defendants to account to the members of the plaintiff class for all wrongfully obtained monies or benefits." n3 It is clear from the complaint, however, that the primary relief plaintiff seeks is actual and punitive damages. In each of the three counts in the complaint plaintiff alleges that as a result of defendants' conduct plaintiff and the members of the proposed class suffered actual and punitive damages. n4 Since plaintiff's predominant claims are for monetary damages, plaintiff's incidental request for declaratory relief does not make this case appropriate for certification under Rule 23(b)(2). See *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 411-416 (5th Cir. 1998).* The damages plaintiff seeks do not "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declarative [*7] relief." *Allison, 151 F.3d at 415.* Instead, the actual and any punitive damages allegedly due members of the proposed class would have to be separately calculated based on the facts of the defendants' alleged misrepresentation, breach, and/or tortious conduct against each member of the class, and the amount that each class member was damaged "as a direct and proximate result" of defendants' conduct. n5 The court therefore declines to certify a class under Rule 23(b)(2).

> n2 Plaintiff's Original Complaint, Docket Entry No. 1 at p. 12.
>
> n3 Id. at p. 13.
>
> n4 Id. at pp. 10-12.
>
> n5 See Plaintiff's Original Complaint at PP 30, 35, and 40.

To obtain class certification under Rule 23(b)(3) plaintiff must establish that questions of law and fact common to the members of the class "predominate" over questions that only affect individual class members, and that a class action is superior to other means of fairly and efficiently adjudicating the controversy. To establish predominance, [*8] plaintiff argues that Crown Life knowingly prepared false illustrations to be disseminated to brokers for use in selling policies and that this common practice makes class certification appropriate notwithstanding any individual difference in the brokers' sales pitches. Crown Life responds that the policies were sold throughout Central and South America by brokers who made their own particularized written and oral presentations to each member of the proposed class, and that individualized fact issues about what was told each

buyer, and the facts of each buyer's reliance, as well as individualized defenses, including the statute of limitations, make class certification under Rule 23(b)(3) inappropriate.

The parties have conducted discovery on the class certification issues, and both sides rely on affidavits, depositions, and other discovery documents to support their positions. One of the principal witnesses relied upon by both sides is Brent M. Bush, who was formerly a regional vice-president of Crown Life and is now a vice-president for BMI. Plaintiff relies on Bush's testimony that all of the materials and illustrations used to sell the policies were prepared by Crown Life, that [*9] the illustrations used for the policies sold in Central and South America did not differ among the various countries, and that agents had no authority to alter the illustrations or the terms and conditions of the policies. Although Bush stated in his affidavit that the illustrations "were customized as to each prospective policy holder's needs ...," n6 the court does not view customized illustrations as necessarily an impediment to class certification since in the same paragraph of his affidavit Bush acknowledged that the customized illustrations were generated on computer software provided by Crown Life using a number of "policyholder specific factors." If, as plaintiff alleges, the underlying assumptions built into the illustrations were misleading, the fact that individualized illustrations were prepared based on those underlying assumptions does not necessarily make the use of the illustrations an individualized issue that would preclude class certification under Rule 23(b)(3).

> n6 Affidavit of Brent M. Bush at P 7, Exhibit 1 in support of Crown Life's Response to Plaintiff's Motion for Class Certification, Docket Entry No. 52.

[*10]

The more fundamental problem with plaintiff's argument is what happened after the illustrations were generated and shown to customers and how those facts, to the extent they are relevant under the three causes of action alleged, bear on the issue of predominance. In a case like this involving potential class members from numerous jurisdictions the Fifth Circuit has explained that in making the predominance analysis this court must determine how variations in the laws of the potential forums could affect the issue of predominance as well as the issue of superiority. *Castano v. American Tobacco Co., 84 F.3d 734, 743 (5th Cir. 1996).* Castano makes clear that plaintiff must identify the applicable substantive law and explain how under that law common

1999 U.S. Dist. LEXIS 13186, *

issues of law and fact predominate. Instead of doing this, however, plaintiff has assumed that the substantive law of Florida applies to the claims of all proposed class members.

Both Texas and federal choice of law principles look to the Restatement (Second) of Conflicts of Laws for deciding choice of law questions. Since each of the alleged class members contracted in his or her home country based on representations [*11] made there, and each has had to pay additional premiums there, the court concludes that under the most significant relationship test of Restatement (Second) of Conflicts of Laws § 145(2) (as to plaintiff's tort claims), § 148(1) (as to plaintiff's misrepresentations claims), and § § 188(2) and (3) (as to plaintiff's breach of contract claims), the Central and South American countries in which the policies are sold would have the most significant relationships with the claims of the proposed class members, and the laws of each of those countries would apply.

Since plaintiff has not explained what, if any, substantive laws in the home countries of the proposed class members are most analogous to the three causes of action alleged, the court cannot consider how potential variations in the laws of those countries affect either predominance or superiority. In fact, as discussed below, neither side has even set out the elements of the three causes of action under Florida law.

In his Memorandum in Support of Plaintiff's Motion for Class Certification plaintiff lists a number of common issues of law and fact. Plaintiff only expends minimal effort, however, explaining how those alleged common [*12] issues of law and fact are relevant to the three causes of action alleged. n7 In its Response n8 Crown Life takes the opposite tact from plaintiff and sets out a host of individualized issues, which Crown Life argues make class certification under Rule 23(b)(3) inappropriate. Like plaintiff Crown Life fails to set out the elements of the plaintiff's three causes of action under the law of Florida or any other particular forum and fails to relate the alleged dissimilarities among the class members' individual cases to the elements of their three causes of action. In attempting to make the Castano analysis, the court is thus presented with no more than the bare bones allegations of the three counts of the complaint and lists of allegedly common and dissimilar issues of fact and law.

n7 See Memorandum, Docket Entry No. 47 at pp. 18-19.

n8 Docket Entry No. 51.

Having carefully considered the allegations in the complaint the court concludes that class certification under Rule 23(b)(3) is not appropriate [*13] because individualized issues predominate. Although plaintiff alleges that defendants used "fraud and misrepresentation" n9 and engaged in "fraudulent misrepresentations," n10 plaintiff does not specifically assert a cause of action for fraud. However, each of the three causes of action that plaintiff does allege implicates issues of reliance and causation, which are the aspects of a fraud claim that the Fifth Circuit has cited in holding that fraud claims are not normally certifiable under Rule 23(b)(3). n11

n9 Plaintiff's Original Complaint at P 2.

n10 Id. at P 21.

n11 See *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973)* ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action.").

For example, in Count One, the claim for breach of contractual right of good faith and fair dealing, plaintiff alleges that defendants "continued to bill [*14] and collect premiums without disclosing that the illustrations given to customers are false and misleading." n12 In Count Two, the claim for unfair and deceptive insurance practices under Florida Statutes 626.9521 and 626.9541, plaintiff alleges that defendants' "knowingly false and misleading illustrations" were unfair and deceptive insurance practices. n13 In Count Three, the tortious misconduct claim, plaintiff alleges that defendants used "false and misleading illustrations and sales pitches." n14 In all three counts plaintiff alleges that "as a direct and proximate result of [defendants' conduct] 'plaintiffs and other class members were damaged in an amount to be proved at trial.'" n15

n12 Plaintiff's Original Complaint at P 29.

n13 Id. at P 34.

n14 Id. at P 38.

n15 Plaintiff's Original Complaint at PP 30, 35, and 40.

In assessing plaintiff's request for class relief this court must "conduct a rigorous analysis of the rule 23

prerequisites before certifying a class." *Castano, 84 F.3d at 740.* **[*15]** Having attempted to perform that analysis, the court is persuaded that each of the three causes of action alleged by plaintiff has within it individualized questions of misrepresentation, scienter, reliance, and causation that predominate over common questions related to the allegedly false assumptions that underlie defendants' illustrations. The court is led to this conclusion by several factors.

First, the allegations in the complaint cited and quoted above are not limited to the illustrations themselves. Plaintiff complains that defendants used standardized "sales literature and standardized sales pitches," n16 that defendants used "the same (or very similar) fraudulent misrepresentations," n17 and that defendants used "false and misleading illustrations and sales pitches." n18 Although plaintiff never specifically uses the word "reliance" in his complaint, the general tenor of the complaint is that neither plaintiff nor other alleged class members would have purchased the policies had they not relied on the illustrations and other false representations they allege. As plaintiff states in his reply: "Simply, plaintiff's contention is that no one would have bought these policies **[*16]** without the fraudulent illustrations which accompany them." n19

> n16 Id. at P 13.
>
> n17 Id. at P 21.
>
> n18 Plaintiff's Original Complaint at PP 38 and 39.
>
> n19 Reply, Docket Entry No. 56 at p. 19.

Second, Mr. Bush's declaration establishes that the decisions to purchase the policies were based on individualized presentations by some 300 sales agents in South and Central America. n20

8. The decision on whether to show a potential customer an illustration, and if so, what type of illustration, was left to the discretion of the sales agents at the point of sale. Any such illustrations were almost always presented to the policy holders in person at face-to-face meetings where the Central or South American sales agent would explain the illustration to the policy holder. Although BMI kept agents informed about the various insurance products available through Crown Life, there was no standard sales presentation or centralized sales training for the Central and South American sales agents. The only **[*17]** way I know of to determine what was discussed with any given policy holder about the illustration (if any) or about the Crown Life policy is to personally interview the sales agent and

policy holder. Additionally, neither Crown Life nor BMI regularly maintained copies of the illustrations, if any, shown to policy holders during the sales process. n21

> n20 Affidavit of Brent M. Bush at P 5, Exhibit 1 in support of Crown Life's Response to Plaintiff's Motion for Class Certification, Docket Entry No. 52.
>
> n21 Affidavit of Brent M. Bush at P 8, Exhibit 1 in support of Crown Life's Response to Plaintiff's Motion for Class Certification, Docket Entry No. 52.

Finally, the facts of Dr. Mansur's claim, which he alleges "typifies the general problem" n22 illustrate the predominance of individualized issues over the alleged common issues related to the allegedly false assumptions underlying the illustrations. Dr. Mansur alleges that "he was told and given an illustration showing, that if he purchased the Crown Life **[*18]** policy he would receive lifetime life insurance coverage with more than $ 100,000 in death benefits" and that he was "told, and given an illustration showing, that he would only be required to pay annual premiums of $ 1,120 for nine years and that the policy would sustain itself thereafter." n23 Dr. Mansur alleges that he "did not realize that he had been deceived until recently, when (contrary to the illustration) he was required to continue making premium payments to keep his policy in force." n24 Dr. Mansur admitted in his deposition that he does not have a copy of the illustration and relied principally upon what the agent told him, rather than upon the illustration. For example, Dr. Mansur testified that "actually, to the best of my recollection, I hardly remember looking at the illustration as I was very -- all the time very attentive of what the person from Crown Life and from Businessmen's were telling me, because there was a lot of information that was crossing to me at that moment." n25

> n22 Plaintiff's Original Complaint at P 18.
>
> n23 Id.
>
> n24 Plaintiff's Original Complaint at P 20. **[*19]**
>
> n25 Mansur Deposition at p. 83, Exhibit 3 in support of Crown Life's Response to Plaintiff's Motion for Class Certification, Docket Entry No. 52.

Case 1:00-cv-00053   Document 63   Filed in TXSD on 01/22/2002   Page 95 of 96

If, as Dr. Mansur alleges, his situation is typical of the members of the class he seeks to certify, then as to each alleged class member the court would have to determine what particular representations were made, whether and to what extent that class member relied upon those representations, whether that reliance was reasonable, whether the representations were based in whole or part on any common assumption underlying Crown Life's illustration, and if so, whether and to what extent the illustrations were relied upon by the class member. n26 Crown Life also points out that the policy issued to Dr. Mansur contains Spanish language, which, according to Crown Life, means "premiums payable for life." Although Dr. Mansur did not have that understanding of the language in question, nor did he rely upon the language of the policy, Crown Life raises the policy language and disclosures in the illustrations that accompanied Dr. Mansur's policy as the basis [*20] both for possible defenses and for creating a fact issue about whether Dr. Mansur could have reasonably relied on the representations allegedly made to him by defendants' agent.

> n26 See *Simon, 482 F.2d at 882* ("Courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action.").

Having carefully considered the parties' arguments the court concludes that plaintiff has failed to show that common issues of law or fact predominate. Not only has plaintiff failed to show what the substantive laws are in each alleged class member's home country or how any differences in those laws would affect the predominance analysis, but, even assuming arguendo that Florida law applied, plaintiff has failed to show that common issues of law or fact predominate over the individualized issues that would necessarily have to be resolved in assessing the claims of each individual class member.

To obtain class certification under [*21] Rule 23(b)(3) the plaintiff must also show that a class action is superior to other means of adjudication. Although Rule 23(b)(3) sets out several factors for the court to consider, in this case the court is persuaded that two of those factors make it clear that a class action would not be the superior method of adjudicating the claims of the proposed class members. First, this is not a case in which the damages alleged by each member are so insignificant that no individual class member would have an economic incentive to pursue his own case. As transferee MDL judge in the Crown Life "vanishing premium" cases, the court has monitored a number of cases brought by individual plaintiffs that have been prosecuted with vigor.

The second factor that strongly militates against a finding of superiority is the difficulty of managing this case as a class action. The court would be faced with having to determine the legal standards and remedies applicable in each class member's home country and with having to resolve logistical problems inherent in litigating a case in which the plaintiffs and many other key fact witnesses live abroad. Cf. *Delgado v. Shell Oil Co., 890 F. Supp. 1324, 1365-71 (S.D. Tex. 1995).* [*22] The court concludes that it would not be manageable or convenient to litigate this case as a class action.

For the reasons explained above Plaintiff's Motion for Class Certification (Docket Entry No. 46) is **DENIED.** Counsel are **ORDERED** to confer and present the court with a proposed scheduling order within ten days from the entry of this Order for the completion of discovery and the filing of any additional motions. Given the age of this case the court is not inclined to approve any schedule that does not require the completion of discovery and filing of all motions by the end of November 1999. The court will conduct a scheduling conference on August 27, 1999, at 3:00 p.m., in Court Room 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas. If counsel wish to participate by telephone, they should inform the court's case manager by letter at least two days before the day of the conference.

**SIGNED** at Houston, Texas, on this 10th day of August, 1999.

SIM LAKE

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FLORES, Individually and On Behalf<br>of All Others Similarly Situated | * <br> * <br> * | |
| VS. | * <br> * | **CIVIL ACTION NO. B-00-053** |
| CERTUS HEALTHCARE, L.L.C.;<br>NOVOPHARM LIMITED; DAVID<br>RODRIGUEZ; DR. ASHOK K. GUMBHIR;<br>and NOVOPHARM HOLDINGS, INC. | * <br> * <br> * <br> * | |

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>

On this day came on for consideration Plaintiff's Motion to Remand and Defendants Novopharm Limited and Novopharm Holdings, Inc.'s response thereto, and the Court, having considered the evidence and argument of counsel, is of the opinion that said Motion for Class Certification should be denied. It is therefore

ORDERED that Plaintiff's Motion for Class Certification be, and it is hereby, DENIED.

SIGNED this _____ day of _____, 2002 at Brownsville, Texas.

_____
JOHN WM. BLACK
UNITED STATES MAGISTRATE JUDGE